# EXHIBIT 1



**ACE American Insurance Company**

# Global Premises Pollution Liability Insurance Policy
## *Declarations*

**This Policy is issued by the stock insurance company identified above (herein called *the Insurer*).**

**THIS IS A CLAIMS-MADE AND REPORTED POLICY.  PLEASE READ THIS POLICY CAREFULLY. SOME OF THE PROVISIONS CONTAINED IN THIS POLICY RESTRICT COVERAGE, SPECIFY WHAT IS AND IS NOT COVERED AND DESIGNATE YOUR RIGHTS AND DUTIES.  LEGAL DEFENSE EXPENSES ARE SUBJECT TO AND WILL ERODE THE LIMITS OF LIABILITY AND ANY APPLICABLE SELF-INSURED RETENTION.**

**THE DECLARATIONS, TOGETHER WITH THE COMPLETED AND SIGNED APPLICATION, THIS POLICY, AND ANY ENDORSEMENTS OR SCHEDULES ATTACHED HERETO, CONSTITUTE THE INSURANCE POLICY.**

| Policy No.: GPI G24890491 001 | Renewal of: New |
|---|---|

| **Item 1.** | First Named Insured: Address: | **Formosa Plastics Corporation, USA** **9 Peachtree Hill Road** **Livingston, NJ 07039** |
|---|---|---|

| **Item 2.** | | **COVERAGE A. –** New Pollution Conditions Coverage | |
|---|---|---|---|
| **a. Policy Period** local time of the address shown in Item 1 | **Policy Inception Date:** **07/01/2010** 12:01 A.M. | | **Policy Expiration Date:** **07/01/2015** 12:01 A.M. |
| **b. Limits of Liability** per "pollution condition" | **$45,000,000** | | |
| **c. Limits of Liability** aggregate all "pollution conditions" | **$45,000,000** | | |
| **d. Self-Insured Retention** | **As per Endorsement # 002** | | |
| | ☐ Coverage **A.** not provided under this Policy (all fields in Item **2.** are left blank) | | |

| **Item 3.** | | **COVERAGE B. –** Pre-Existing Pollution Conditions Coverage | |
|---|---|---|---|
| **a. Policy Period** local time of the address shown in Item 1 | **Policy Inception Date:** **07/01/2010** 12:01 A.M. | | **Policy Expiration Date:** **07/01/2015** 12:01 A.M. |
| **b. Limits of Liability** per "pollution condition" | **$45,000,000** | | |
| **c. Limits of Liability** aggregate all "pollution conditions" | **$45,000,000** | | |
| **d. Self-Insured Retention** | **As per Endorsement #002** | | |
| | ☐ Coverage **B.** not provided under this Policy (all fields in Item **3.** are left blank) | | |

| **Item 4.** | | **COVERAGE C. –** Foreign Jurisdiction Pollution Conditions Coverage | |
|---|---|---|---|
| **a. Policy Period** local time of the address shown in Item 1 | **Policy Inception Date:** **07/01/2010** 12:01 A.M. | | **Policy Expiration Date:** **07/01/2015** 12:01 A.M. |
| **b. Limits of Liability** per "pollution condition" | **$45,000,000** | | |
| **c. Limits of Liability** aggregate all "pollution conditions" | **$45,000,000** | | |
| **d. Self-Insured Retention** | **As per Endorsement #002** | | |
| | ☐ Coverage **C.** not provided under this Policy (all fields in Item **4.** are left blank) | | |

| Item 5. | Limits of Liability:<br>***Total Policy & Program Aggregate*** | **$45,000,000** |
|---|---|---|
| Item 6. | Premium:<br>NJ PLIGA TAX:<br>Total: | **$1,047,489.00**<br>**$9,427.40**<br>**$1,056,916.40**<br>**(The entire amount of this premium shall be 100% minimum earned as of the first day of the Policy Period indicated in Item.s 2.a., 3.a., and 4.a., respectively.)** |
| Item 7. | Producer:<br>Name & Address | **Marsh USA**<br>**44 Whippany Road, Cn 1966**<br>**Morristown, NJ 07962** |

| Item 8. | | |
|---|---|---|
| | **a. Notice of Claim or Pollution Condition** | **b. All other Notices** |
| **Notices** | Environmental Risk Claims Manager<br>ACE USA Claims<br>P.O. Box 5103<br>Scranton, PA 18505-0510<br>Fax: (866) 635-5687<br><br>First Notice Fax: (800) 951-4119<br>First Notice Email:<br><u>CasualtyRiskEnvironmentalFirstNotice@acegroup.com</u> | Environmental Risk Underwriting Officer<br>ACE Environmental Risk<br>P.O. Box 1000<br>436 Walnut Street – WA 07A<br>Philadelphia, PA 19106 |
| | **24 Hour Emergency Response Hotline** | **1-888-310-9553** |

| Item 9. | Covered Locations: | **Per the list of locations submitted and on file with the underwriter, and referenced below:**<br>1. Formosa Plastics Corporation, Delaware (DE)<br>Schoolhouse Road<br>Delaware City, DE 19706<br><br>2. Formosa Plastics Corporation, Louisiana (LA)<br>P.O. Box 271<br>Gulf States Road<br>Baton Rouge, LA 70821<br><br>3. Formosa Plastics Corporation, U.S.A.<br>9 Peach Tree Hill Road<br>Livingston, NJ 07039<br><br>4. Nan Ya Plastics Corporation, America<br>P.O. Box 939<br>140 E. Beulah Road (aka, Beulah & 52 South)<br>Lake City, SC 29560<br><br>5. Nan Ya Plastics Corporation U.S.A.<br>2081 FM 102 Rd. (aka 77 Highway 59)<br>Wharton, TX 77448<br><br>6. Nan Ya Plastics Corporation USA<br>8989 North Loop Road East<br>Houston, TX 77029<br><br>7. Nan Ya Plastics Corporation, America<br>5561 Normandy Road<br>Batchelor, LA 70715<br><br>8. Inteplast Group Ltd.<br>101 Inteplast Blvd.<br>Lolita, TX 77971 |
|---|---|---|

9. Inteplast Group, Ltd.
10300 North Loop Road East
Houston, TX 77029

10.  Inteplast Group Ltd.
291 Industrial Drive
Saint John, New Brunswick, Canada

11.  Inteplast Group Ltd.
7503 Vantage Place
Delta, British Columbia, Canada

12.  Inteplast Group Ltd.
455 Somerset Avenue, Building #3
North Dighton, MA

13. Neumin Production Company
Lavaca Pipeline Company (see figure depicting pipeline system)
Formosa Hydrocarbons Company, Inc.
103 Fannin Road
Point Comfort, TX 77978

14. Formosa Plastics Corporation, Illinois
19800 Old Route 36 West
Illiopolis, IL 62539

15. Formosa Utility Venture, Ltd.
101 Formosa Drive
Point Comfort, TX

16. Formosa Plastics Corporation, Texas
(FPC TX) and
Effective 1/1/2006 Formosa Plastics Corporation America
201 Formosa Drive
Point Comfort, TX 77978

J-M Manufacturing Company, Inc. locations (formerly owned by FPC)

17.  1051 Sperry Road
Stockton, CA95206

18. 10900 Hemlock Avenue
Fontana, CA 92335

19. P.O. Box 731
Umatilla, OR 97882

20. 1742 E. Plattville Road
Pueblo West, CO 81007

21. 1314 W. 3rd Street
Wilton, IA 52778

22. 743 Main Street
Winnabago, MN 56092

23. 35 Grant Street
Franklin, PA 16323

| | | |
|---|---|---|
| | | 24. P.O. Box 99<br>Batchelor, LA 70715<br><br>25. Ryan Station Road<br>Butner, NC 27509<br><br>26. 790 S. Main Street<br>Newberry, FL 32669<br><br>27. P.O. Box 185<br>Green Cove, FL 32043<br><br>28. 700A Highway 59<br>Wharton, TX 77488<br><br>29. 315 Grant Street<br>Meadville, PA<br><br>30. P.O. Box 71<br>2101 J-M Drive<br>Adel, GA 31620<br><br>31. All oil/gas production wells and natural gas distribution network owned/operated by Neumin Production Company, Neumin Oil and Gas, LLC, and Lavaca Pipe Line Company<br><br><br>☐ if checked here, schedule of Covered Locations is designated via endorsement. |

**Policy Form No.** <u>PF- 26144 (01/09)</u> Global Premises Pollution Liability Insurance Policy

**Endorsements and Notices Attached at Policy Issuance:**

| Endorsement Number: | Form Number: | Form Name: |
|---|---|---|
| | PF-26144 (01/09) | Global Premises Pollution Liability Insurance Policy |
| 001 | PF-24588 (03/08) | Naturally Occurring Materials Endorsement |
| 002 | PF-26153 (01/09) | Aggregated Self-Insured Retention (Coverages A., B. And C.) Endorsement |
| 003 | PF-26156 (01/09) | Asbestos Coverage (Bodily Injury & Property Damage Only) Endorsement |
| 004 | PF-26160 (01/09) | Automatic Acquisition Upon Due Diligence (Additional Premium) Endorsement |
| 005 | PF-26161 (01/09) | Business Interruption And Delay Expense Endorsement |
| 006 | PF-26173 (01/09) | Schedule Of Covered Locations (Coverage B.) Endorsement |
| 007 | PF-26183 (01/09) | Deletion Of Discovery Coverage (Coverage B.) Endorsement |
| 008 | PF-26186 (01/09) | Basic Extended Reporting Period (90 Days) Endorsement |
| 009 | PF-26188 (01/09) | Schedule Of Foreign Subsidiaries |
| 010 | PF-26196 (01/09) | Identified Contamination Exclusion |
| 011 | PF-26201 (01/09) | Jurisdiction And Venue And Choice Of Law (Deletion) Endorsement |
| 012 | PF-26203 (01/09) | Schedule Of Known Conditions (Documents) Endorsement |
| 013 | PF-26206 (01/09) | Lead-Based Paint Coverage (Bodily Injury & Property Damage Only) Endorsement |
| 014 | PF-26212 (01/09) | Schedule Of Named Insureds Endorsement |
| 015 | PF-26220 (01/09) | Notice Of Cancellation (90 Days) Endorsement |
| 016 | PF-26226 (01/09) | Other Insurance (Primary – Except) Endorsement |
| 017 | PF-26238 (01/09) | Transportation Coverage Endorsement |
| 018 | PF-26598 (03/09) | Schedule Of Named Insureds (Broad) Endorsement |
| 019 | PF-27565 (06/09) | Anti-Stacking Endorsement |
| 020 | PF-27902b (08/09) | Catastrophe Management Endorsement (GPPL) |
| 021 | MANU (06/10) | Coverage Limitation And Reopener II Endorsement |
| 022 | MANU (05/10) | Location-Specific Pollution Conditions Exclusionary (Deepwater Horizon) (GPPL) Endorsement |
| 023 | MANU (06/10) | Non-Owned Disposal Sites Coverage (Blanket/Scheduled - New Waste And Historical Waste) Endorsement |
| 024 | MANU (5/10) | Asbestos, Lead-Based Paint And Punitive Damages (Sublimit) Endorsement |
| 025 | PF-23728 (01/08) | Terrorism Risk Insurance Act Endorsement |
| 026 | TRIA11b (1/08) | Disclosure Pursuant To Terrorism Risk Insurance Act |
| 027 | LD-2S76 (03/92) | New Jersey Changes - Cancellation And Nonrenewal |

| 028 | ALL-21101 (11/06) | Trade Or Economic Sanctions Endorsement |
| 029 | CC-1K11e  (02/06) | Signature Endorsement |
|  | ALL-20887 (10/06) | ACE Producer Compensation Practices & Policies |
|  | IL P 001 01 04 | U.S. Treasury Department's Office Of Foreign Assets Control ("OFAC") Advisory Notice To Policyholders |

**IN WITNESS WHEREOF, the Insurer has caused this Policy to be countersigned by a duly authorized representative of the Insurer.**

DATE: _____July 1, 2010_____          _____
                    MO/DAY/YR                                      AUTHORIZED REPRESENTATIVE



**ACE American Insurance Company**

# Global Premises Pollution Liability Insurance Policy

**This Policy is issued by the stock insurance company identified above (herein called *the Insurer*).**

**THIS IS A CLAIMS-MADE AND REPORTED POLICY. PLEASE READ THIS POLICY CAREFULLY. SOME OF THE PROVISIONS CONTAINED IN THIS POLICY RESTRICT COVERAGE, SPECIFY WHAT IS AND IS NOT COVERED AND DESIGNATE YOUR RIGHTS AND DUTIES. LEGAL DEFENSE EXPENSES ARE SUBJECT TO AND SHALL ERODE THE LIMITS OF LIABILITY AND ANY APPLICABLE SELF-INSURED RETENTION.**

Throughout this Policy the words *the Insurer* shall refer to the company providing this insurance. Other words and phrases that appear in quotation marks have special meanings and are defined in Section **V., DEFINITIONS**.

In consideration of the payment of the premium and in reliance upon all statements made in the Application to this Policy, including the information furnished in connection therewith, and subject to all terms, definitions, conditions, exclusions and limitations of this Policy, the Insurer agrees to provide insurance coverage to the "insured" as described herein.

## I.    INSURING AGREEMENTS

The Insurer agrees to pay on behalf of the "insured", or in such jurisdictions where the Insurer may be prevented by law from paying on behalf of the "insured", the Insurer shall indemnify the relevant "named insured" pursuant to Coverage **C.**, below, for:

**A.**    NEW POLLUTION CONDITIONS (Coverage **A.**)

"Claims", "remediation costs", and associated "legal defense expenses", in excess of the "self-insured retention", arising out of a "pollution condition" on, at, under, or migrating from a "covered location", provided the "claim" is first made, or the "insured" first discovers such "pollution condition" during the "policy period". Any such "claim" must be reported to the Insurer, in writing, during the "policy period" or any applicable "extended reporting period". Any such discovery of a "pollution condition" must be reported to the Insurer in writing during the "policy period".

The coverage afforded under this Coverage **A.** only applies to "pollution conditions" that first commence, in their entirety, on or after the inception date identified in Item **2.a.** of the Declarations to this Policy.

**B.**    PRE-EXISTING POLLUTION CONDITIONS (Coverage **B.**)

"Claims", "remediation costs", and associated "legal defense expenses", in excess of the "self-insured retention", arising out of a "pollution condition" on, at, under, or migrating from a "covered location", provided the "claim" is first made, or the "insured" first discovers such "pollution condition" during the "policy period". Any discovery of a "pollution condition" must be reported to the Insurer in writing during the "policy period". Any such "claim" must be reported to the Insurer, in writing, during the "policy period" or any applicable "extended reporting period".

The coverage afforded under this Coverage **B.** only applies to "pollution conditions" that first commenced, in whole or part, prior to the inception date identified in Item **3.a.** of the Declarations to this Policy.

**C.**    FOREIGN POLLUTION CONDITIONS (Coverage **C.**)

"Foreign subsidiary loss", in excess of the "self-insured retention", for which the "first named insured" or other "named insured":

**1.**    Has reimbursed its "foreign subsidiary" in response to a "foreign subsidiary claim"; or

**2.**    Represents and warrants that it has an obligation to reimburse or indemnify its "foreign subsidiary" in response to a "foreign subsidiary claim" and that such reimbursement or indemnification obligation pre-dated the "foreign subsidiary loss" upon which the "foreign subsidiary claim" is premised.

The coverage afforded to the "first named insured" or other "named insured" under this Coverage **C.** only applies to "foreign subsidiary claims" that:

**1.**    Are first made against the "first named insured" or other "named insured" and reported to the Insurer in writing during the "policy period", or, if elected, the "extended reporting period"; and

**2.**    Arise out of "pollution conditions" and associated "foreign subsidiary loss" that would have otherwise been covered pursuant to Coverages **A.** or **B.**, above, or any  Supplemental Coverages added to this Policy by

endorsement, if such "foreign subsidiary loss" had been a "claim", "remediation cost" or associated "legal defense expense" received or incurred directly by an "insured" under this Policy.

It is also a condition precedent to any indemnification obligation under this Coverage **C.**, that, upon receipt of a "foreign subsidiary claim" to which this insurance may apply, in whole or in part, the "first named insured" or other "named insured" have a right to assume control of the investigation, adjustment, defense and settlement of any alleged "foreign subsidiary loss" pursuant to Section **III., DEFENSE AND SETTLEMENT**, Subsection **F.**, and immediately assign those rights to the Insurer.

## II.    LIMITS OF LIABILITY AND SELF-INSURED RETENTION

**A.**    It is expressly agreed that the Insurer's obligation to pay for any covered "claims", "remediation costs", "foreign subsidiary loss" or "legal defense expense" shall attach to the Insurer only after the "first named insured" shall have paid, or, in the event of a "foreign subsidiary claim" under Coverage **C.**, have provided evidence to the Insurer that a "named insured" or "foreign subsidiary" has paid, the full amount of the "self-insured retention". Under no circumstances shall the Insurer be liable to pay any amount within the "self-insured retention". In the event that the "first named insured" cannot provide satisfactory evidence that a "named insured" or "foreign subsidiary" has paid the full amount of the "self-insured retention" with respect to any "pollution condition" resulting in a "foreign subsidiary claim" under Coverage **C.** of this Policy, the "first named insured" shall remain responsible to pay the "self-insured retention" before the Insurer's payment obligation under this Policy shall attach.

**B.**    One "self-insured retention" shall apply to all "claims", "remediation costs", "foreign subsidiary loss" and "legal defense expense" arising from the same, continuous, repeated, or related "pollution condition".

**C.**    With respect to Coverage **A.**, and subject to Subsections **D.** and **I.**, below, the most the Insurer shall pay for all "claims", "remediation costs", and associated "legal defense expenses" arising from the same, continuous, repeated, or related "pollution condition" is the Limit of Liability identified in Item **2.b.** of the Declarations.

**D.**    With respect to Coverage **A.**, and subject to Subsection **I.**, below, the Limit of Liability identified in Item **2.c.** of the Declarations shall be the maximum liability of the Insurer under this Policy with respect to all "claims", "remediation costs", and associated "legal defense expense" for all "pollution conditions".

**E.**    With respect to Coverage **B.**, and subject to Subsections **F.** and **I.**, below, the most the Insurer shall pay for all "claims", "remediation costs", and associated "legal defense expenses" arising from the same, continuous, repeated, or related "pollution condition" is the Limit of Liability identified in Item **3.b.** of the Declarations.

**F.**    With respect to Coverage **B.**, and subject to Subsection **I.**, below, the Limit of Liability identified in Item **3.c.** of the Declarations shall be the maximum liability of the Insurer under this Policy with respect to all "claims", "remediation costs", and associated "legal defense expenses" for all "pollution conditions".

**G.**    With respect to Coverage **C.**, and subject to Subsections **H.** and **I.**, herein, the most the Insurer shall reimburse the "first named insured" for all "foreign subsidiary claims" seeking covered "foreign subsidiary loss" and associated "legal defense expense" that arise from the same, continuous, repeated, or related "pollution conditions" is the Limit of Liability identified in Item **4.b.** of the Declarations.

**H.**    With respect to Coverage **C.**, and subject to Subsection **I.**, herein, the Limit of Liability identified in Item **4.c.** of the Declarations shall be the maximum reimbursement to the "first named insured" under this Policy with respect to all "foreign subsidiary claims" for all "pollution conditions".

**I.**    The Aggregate Limit of Liability identified in Item **5.** of the Declarations shall be the maximum liability of the Insurer under this Policy with respect to all "claims", "remediation costs", "foreign subsidiary claims" and associated "legal defense expense" for all "pollution conditions" under Coverages **A., B.** and **C.,** or any Supplemental Coverages added to this Policy by endorsement.

**J.**    If the Insurer or an affiliate has issued claims-made Premises Pollution Liability coverage for a "covered location" in one or more policy periods, and a "pollution condition" is first discovered and reported to the Insurer in accordance with the terms and conditions of this Policy, then:

    **1.**    All such continuous, repeated, or related "pollution conditions" that are subsequently reported to the Insurer during later Premises Pollution Liability policy periods shall be deemed to be one "pollution condition" discovered during this "policy period"; and

    **2.**    All "claims" or "foreign subsidiary claims" seeking "bodily injury", "property damage", "remediation costs", "foreign subsidiary loss" arising out of a "pollution condition" that was discovered during this "policy period", including any continuous, repeated, or related "pollution conditions", shall be deemed to have been first made and reported during this "policy period",

and no other policy shall respond.

## III.    DEFENSE AND SETTLEMENT

**A.**    The Insurer shall have the right and the duty to defend the "insured" against a "claim" to which this insurance applies.   The Insurer shall have no duty to defend the "insured" against any "claim" to which this insurance shall not apply.   The Insurer's duty to defend an "insured", or indemnify the "first named insured" for defense costs consistent with Coverage **C.**, herein,  and Subsection **F.**, below, ends once the Limits of Liability are exhausted or are tendered into a court of applicable jurisdiction, or once the "insured" refuses a settlement offer as provided in Subsection **E.,** below.

**B.**    The Insurer shall have the right to select legal counsel to represent the "insured" for the investigation, adjustment, and defense of any "claims" covered under this Policy.  Selection of legal counsel by the Insurer shall not be done without the consent of the "insured"; such consent shall not be unreasonably withheld.  "Legal defense expenses" incurred prior to the selection of legal counsel by the Insurer shall not be covered under this Policy, or credited against the "self-insured retention".

**C.**    The "insured" shall have the right and the duty to retain a qualified environmental consultant to perform any investigation and/or remediation of any "pollution condition" covered under this Policy.  The "insured" must receive the written consent of the Insurer prior to the selection and retention of such consultant, except in the event of an "emergency response".  Any costs incurred prior to such consent shall not be covered under this Policy, or credited against the "self-insured retention", except in the event of an "emergency response".

**D.**    "Legal defense expenses" reduce the Limits of Liability identified in Items **2., 3., 4.** and **5.** of the Declarations and shall be applied to the "self-insured retention".

**E.**    The Insurer shall present all settlement offers to the "insured".  If the Insurer recommends a settlement which is acceptable to a claimant, exceeds any applicable "self-insured retention", is within the Limits of Liability, and does not impose any additional unreasonable burdens on the "insured", and the "insured" refuses to consent to such settlement offer, then the Insurer's duty to defend shall end. The "insured" shall defend such "claim" independently. The Insurer's liability shall not exceed the amount for which the "claim" could have been settled if the Insurer's recommendation had been accepted, exclusive of the "self-insured retention".

**F.**    In jurisdictions where the Insurer may be prevented by law, or otherwise, from directly insuring a "foreign subsidiary", upon receipt of a "foreign subsidiary claim", the "first named insured" or other "named insured" shall enter into a written agreement with the "foreign subsidiary" regarding the handling of any "pollution condition" or "claim" for which the "first named insured" or other "named insured" may have a right to indemnity, in whole or in part, pursuant to Coverage **C.** of this Policy.  Such agreement shall require, at a minimum, that:

**1.**    The "first named insured" or other "named insured" has the right to control the investigation, adjustment, defense and settlement of any alleged "foreign subsidiary loss" consistent with the Insurer's own rights in Subsections **B., C.** and **E.,** above; and

**2.**    The "first named insured" or other "named insured" have subrogation rights consistent with the Insurer's own rights in Section **IX.**, **GENERAL CONDITIONS**, Subsection **E.**, **Subrogation**, of this Policy.  Thereafter, the "first named insured" or other "named insured" shall assign those rights to the Insurer.


## IV.    COVERAGE TERRITORY

The coverage afforded under this Policy shall apply to "covered locations" worldwide, except for any locations within:

**1.**    The People's Republic of China; and

**2.**    Any of the former member states of the Union of Soviet Socialist Republics, including Armenia, Azerbaijan, Belarus, Estonia, Georgia, Kazakhstan, Kyrgyzstan, Latvia, Lithuania, Moldova, Russia, Tajikistan, Turkmenistan, Ukraine and Uzbekistan.

Notwithstanding the foregoing, this Policy shall not afford coverage for any risk which would otherwise be in violation of the laws of the United States of America including, but not limited to, economic or trade sanction laws or export control laws administered by the government of the United States of America.


## V.    DEFINITIONS

**A.**    **"Additional insured"** means any person or entity specifically endorsed onto this Policy as an "additional insured", if any.  Such "additional insured" shall maintain only those rights under this Policy as are specified by endorsement.

**B. "Biodiversity damages"** means injury to, damage sustained by, or the destruction or loss of, land, air, water, groundwater, drinking water, fish, wildlife, biota and their habitats.

**C. "Bodily injury"** means physical injury, illness, disease, mental anguish, emotional distress, or shock, sustained by any person, including death resulting therefrom.

**D. "Claim"** means the written assertion of a legal right received by the "insured" from a third-party, including but not limited to a "government action", suits or other actions alleging responsibility or liability on the part of the "insured" for "bodily injury", "property damage", or "remediation costs" arising out of "pollution conditions" to which this insurance applies.

Solely with respect to Coverage **C.** of this Policy, and with respect to the corresponding definition of "foreign subsidiary loss" in this Section **V.**, **"claim"** means the assertion of a legal right, including but not limited to a "government actions", suits or other actions alleging responsibility or liability on the part of a "foreign subsidiary" for "bodily injury", "property damage", or "remediation costs" arising out of "pollution conditions" to which this insurance applies.

**E. "Contingent transportation"** means the movement of the "insured's" waste or products by automobile, aircraft, watercraft, or other conveyance beyond the boundaries of a "covered location" by a person or entity, other than an "insured" or "foreign subsidiary", engaged in the business of transporting property for hire, until such time as the waste or product is unloaded from the automobile, aircraft, watercraft, or other conveyance.

**F. "Covered location"** means any location specifically identified in Item **9.** of the Declarations, or any other location specifically endorsed onto this Policy as a "covered location".

**G. "Emergency response"** means actions taken and reasonable "remediation costs" incurred within seventy-two (72) hours following the discovery of a "pollution condition" by an "insured" or "foreign subsidiary" in order to abate or respond to an imminent and substantial threat to human health or the environment arising from such "pollution condition".

**H. "Environmental indemnity obligations"** means an "insured's" or "foreign subsidiary's" obligations to defend or indemnify a third-party with respect to a "pollution condition" to which this insurance otherwise applies, provided that such defense or indemnity obligation is explicitly included within a contract identified on the Schedule of Insured Contracts Endorsement attached to this Policy, if any.

**I. "Environmental laws"** means any international (including European Union), national, federal, state, provincial, commonwealth, municipal or other local laws, statutes, directive, ordinances, rules, guidance documents, regulations, and all amendments thereto, including voluntary cleanup or risk-based corrective action guidance, governing the liability or responsibilities of the "insured" or "foreign subsidiary" with respect to a "pollution condition".

**J. "Extended reporting period"** means the additional period of time in which to report a "claim" or "foreign subsidiary claim" first made against the "insured" or "foreign subsidiary" during or subsequent to the end of the "policy period".

**K. "Exterior Insulation and Finish System (EIFS)"** means synthetic stucco or any other exterior insulation and finish system used on any part of any building or structure and consisting of:

**1.** A rigid or semi-rigid insulation board made of expanded polystyrene or other materials;

**2.** The adhesive and/or mechanical fasteners used to attach the insulation board to the substrate;

**3.** A reinforced base coat; and

**4.** A finish coat providing surface texture and color.

**L. "First named insured"** means the person or entity as identified in Item **1.** of the Declarations. The "first named insured" is the party responsible for the payment of any premiums and the payment of, or evidencing payment of, any applicable "self-insured retention" amounts. The "first named insured" shall also serve as the sole agent on behalf of all "insureds" with respect to the provision and receipt of notices, including notice of cancellation or non-renewal, receipt and acceptance of any endorsements or any other changes to this Policy, return of any premium, assignment of any interest under this Policy, as well as the exercise of any applicable "extended reporting period", unless any such responsibilities are otherwise designated by endorsement.

**M. "Foreign subsidiary"** means:

**1.** The entities identified on the Schedule of Foreign Subsidiaries attached to this Policy, if any; and

**2.** Any entity which would otherwise qualify as a "named insured" or "additional insured" as defined in any Broad Named Insured or Broad Additional Insured Schedule or Endorsement attached to this Policy, but for the fact

that such entity is domiciled, or its principal place of business is located in a jurisdiction where the Insurer cannot lawfully insure that entity on a non-admitted basis.

**N.**  **"Foreign subsidiary claim"** means a written demand made by a "foreign subsidiary" to the "first named insured" or other "named insured" seeking reimbursement or indemnification for "foreign subsidiary loss".

**O.**  **"Foreign subsidiary loss"** means "claims", "remediation costs", and any associated "legal defense expense", for which a "foreign subsidiary" is legally responsible for payment of, and which conform with the conditions precedent to coverage contained in Coverages **A., B.,** and **C.** of this Policy, or any Supplemental Coverages added to this Policy by endorsement.

**P.**  **"Fungi"** means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents, or byproducts produced or released by "fungi".

**Q.**  **"Government action"** means action taken or liability imposed by any international (including European Union), national, federal, state, commonwealth, provincial, municipal or other local government agency or body acting under the authority of "environmental laws".

**R.**  **"Insured"** means the  "first named insured", any "named insured", any "additional insured", and any past or present director or officer of, partner in, or employee of, any "insured" while acting within the scope of his or her duties as such.

**S.**  **"Legal defense expense"** means reasonable legal costs, charges, and expenses, including expert charges, incurred by the "insured" in the investigation, adjustment, or defense of "claims" or suits.

Solely with respect to Coverage **C.** of this Policy, and with respect to the corresponding definition of "foreign subsidiary loss" in this Section **V., "legal defense expense"** also means reasonable legal costs, charges, and expenses, including expert charges, incurred by a "foreign subsidiary" in the investigation, adjustment, or defense of "claims" or suits.

**T.**  **"Low-level radioactive waste"** means waste that is radioactive but not classified as the following: high-level waste (spent nuclear fuel or the highly radioactive waste produced if spent fuel is reprocessed), uranium milling residues, and waste with greater than specified quantities of elements heavier than uranium.

**U.**  **"Mixed waste"** means:

    **1.**  Waste containing both radioactive and hazardous components as defined under United States law within the Atomic Energy Act and the Resource Conservation and Recovery Act, as either may be amended; and

    **2.**  Equivalent waste located in any other jurisdiction to the extent that such waste would be subject to the United States laws, above, if the waste was physically located there.

**V.**  **"Named insured"** means any person or entity specifically endorsed onto this Policy as a "named insured", if any. Such "named insured" shall maintain the same rights under this Policy as the "first named insured" unless otherwise specified by endorsement.

**W.**  **"Natural resource damage"** means  injury to, destruction of, or loss of, including the resulting loss of value of, fish, wildlife, biota, land, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the fishery conservation zone established by the Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. § 1801 et. seq.)), any state or local government, any foreign government, or any Native American Tribe, or, if such resources are subject to a trust restriction on alienation, any members of any Native American Tribe, including the reasonable costs of assessing such injury, destruction or loss resulting therefrom.

**X.**  **"Non-owned disposal site"** means a site not owned or operated by the "insured" or "foreign subsidiary", which receives, or has historically received, the "insured's" or "foreign subsidiary's" waste.

**Y.**  **"Policy period"** means, the period of time specifically identified in Item **2.a.** of the Declarations for Coverage **A.,** Item **3.a.** of the Declarations for Coverage **B.** , and/or Item **4.a.** of the Declarations for Coverage **C.,** or any shorter period resulting from the cancellation of this Policy.

**Z.**  **"Pollution condition"** means:

    **1.**  The presence of "fungi"; or

    **2.**  The discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including smoke, soot, vapors, fumes, acids, alkalis, chemicals, hazardous substances,

hazardous materials, or waste materials, on, in, into, or upon land and structures thereupon, the atmosphere, surface water, or groundwater. For the purpose of this definition, waste materials include, but are not limited to, "low-level radioactive waste", "mixed waste".

**AA. "Property damage"** means:

1. Physical injury to, or destruction of, tangible property of a third-party, including all resulting loss of use of that property;

2. Loss of use of tangible property of a third-party, that is not physically injured or destroyed;

3. Diminished value of tangible property owned by a third-party;

4. "Natural resource damages"; and

5. "Biodiversity damages".

**BB. "Remediation costs"** means reasonable expenses incurred to investigate, quantify, monitor, mitigate, abate, remove, dispose, treat, neutralize, or immobilize "pollution conditions" to the extent required by "environmental law".

**"Remediation costs"** shall also include:

1. Reasonable legal cost, where such cost has been incurred by an "insured" or "foreign subsidiary" with the written consent of the Insurer; and

2. Reasonable expenses required to restore, repair or replace real or personal property, to substantially the same condition it was in prior to being damaged during the course of responding to a "pollution condition".

**CC. "Responsible person"** means any employee of an "insured" responsible for environmental affairs, control, or compliance at a "covered location", and any officer or director of, or partner in, an "insured" or "foreign subsidiary".

**DD. "Self-insured retention"** means the dollar amount identified in Item **2.d.** of the Declarations for Coverage **A.,** Item **3.d.** of the Declarations for Coverage **B.,** and/or Item **4.d.** of the Declarations for Coverage **C.,** or as otherwise designated by endorsement, if any.

**EE. "Terrorism"** means activities against persons, organizations or property of any nature:

1. That involve the following or preparation for the following:

   a. Use or threat of force or violence; or

   b. Commission or threat of a dangerous act; or

   c. Commission or threat of an act that interferes with or disrupts an electronic, communication, information, or mechanical system; and

2. When one or both of the following applies:

   a. The effect is to intimidate or coerce a government or the civilian population or any segment thereof, or to disrupt any segment of the economy; or

   b. It appears that the intent is to intimidate or coerce a government, or to further political, ideological, religious, social or economic objectives or to express (or express opposition to) a philosophy or ideology.

**FF. "Underground storage tank"** means any tank and associated piping and appurtenances connected thereto which tank has more than ten percent (10%) of its volume below ground.

**GG. "War"** means war, whether or not declared, civil war, martial law, insurrection, revolution, invasion, bombardment or any use of military force, usurped power or confiscation, nationalization or damage of property by any government, military or other authority.

**VI. EXCLUSIONS**

This insurance shall not apply to:

**A. Asbestos**

"Claims", "remediation costs", "foreign subsidiary loss" or "legal defense expenses", arising out of or related to asbestos or asbestos-containing materials.

This exclusion shall not apply to "remediation costs" arising out of or related to asbestos or asbestos-containing materials discovered in soil or groundwater.

**B. Claims Against Foreign Subsidiaries**

Underlying "claims", or associated "legal defense expenses", made directly against any "foreign subsidiary". This exclusion shall not apply to "foreign subsidiary claims" made against a "named insured" that are otherwise covered under Coverage **C.** of this Policy.

Notwithstanding, this insurance shall not apply to any "foreign subsidiary claim" alleging, based upon, arising out of, or attributable to, any claim, suit, action, loss, or act, error or omission, which would have been excluded if made against or incurred by any "insured" under Coverage **A.,** Coverage **B.,** or any Supplemental Coverages added to this Policy by endorsement.

**C. Contractual Liability**

"Claims", "remediation costs", "foreign subsidiary loss" or "legal defense expenses" arising out of or related to liability of others assumed by any "insured" or "foreign subsidiary" through contract or agreement, except if the liability would have attached to the "insured" or "foreign subsidiary" in the absence of such contract or agreement.

This exclusion shall not apply to:

**1.** "Environmental indemnity obligations"; and

**2.** "Foreign subsidiary claims" premised upon liability of a "foreign subsidiary" assumed by a "named insured" through a contract or agreement to which Coverage **C.** of this Policy applies.

**D. Divested Property**

"Claims", "remediation costs", "foreign subsidiary loss" or "legal defense expenses" arising out of or related to a "pollution condition" at a "covered location" where such "pollution condition" first commenced after the "covered location" had been sold, abandoned, or given away by any "insured" or "foreign subsidiary", or was condemned.

This exclusion shall not apply to Coverage **B.**

**E. Employers Liability**

"Claims", "foreign subsidiary loss" or "legal defense expenses" arising out of or related to "bodily injury" to:

**1.** Any "insured" or any employee of its parent corporation, "foreign subsidiary", subsidiary or affiliate:

    **a.** Arising out of, or in the course of, employment by any "insured", its parent, "foreign subsidiary", subsidiary or affiliate; or

    **b.** Performing duties related to the conduct of the business of any "insured", its parent corporation, subsidiary, "foreign subsidiary" or affiliate.

**2.** The spouse, child, parent, brother or sister of any "insured" or employee of its parent, "foreign subsidiary", subsidiary or affiliate as a consequence of Paragraph **1.,** above.

This exclusion applies:

**1.** Whether an "insured" or "foreign subsidiary" may be liable as an employer or in any other capacity; and

**2.** To any obligation to share damages with or repay someone else who must pay damages because of such "bodily injury".

**F. Exterior Insulation and Finish System (EIFS)**

"Claims", "remediation costs", "foreign subsidiary loss" or "legal defense expenses" arising out of or related to "fungi", where such "fungi" is caused by or related to the presence or use of an "Exterior Insulation and Finish System (EIFS)", synthetic stucco, or any similar product or any part thereof, including the application or use of paints, conditioners, primers, accessories, flashings, coatings, caulkings or sealants in connection with such a product.

**G. Fines and Penalties**

Payment of criminal fines, criminal penalties, punitive, exemplary or multiplied damages, or any associated "claims" seeking exclusively injunctive relief in addition to such fines, penalties or damages.

This exclusion shall apply to any "legal defense expense" associated with such fines, penalties or damages.

This exclusion shall not apply to punitive damages where such coverage is insurable by law.

 © 2009

**H.   First-Party Property Damage**

"Claims", foreign subsidiary loss" or "legal defense expenses" arising out of or related to damage to real or personal property owned by, leased to, loaned to, or rented by any "insured" or "foreign subsidiary", or otherwise in the care, custody, or control of any "insured" or "foreign subsidiary".

This exclusion shall not apply to "remediation costs".

**I.   Fraud or Misrepresentation**

"Claims", "remediation costs", "foreign subsidiary loss" or "legal defense expenses" arising out of or related to fraudulent acts or material misrepresentations on the part of any "insured" or "foreign subsidiary" which would have affected the Insurer's decision to issue this Policy pursuant to the financial terms identified in the Declarations.

**J.   Insured's Internal Expenses**

"Claims", "remediation costs", "foreign subsidiary loss" or "legal defense expenses" arising out of or related to expenses incurred by any "insured" or any "foreign subsidiary" for services performed by its salaried staff and any employees.

This exclusion shall not apply to "emergency response" or any costs, charges or expense incurred with the prior written approval of the Insurer at its sole discretion.

**K.   Insured vs. Insured**

"Claims" made by any "insured" or "foreign subsidiary" against any other "insured" or "foreign subsidiary".

**L.   Intentional Non-Compliance**

"Claims", "remediation costs", "foreign subsidiary loss" or "legal defense expenses" arising out of or related to the intentional disregard of, or knowing, willful, or deliberate non-compliance with, any law, statute, regulation, administrative complaint, notice of violation, notice letter, instruction of any governmental agency or body, or executive, judicial or administrative order by any "responsible person".

**M.   Known Conditions**

"Claims", "remediation costs", "foreign subsidiary loss", or associated "legal defense expenses", arising out of or related to "pollution conditions" in existence prior to the "policy period" and reported to a "responsible person" but not specifically referenced or identified in documents listed on the Schedule of Known Conditions Endorsement attached to this Policy.

**N.   Lead-Based Paint**

"Claims", "remediation costs", "foreign subsidiary loss" or "legal defense expenses" arising out of or related to lead-based paint.

This exclusion shall not apply to "remediation costs" arising out of or related to lead-based paint discovered in soil or groundwater.

**O.   Material Change in Risk**

"Claims", "remediation costs", "foreign subsidiary loss" or "legal defense expenses" arising out of or related to a change in the use or operations at a "covered location" that materially increases the likelihood or severity of a "pollution condition" or "claim" from the intended uses or operations identified by an "insured" for the Insurer prior to the inception date of this Policy.  This exclusion shall only apply to the "covered location" associated with the change in use or operations and shall not limit coverage for other "covered locations" under this Policy.

**P.   Naturally Occurring Materials**

"Claims", "remediation costs", "foreign subsidiary loss" or "legal defense expenses" arising out of or related to the presence or removal of naturally occurring materials.

This exclusion shall not apply in those circumstances where naturally occurring substances are present at a "covered location" as a result of human activities or human processes.

**Q.   Non-Owned Disposal Sites**

"Claims", "remediation costs", "foreign subsidiary loss" or "legal defense expenses" arising out of or related to "pollution conditions" on, at, under, or migrating from a "non-owned disposal site".

This exclusion shall not apply to any "non-owned disposal site" identified on the Schedule of Non-Owned Disposal Sites Endorsement attached to this Policy, if any.

**R. Underground Storage Tanks**

"Claims", "remediation costs", "foreign subsidiary loss" or "legal defense expenses" arising out of or related to "pollution conditions" emanating from an "underground storage tank" located at a "covered location":

**1.** When the existence of such "underground storage tank" was known to a "responsible person" prior to the "Policy Period"; and

**2.** Which "underground storage tank" is not identified in the Schedule of Insured Underground Storage Tanks, if applicable; or

**3.** If an "underground storage tank" has been closed or removed, and is not identified on the Schedule of Known Conditions Endorsement, if applicable.

**S. Vehicles**

"Claims", "remediation costs", "foreign subsidiary loss" or "legal defense expenses" arising out of or related to "pollution conditions" resulting from the use, maintenance or operation, including loading or unloading, of an automobile, aircraft, watercraft, or other conveyance beyond the boundaries of a "covered location".

This exclusion shall not apply to "contingent transportation", if such coverage is added to this Policy by endorsement.

**T. War or Terrorism**

"Claims", "remediation costs", "foreign subsidiary loss" or "legal defense expenses" arising out of or related to "pollution conditions" attributable, whether directly or indirectly, to any acts that involve, or that involve preparation for, "war" or "terrorism" regardless of any other cause or event that contributes concurrently or in any sequence to the injury or damage.

## VII. REPORTING AND COOPERATION

**A.** The "insured" must see to it that the Insurer receives written notice of any "claim" or "pollution condition", as soon as practicable, at the address identified in Item **8.a.** of the Declarations.  Notice should include reasonably detailed information as to:

**1.** The identity of the "insured", including contact information for an appropriate person to contact regarding the handling of the "claim" or "pollution condition";

**2.** The identity of "covered location";

**3.** The nature of the "claim" or "pollution condition"; and

**4.** Any steps undertaken by the "insured" to respond to the "claim" or "pollution condition".

In the event of a "pollution condition", the "insured" must also take all reasonable measures to provide immediate verbal notice to the Insurer.

**B.** The "insured" must:

**1.** Immediately send the Insurer copies of any demands, notices, summonses or legal papers received in connection with any "claim";

**2.** Authorize the Insurer to obtain records and other information;

**3.** Cooperate with the Insurer in the investigation, settlement or defense of the "claim";

**4.** Assist the Insurer, upon the Insurer's request, in the enforcement of any right against any person or organization which may be liable to the "insured" or a "foreign subsidiary" because of "bodily injury", "property damage", "remediation costs", "foreign subsidiary loss", or "legal defense expense" to which this Policy may apply; and

**5.** Provide the Insurer with such information and cooperation as it may reasonably require.

**C.** No "insured" or "foreign subsidiary" shall make or authorize an admission of liability or attempt to settle or otherwise dispose of any "claim" or "foreign subsidiary claim" without the written consent of the Insurer.  Nor shall

any "insured" retain any consultants or incur any "remediation costs" without the prior express written consent of the Insurer, except in the event of an "emergency response".

**D.**  Upon the discovery of a "pollution condition", the "insured" shall make every attempt to mitigate any loss and comply with applicable "environmental laws".  The Insurer shall have the right, but not the duty, to mitigate such "pollution conditions" if, in the sole judgment of the Insurer, the "insured" fails to take reasonable steps to do so.   In that event, any "remediation costs" incurred by the Insurer shall be deemed incurred by the "insured", and shall be subject to the "self-insured retention" and Limits of Liability identified in the Declarations.

**E.**  Solely with respect to Coverage **C.** of this Policy, Subsections **A.** through **D.** of this Section **VII.** shall apply as if any "foreign subsidiary" were a "named insured" under this Policy.

## VIII.   EXTENDED REPORTING PERIOD

**A.**  The "first named insured" shall be entitled to a basic "extended reporting period", and may purchase an optional supplemental "extended reporting period", following Cancellation, as described in Subsection **A.**, Paragraph **1.** of Section **IX., GENERAL CONDITIONS**, or nonrenewal.

**B.**  "Extended reporting periods" shall not reinstate or increase any of the Limits of Liability.  "Extended reporting periods" shall not extend the "policy period" or change the scope of coverage provided.  A "claim" or "foreign subsidiary claim" first made against an "insured" and reported to the Insurer within the basic "extended reporting period" or supplemental "extended reporting period", whichever is applicable, shall be deemed to have been made on the last day of the "policy period".

**C.**  Provided the "first named insured" has not purchased any other insurance to replace this Policy, the "first named insured" shall have a sixty (60) day basic "extended reporting period" without additional charge.

**D.**  Provided the "first named insured" has not purchased any other insurance to replace this Policy, the "first named insured" shall also be entitled to purchase a supplemental "extended reporting period" of up to thirty-four (34) months for not more than two hundred percent (200%) of the full premium identified in Item **6.** of the Declarations to this Policy. Such supplemental "extended reporting period" starts when the basic "extended reporting period" ends. The Insurer shall issue an endorsement providing a supplemental "extended reporting period" provided that the "first named insured":

**1.**  Makes a written request, to the address identified in Item **8.b.** of the Declarations, for such endorsement which the Insurer receives prior to the expiration of the "policy period"; and

**2.**  Pays the additional premium when due.  If that additional premium is paid when due, the supplemental "extended reporting period" may not be cancelled, provided that all other terms and conditions of the Policy are met.

## IX.   GENERAL CONDITIONS

**A. Cancellation**

**1.**  This Policy may be cancelled only by the "first named insured", or through the "first named insured's" agent, by mailing to the Insurer at the address identified in Item **8.b.** of the Declarations, written notice stating when such cancellation shall be effective.

**2.**  This Policy may be cancelled by the Insurer for the following reasons:

**a.**  Non-payment of premium;

**b.**  Fraud or material misrepresentation on the part of any "insured" or "foreign subsidiary",

by mailing to the "first named insured" at the "first named insured's" last known address, written notice stating when, not less than sixty (60) days thereafter, fifteen (15) days if cancellation is for non-payment of any unpaid portion of the premium, such cancellation shall be effective. The mailing of notice shall be sufficient proof of notice. The effective date and hour of cancellation stated in the notice shall be the end of the "policy period".

Subparagraph **2.b.**, herein, shall apply only to that "insured" that engages in the fraud or misrepresentation. This exception shall not apply to any "insured" who is a parent corporation, subsidiary, employer of, or otherwise affiliated by ownership with, such "insured", including the "first named insured" in the event that the implicated entity is a "foreign subsidiary".

3.  In the event of cancellation, the premium percentage identified in Item **6.** of the Declarations shall be the minimum-earned premium upon the inception date of this Policy.  Thereafter, the remaining unearned premium, if any, shall be deemed earned by the Insurer on a *pro rata* basis over the remainder of the "policy period".  Any unearned premium amounts due the "first named insured" upon cancellation of this Policy shall be calculated on a *pro rata* basis and refunded within thirty (30) days of the effective date of cancellation.

**B.   Inspection and Audit**

To the extent of the "insured's" or "foreign subsidiary's" ability to provide such access, and with reasonable notice to the "insured", the Insurer shall be permitted, but not obligated, to inspect and sample the "covered locations".  The "insured" shall have the concurrent right to collect split samples.  Neither the Insurer's right to make inspections, the making of said inspections, nor any report thereon shall constitute an undertaking, on behalf of or for the benefit of the "insured" or others, to determine or warrant that such property or operations are safe or in compliance with "environmental law", or any other law.

The Insurer may examine and audit the "insured's" books and records during this "policy period" and extensions thereof and within three (3) years after the final termination of this Policy.

**C.   Legal Action Against the Insurer**

No person or organization other than an "insured" has a right under this Policy:

1.  To join the Insurer as a party or otherwise bring the Insurer into a suit against any "insured" or "foreign subsidiary"; or

2.  To sue the Insurer in connection with this insurance unless all of the Policy terms have been fully complied with.

**D.   Bankruptcy**

The insolvency or bankruptcy of any "insured" or "foreign subsidiary", or any "insured's" or "foreign subsidiary's" estate, shall not relieve the Insurer of its obligations under this Policy.  However, any such insolvency or bankruptcy of the "insured" or "foreign subsidiary", or the "insured's" or "foreign subsidiary's" estate, shall not relieve the "insured" of its "self-insured retention" obligations under this Policy.  This insurance shall not replace any other insurance to which this Policy is excess, nor shall this Policy drop down to be primary, in the event of the insolvency or bankruptcy of any underlying insurer.

**E.   Subrogation**

In the event of any payment under this Policy by the Insurer, the Insurer shall be subrogated to all of the rights of recovery against any person or organization, and the "insured" shall, and shall cause all "foreign subsidiaries" to, execute and deliver instruments and papers and do whatever else is necessary to secure such rights.  All "insureds" and "foreign subsidiaries" shall do nothing to prejudice such rights.  Any recovery as a result of subrogation proceedings arising under this Policy shall accrue first to the "insureds" to the extent of any payments in excess of the limit of coverage; then to the Insurer to the extent of its payment under the Policy; and then to the "insured" to the extent of the "self-insured retention".  Expenses incurred in such subrogation proceedings shall be apportioned among the interested parties in the recovery in the proportion that each interested party's share in the recovery bears to the total recovery.

**F.   Representations**

By accepting this Policy, the "first named insured" agrees that:

1.  The statements in this Policy, including, but not limited to, warranties contained within the policy form, and any statements in the Declarations, schedules, endorsements and applications for this Policy, are accurate and complete;

2.  Those statements and warranties constitute representations the "first named insured" made to the Insurer; and

3.  This Policy has been issued in reliance upon the "first named insured's" representations.

**G.   Separation of Insureds**

Except with respect to the Limits of Liability, Cancellation condition **2.a.**, above, the Fraud or Misrepresentation Exclusion, the Insured vs. Insured Exclusion, the Intentional Non-Compliance Exclusion, the Known Conditions Exclusion, the Material Change in Risk Exclusion, the Underground Storage Tank Exclusion, and any obligations specifically assigned to the "first named insured", this Policy applies:

1. As if each "named insured" were the only "named insured"; and

2. Separately to each "insured" against whom a "claim" is made.

### H.  Other Insurance

If other valid and collectible insurance is available to any "insured" or "foreign subsidiary" covering a loss also covered by this Policy, other than a policy that is specifically written to apply in excess of this Policy, the insurance afforded by this Policy shall apply in excess of and shall not contribute with such other insurance.

### I.  Jurisdiction and Venue

It is agreed that in the event of the failure of the Insurer to pay any amount claimed to be due hereunder, the Insurer and the "insured" shall submit to the exclusive jurisdiction of the State of New York and shall comply with all requirements necessary to give such court jurisdiction.  Nothing in this clause constitutes or should be understood to constitute a waiver of the Insurer's right to remove an action to a United States District Court.

### J.  Choice of Law

All matters arising hereunder including questions relating to the validity, interpretation, performance, and enforcement of this Policy, including the rights, duties and obligations thereunder, shall be determined in accordance with the law and practices of the State of New York.

### K.  Proof of Insurance in Foreign Jurisdictions

This Policy shall not serve as proof of insurance in any country where non-admitted insurance is prohibited by local applicable law.

### L.  Changes and Assignment

Notice to or knowledge possessed by any person shall not effect waiver or change in any part of this Policy or estop the Insurer from asserting any right under the terms of this Policy. The terms, definitions, conditions, exclusions and limitations of this Policy shall not be waived or changed, and no assignment of any interest under this Policy shall bind the Insurer, except as provided by endorsement and attached to this Policy.

### M.  Headings

The descriptions in the headings and sub-headings of this Policy are inserted solely for convenience and do not constitute any part of the terms or conditions hereof.

### N.  Consent

Where the consent of the Insurer, or an "insured", is required under this Policy, such consent shall not be unreasonably withheld, delayed, conditioned, or denied.

### O.  Currency

Payments made by the Insurer under this Policy shall be made in the same currency as the Limits of Liability identified in the Declarations of this Policy.  At the Insurer's sole option, and upon any "insured's" request, the Insurer may choose to pay any sums due under this Policy in any relevant currency.  When any such payment involves a currency other than that of the Limits of Liability of this Policy, the Insurer shall convert the value of the payment from the currency of the Limits of Liability of this Policy, using the free rate of exchange as published in *The Wall Street Journal* in effect at the end of the last business day preceding the date of settlement of the loss. Once the Insurer makes any such conversion from another currency, the Insurer shall apply all of the other terms and conditions of this Policy to determine the final amount of its payment obligation.

## NATURALLY OCCURRING MATERIALS ENDORSEMENT

| Named Insured<br>**Formosa Plastics Corporation, USA** | | | Endorsement Number<br>**001** |
|---|---|---|---|
| Policy Symbol<br>**GPI** | Policy Number<br>**G24890491 001** | Policy Period<br>**07/01/2010 to 07/01/2015** | Effective Date of Endorsement<br>**07/01/2010** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Section **VI.**, **EXCLUSIONS**, Subsection **P., Naturally Occurring Materials**, of this Policy is deleted in its entirety.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

## AGGREGATED SELF-INSURED RETENTION (Coverages A., B. and C.) ENDORSEMENT

| Named Insured **Formosa Plastics Corporation, USA** | | | Endorsement Number **002** |
|---|---|---|---|
| Policy Symbol **GPI** | Policy Number **G24890491 001** | Policy Period **07/01/2010 to 07/01/2015** | Effective Date of Endorsement **07/01/2010** |
| Issued By (Name of Insurance Company) **ACE American Insurance Company** | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

With respect to coverage under Section **I., INSURING AGREEMENTS**, Subsections **A., B.** and **C.**, of this Policy:

**I.**   Items **2.d., 3.d.**, and **4.d., Self-Insured Retention**, of the Declarations are deleted in their entirety and replaced with the following:

    **i.**   The per "pollution condition" "self-insured retention" applicable to the respective coverage parts shall be as follows:

        Coverage **A**:

        $1,000,000 Per Pollution Condition retention

        Coverage **B**:

        $1,000,000 Per Pollution Condition retention

        Coverage **C**:

        $1,000,000 Per Pollution Condition retention

    **ii.**   $5,000,000 Aggregate retention applicable to all Pollution Conditions under Coverages **A., B.** and **C.**

    **iii.**   $100,000 Maintenance retention per Pollution Condition under Coverages **A., B.** and **C.**, thereafter.

**II.**   Section **II., LIMITS OF LIABILITY AND SELF-INSURED RETENTION**, Subsection **B.**, of this Policy is deleted in its entirety and replaced with the following:

**B.**   One "self-insured retention" shall apply to all "claims", "remediation costs", "foreign subsidiary loss" and "legal defense expense" arising from the same, continuous, repeated, or related "pollution condition". Upon the "first named insured's" exhaustion of the Aggregate "self-Insured retention" amount identified in Items **2.d.ii., 3.d.ii,** or **4.d.ii.** of the Declarations, respectively, by approved payments made under multiple "self-insured retentions" applicable to multiple "pollution conditions" to which this insurance applies, all ongoing and future "claims", "remediation costs", "foreign subsidiary loss"  and associated "legal defense expense" attributable to both outstanding and newly discovered "pollution conditions", if any, shall be subject to the reduced Maintenance "self-insured retention" amount identified in Items **2.d.iii., 3.d.iii.** or **4.d.iii.** of the Declarations. With respect to any ongoing "claims", "remediation costs", "foreign subsidiary loss"  and associated "legal defense expense" attributable to an outstanding "pollution condition" that has been reported to the Insurer prior to exhaustion of the Aggregate "self-insured retention", if the "first named insured" has already made approved payments for "claims", "remediation costs", "foreign subsidiary loss" and associated "legal defense expense" in an amount equal to or in excess of the Maintenance "self-insured retention", then the "first named insured" shall have no further "self-insured retention" obligation with respect to that specific "pollution condition".  Notwithstanding any other provision in this Policy to the contrary, under no circumstances shall the Insurer be liable to pay any amount under this Policy until the "first named insured" has paid the full amount of its "self-insured retention", or, in the event of exhaustion, discussed above, its Maintenance "self-

insured retention", with respect to each "pollution condition".

All other terms and conditions of this Policy remain unchanged.

_____
                                        Authorized Representative

## ASBESTOS COVERAGE (Bodily Injury & Property Damage Only) ENDORSEMENT

| Named Insured<br>**Formosa Plastics Corporation, USA** | | | Endorsement Number<br>**003** |
|---|---|---|---|
| Policy Symbol<br>**GPI** | Policy Number<br>**G24890491 001** | Policy Period<br>**07/01/2010 to 07/01/2015** | Effective Date of Endorsement<br>**07/01/2010** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Section **VI.**, **EXCLUSIONS,** Subsection **A.**, **Asbestos**, of this Policy is deleted in its entirety and replaced with the following exclusion:

**A. Asbestos**

"Claims", "remediation costs", "foreign subsidiary loss" or "legal defense expenses", arising out of or related to asbestos or asbestos-containing materials.

This exclusion shall not apply to:

**1.** Third-party "claims" for "bodily injury", and any associated "legal defense expenses" or "foreign subsidiary loss", arising out of asbestos or asbestos-containing materials;

**2.** Third-party, non-governmental "claims" for "property damage", and associated "legal defense expenses or "foreign subsidiary loss", arising out of asbestos or asbestos-containing materials; and

**3.** "Remediation costs" arising out of asbestos or asbestos-containing materials discovered in soil or groundwater.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

## AUTOMATIC ACQUISITION UPON DUE DILIGENCE (Additional Premium)
## ENDORSEMENT

| Named Insured<br>**Formosa Plastics Corporation, USA** | | Endorsement Number<br>**004** |
|---|---|---|
| Policy Symbol<br>**GPI** | Policy Number<br>**G24890491 001** | Policy Period<br>**07/01/2010 to 07/01/2015** | Effective Date of Endorsement<br>**07/01/2010** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

For an additional premium charge, any property acquired or leased by a "named insured" or "foreign subsidiary" during the "policy period" shall be added to the Policy as a "covered location" for an additional premium charge, provided:

1. The Insurer receives written notice of the property acquisition within sixty (60) days of closing on the property or lease effective date; and

2. The "named insured" or "foreign subsidiary" completes the following environmental due diligence assessment of the property prior to its acquisition:

   a. The "named insured" or "foreign subsidiary" commissions and receives a Phase I Environmental Site Assessment report (or its functional equivalent with respect to any property acquired in a jurisdiction outside of the United States of America) on the property that is performed by a qualified environmental consultant in accordance with ASTM Standard E 1527-05 (as subsequently revised); or

   b. The "named insured" or "foreign subsidiary" receives a Phase I Environmental Site Assessment report (or its functional equivalent with respect to any property acquired in a jurisdiction outside of the United States of America) on the property that has been conducted by a qualified environmental consultant for a third-party, provided that the assessment and related report are prepared in accordance with ASTM Standard E 1527-05 (or subsequent revisions), and that the consultant responsible for the assessment has provided the "named insured" with written confirmation that the "named insured" or "foreign subsidiary", as applicable, is entitled to rely on the conclusions of that report as if the assessment had been performed on its behalf.

If the Phase I Environmental Site Assessment does not identify any Recognized Environmental Conditions as defined by ASTM Standard E 1527-05 (as subsequently revised), the property shall automatically be added to the Policy as an additional "covered location" effective on the date the "insured" acquires the property. Upon receipt of notice of the acquisition, the Insurer shall provide a written endorsement to the "first named insured": 1) confirming that the property has been added to the Policy as an additional "covered location"; and 2) notifying the "first named insured" of the associated additional premium.

If the Phase I Environmental Site Assessment identifies any Recognized Environmental Conditions, then, before the property may be added to the Policy, the "named insured" or "foreign subsidiary" must complete a Phase II Environmental Assessment (or its functional equivalent with respect to any property acquired in a jurisdiction outside of the United States of America). Thereafter, the Insurer shall have thirty (30) days to review and approve the Phase II Environmental Assessment report. Said approval shall not be unreasonably withheld, but the Insurer reserves the right to limit coverage with respect to any Recognized Environmental Conditions identified at the property. Upon such approval, the Insurer shall provide a written endorsement to the "first named insured": 1) confirming the effective date that the property has been added to the Policy as an additional "covered location"; 2) describing the extent of the coverage being afforded with respect to the Recognized Environmental Conditions identified at the property; and 3) notifying the "first

named insured" of the associated additional premium.

All other terms and conditions of this Policy remain unchanged.

_____
                    Authorized Representative

## BUSINESS INTERRUPTION AND DELAY EXPENSE ENDORSEMENT

| Named Insured **Formosa Plastics Corporation, USA** | | | Endorsement Number **005** |
|---|---|---|---|
| Policy Symbol **GPI** | Policy Number **G24890491 001** | Policy Period **07/01/2010 to 07/01/2015** | Effective Date of Endorsement **07/01/2010** |
| Issued By (Name of Insurance Company) **ACE American Insurance Company** | | | |

Insert the policy number. The remainder of the information is to be completed only when this Endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

**I.**  Section **I., INSURING AGREEMENTS**, of this Policy is amended by addition of the following:

SUPPLEMENTAL COVERAGE – BUSINESS INTERRUPTION

Actual "business interruption loss" incurred by an "insured" or, with respect to the indemnity coverage provided under Coverage **C.** of this Policy, a "foreign subsidiary", during a "period of interruption" resulting from the discovery of a "covered pollution condition" during the "policy period".

The coverage afforded under this Supplemental Coverage only applies to "business interruption loss" that:

**1.**  Is directly attributable to a "covered pollution condition"; and

**2.**  Is reported to the Insurer, in writing, as soon as practicable, and during the "policy period".

**II.**  The amount the Insurer shall pay for "business interruption loss" under this Supplemental Coverage is limited by the following Sublimit of Liability and Deductible Period:

**Sublimit of Liability**: **$45,000,000**

**Deductible Period**:  **Seven (7) days**

The Sublimit of Liability identified above shall be the maximum amount the Insurer shall pay for all "business interruption loss" arising out of all "covered pollution conditions".  This Sublimit of Liability shall be subject to the applicable Aggregate Limits of Liability identified in the Declarations to this Policy. Under no circumstance shall the Insurer be liable to pay any amount in excess of any applicable Aggregate Limits of Liability.

The "insured" shall pay all "business interruption loss" incurred during the Deductible Period.

**III.**  Section **V., DEFINITIONS**, of this Policy is amended by addition of the following:

**"Business income"** means:

**1.**  Net profit or loss, before income taxes, including "rental income" from tenants, that would have been realized had there been no "business interruption";

**2.**  The "insured's" or "foreign subsidiary's" continuing operating and payroll expense (excluding payroll expense of officers, executives, department managers and contract employees);

**3.**  Costs incurred by the "insured" or "foreign subsidiary" as rent for temporary premises when a portion of a "covered location" becomes untenantable due to a "covered pollution condition" and temporary premises are required to continue the "insured's" or "foreign subsidiary's" operations.  Such rental costs cannot exceed the fair rental value of the untenantable portion of the "covered location".

**"Business interruption"** means necessary partial or complete suspension of the "insured's" or "foreign subsidiary's" operations at a "covered location" arising from a "covered pollution condition".

**"Business interruption loss"** means:

1. "Business income";

2. "Extra expense; and

3. "Delay expense".

**"Covered pollution condition"** means a "pollution condition" for which coverage for "remediation costs" is otherwise afforded under this Policy pursuant to either Coverage **A.** or Coverage **B.,** only, or corresponding "foreign subsidiary loss" under Coverage **C.**  The coverage afforded under this Endorsement shall not apply to any "business interruption loss" arising from or related "pollution conditions" for which coverage for "remediation costs" is excluded under this Policy.

**"Delay expense"** means for a "covered location" under development, where a "covered pollution condition" causes a delay in the completion or development, any of the following expenses incurred shall be afforded coverage:

1. Additional interest on money the "insured" or "foreign subsidiary" has borrowed to finance the construction, development, or remediation of a project at a "covered location";

2. Additional realty taxes and other assessments;

3. Additional advertising or promotional expense;

4. Additional expenses incurred resulting from the renegotiation of leases, including associated usual and customary legal representation expense; and

5. Additional engineering, architectural, and consulting fees.

**"Extra expense"** means costs incurred by the "insured" or "foreign subsidiary", due to a "covered pollution condition", that are necessary to avoid or mitigate any "business interruption".  Such costs must be incurred to actually minimize the amount of foregone "business income" that would otherwise be covered under this Endorsement.

**"Period of interruption"** means the length of time commencing with the date that operations are necessarily suspended at a "covered location" as a result of "covered pollution conditions".

**"Rental income"** means the actual rental fees lost as a result of a "suspension" of a rented "covered location".

**"Suspension"** means that part of or all of a rented "covered location" is rendered untenantable for the purposes identified to the Insurer at the inception of the Policy, due to "covered pollution conditions".

IV. The following Conditions and Limitations shall apply to any coverage afforded under this Endorsement:

A. If such "business interruption" delays the start of the "insured's" or "foreign subsidiary's" operations, the "period of interruption" shall begin on the date the operations would have begun if the "covered pollution condition" had not resulted in "business interruption".

B. The "period of interruption" shall end on the date that the subject "covered pollution condition" has been remedied to the point at which the "insured's" or "foreign subsidiary's" normal operations could reasonably be restored.  Coverage shall not be afforded for any "covered pollution condition" resulting in loss of "business income" as a result of unfavorable business conditions caused by the impact of the "covered pollution condition".

C. If the Insurer and the "insured" disagree on the amount of "business income" or any other amount that is or may be covered under this Endorsement, either may make written demand for an appraisal of the loss. In this event, each party shall select a competent and impartial appraiser.  If necessary, the two appraisers shall select an umpire.  If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers shall state separately the amount of "business income" or any other amount.  If they fail to agree to a resolution, they shall submit their differences to the umpire.  A decision agreed to by the appraisers, of the umpire, if necessary, shall be binding upon both parties.  Each party shall:

1. Pay its chosen appraiser; and

2. Bear the other expenses of the appraisal and umpire equally.

If there is an appraisal, the Insurer shall still retain all of its rights under the policy to deny all or a

portion of the claim.

All other terms and conditions of this Policy remain unchanged.

_____
                                                    Authorized Representative

## SCHEDULE OF COVERED LOCATIONS (Coverage B.) ENDORSEMENT

| Named Insured<br>**Formosa Plastics Corporation, USA** | | | Endorsement Number<br>**006** |
|---|---|---|---|
| Policy Symbol<br>**GPI** | Policy Number<br>**G24890491 001** | Policy Period<br>**07/01/2010 to 07/01/2015** | Effective Date of Endorsement<br>**07/01/2010** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Coverage is afforded only under Coverage **B.** of this Policy for the "covered locations" identified in the Schedule of Covered Locations, below.

| SCHEDULE OF COVERED LOCATIONS | COVERAGE PROVIDED |
|---|---|
| 1051 Sperry Road<br>Stockton, CA95206 | B |
| 10900 Hemlock Avenue<br>Fontana, CA 92335 | B |
| P.O. Box 731<br>Umatilla, OR 97882 | B |
| 1742 E. Plattville Road<br>Pueblo West, CO 81007 | B |
| 1314 W. 3rd Street<br>Wilton, IA 52778 | B |
| 743 Main Street<br>Winnabago, MN 56092 | B |
| 35 Grant Street<br>Franklin, PA 16323 | B |
| P.O. Box 99<br>Batchelor, LA 70715 | B |
| Ryan Station Road<br>Butner, NC 27509 | B |
| 790 S. Main Street<br>Newberry, FL 32669 | B |
| P.O. Box 185<br>Green Cove, FL 32043 | B |
| 700A Highway 59<br>Wharton, TX 77488 | B |
| 315 Grant Street | B |

Meadville, PA

P.O. Box 71                                              B
2101 J-M Drive
Adel, GA 31620

All other terms and conditions of this Policy remain unchanged.

_____
                                    Authorized Representative

## DELETION OF DISCOVERY COVERAGE (Coverage B.) ENDORSEMENT

| Named Insured | Endorsement Number |
|---|---|
| **Formosa Plastics Corporation, USA** | **007** |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| **GPI** | **G24890491 001** | **07/01/2010 to 07/01/2015** | **07/01/2010** |

| Issued By (Name of Insurance Company) |
|---|
| **ACE American Insurance Company** |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Section **I.**, **INSURING AGREEMENTS**, Subsection **B.**, PRE-EXISTING POLLUTION CONDITIONS, of this Policy is hereby deleted in its entirety and replaced with the following:

**B.**  PRE-EXISTING POLLUTION CONDITIONS

"Claims" and associated "legal defense expenses", in excess of the "self-insured retention", arising out of a "pollution condition" on, at, under, or migrating from a "covered location", provided the "claim" is first made during the "policy period".  Any such "claim" must be reported to the Insurer, in writing, during the "policy period" or any applicable "extended reporting period".

The coverage afforded under this Coverage **B.** only applies to "pollution conditions" that first commenced, in whole or part, prior to the inception date identified in Item **3.a.** of the Declarations to this Policy.

All other terms and conditions of this Policy remain unchanged.

_____

Authorized Representative

## BASIC EXTENDED REPORTING PERIOD (90 Days) ENDORSEMENT

| Named Insured<br>**Formosa Plastics Corporation, USA** | | | Endorsement Number<br>**008** |
|---|---|---|---|
| Policy Symbol<br>**GPI** | Policy Number<br>**G24890491 001** | Policy Period<br>**07/01/2010 to 07/01/2015** | Effective Date of Endorsement<br>**07/01/2010** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Section **VIII.**, **EXTENDED REPORTING PERIOD**, of this Policy is hereby deleted in its entirety and replaced with the following:

### VIII. EXTENDED REPORTING PERIOD

**A.** The "first named insured" shall be entitled to a basic "extended reporting period", and may purchase an optional supplemental "extended reporting period", following cancellation, as described in Subsection **A.,** Paragraph **1.** of Section **IX., GENERAL CONDITIONS**, or nonrenewal.

**B.** "Extended reporting periods" shall not reinstate or increase any of the Limits of Liability. "Extended reporting periods" shall not extend the "policy period" or change the scope of coverage provided. A "claim" first made against an "insured" and reported to the Insurer within the basic "extended reporting period" or supplemental "extended reporting period", whichever is applicable, shall be deemed to have been made on the last day of the "policy period".

**C.** Provided the "first named insured" has not purchased any other insurance to replace this Policy, the "first named insured" shall have a ninety (90) day basic "extended reporting period" without additional charge.

**D.** Provided the "first named insured" has not purchased any other insurance to replace this Policy, the "first named insured" shall also be entitled to purchase a supplemental "extended reporting period" of up to thirty-three (33) months for not more than two-hundred percent (200%) of the full policy premium stated in Item **6.** of the Declarations. Such supplemental "extended reporting period" starts when the basic "extended reporting period" ends. The Insurer shall issue an endorsement providing a supplemental "extended reporting period" provided that the "first named insured":

   **1.** Makes a written request, to the address identified in Item **8.b.** of the Declarations, for such endorsement which the Insurer receives prior to the expiration of the "policy period"; and

   **2.** Pays the additional Premium when due. If that additional Premium is paid when due, the supplemental "extended reporting period" may not be cancelled, provided that all other terms and conditions of the Policy are met.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

# SCHEDULE OF FOREIGN SUBSIDIARIES

| Named Insured | Endorsement Number |
|---|---|
| **Formosa Plastics Corporation, USA** | **009** |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| **GPI** | **G24890491 001** | **07/01/2010 to 07/01/2015** | **07/01/2010** |

| Issued By (Name of Insurance Company) |
|---|
| **ACE American Insurance Company** |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insureds" and the Insurer hereby agree that the entities identified below constitute "foreign subsidiaries" as that phrase is used within this Policy:

### Schedule of Foreign Subsidiaries

1. Interplast Group, Ltd., 291 Industrial Drive, Saint John, New Brunswick, Canada
2. Interplast Group, Ltd., 7503 Vantage Place, Delta, British Columbia, Canada

Notwithstanding the Insurer's agreement to specifically identify the entities, above, on this Schedule of Foreign Subsidiaries, the "insureds" and the Insurer agree that such entities are not "insureds" within the meaning of this Policy and that they have no independent legal rights to any payment or indemnification under any of the Coverages afforded pursuant to this Policy.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

## IDENTIFIED CONTAMINATION EXCLUSION

| Named Insured **Formosa Plastics Corporation, USA** | | | Endorsement Number **010** |
|---|---|---|---|
| Policy Symbol **GPI** | Policy Number **G24890491 001** | Policy Period **07/01/2010 to 07/01/2015** | Effective Date of Endorsement **07/01/2010** |
| Issued By (Name of Insurance Company) **ACE American Insurance Company** | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Section **VI.**, **EXCLUSIONS**, of this Policy is hereby amended by the addition of the following exclusion:

**Identified Contamination**

"Claims", "remediation costs", "foreign subsidiary loss" or "legal defense expenses" arising from or related to the following "pollution conditions", <u>regardless of whether such "pollution conditions" are identified on a Schedule of Known Conditions Endorsement to this Policy</u>:

**Pollution Conditions**

1. Any "pollution conditions" on, at, under or migrating from 19800 Old Route 36 West, Illiopolis, IL 62539 "covered location" associated with, in whole or in part, the explosion and subsequent fire that occurred in April 2004.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

## JURISDICTION AND VENUE AND CHOICE OF LAW (Deletion) ENDORSEMENT

| Named Insured **Formosa Plastics Corporation, USA** | | | Endorsement Number **011** |
|---|---|---|---|
| Policy Symbol **GPI** | Policy Number **G24890491 001** | Policy Period **07/01/2010 to 07/01/2015** | Effective Date of Endorsement **07/01/2010** |
| Issued By (Name of Insurance Company) **ACE American Insurance Company** | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Section **IX.**, **GENERAL CONDITIONS**, Subsections **I.**, **Jurisdiction and Venue**, and **J.**, **Choice of Law**, are hereby deleted in their entirety.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

## SCHEDULE OF KNOWN CONDITIONS (Documents) ENDORSEMENT

| Named Insured<br>**Formosa Plastics Corporation, USA** | | | Endorsement Number<br>**012** |
|---|---|---|---|
| Policy Symbol<br>**GPI** | Policy Number<br>**G24890491 001** | Policy Period<br>**07/01/2010 to 07/01/2015** | Effective Date of Endorsement<br>**07/01/2010** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree that the "pollution conditions" identified within the documents listed in the Schedule of Known Conditions (Documents), below, have been disclosed to the Insurer prior to the inception of this Policy:

### SCHEDULE OF KNOWN CONDITIONS (Documents)

1. FPC USA Corporate Environmental Audit, FPC-Delaware, Schoolhouse Rd., Delaware City, DE, dated March 2009.

2. Marsh Underwriting Report FPC-Delaware, Schoolhouse Rd., Delaware City, DE dated November 2009

3. US Chemical & Safety – Investigation Report for Vinyl Chloride Explosion, FPC-Illinois, 19800 Old Rt. 36 West, Illiopolis, IL, dated 9/14/09.

4. Phase I ESA, Nan Ya Plastics Corp.- America, 5561 Normandy Road, Batchelor, LA prepared by PBS&J dated 11/21/03

5. SPCC Plan (Table of Contents only), Nan Ya Plastics Corp.- America, 5561 Normandy Road, Batchelor, LA, dated 12/2009.

6. Marsh Underwriting Report, Nan Ya Plastics Corp.- America, 5561 Normandy Road, Batchelor, LA, dated 11/2009.

7. SPCC Plan (Table of Contents only), J-M Manufacturing Co., Highway 1 South, Batchelor, LA, dated 12/2009.

8. Phase I ESA FPC-Louisiana, 100 Gulf States Rd., Baton Rouge, LA conducted by PBS&J, dated 5/29/08.

9. FPC USA Corporate-Environmental Audit, FPC-Louisiana, 100 Gulf States Rd., Baton Rouge, LA, dated 8/2009.

10. Marsh Underwriting Report, FPC-Louisiana, 100 Gulf States Rd., Baton Rouge, LA, dated 11/2009.

11. Phase I Environmental Site assessment, Nan Ya Plastics Corp., South Carolina Plant, 104 East Beulah Rd., Lake City, SC prepared by PBS&J dated 11/20/2003.

12. MARSH - Draft Underwriting Report, Nan Ya Plastics Corp., South Carolina Plant, 104 East Beulah Rd., Lake City, SC, dated 11/2009.

13. Phase I ESA, Interplast Group, Ltd., 101 Interplast Blvd., Lolita, TX prepared by PBS&J dated 4/22/05.

14. Phase I ESA draft report, Interplast Group, Ltd., 101 Interplast Blvd., Lolita, TX prepared by Malcolm Pirnie, Inc. dated 4/12/2010.

15. Marsh Underwriting Report, Interplast Group, Ltd., 101 Interplast Blvd., Lolita, TX, dated 10/1/09.

16. Phase I ESA, FPC-America, 201 Formosa Drive, Point Comfort, TX, prepared by PBS&J, dated 7/19/02.

17. Supplement to Phase I ESA, FPC-America, 201 Formosa Drive, Point Comfort, TX, prepared by PBS&J, dated 8/29/02.

18. Phase I ESA, FPC-America, 201 Formosa Drive, Point Comfort, TX, prepared by PBS&J, dated 9/14/02.

19. Response to Comments/Final Decision Document regarding Final Consent Order, FPC-America, 201 Formosa Drive, Point Comfort, TX

20. Consent Order, FPC-America, 201 Formosa Drive, Point Comfort, TX, dated 2/3/10.

21. FPC USA Corporate-Environmental Audit, FPC-America, 201 Formosa Drive, Point Comfort, TX, dated 10/2009.

22. Marsh Underwriting Report, Formosa Plastics Corp., Nan Ya Plastics Corp., Wharton TX, dated 9/23/09.

23. Executive Summary – Phase I ESA, 7503 Vantage Place, Delta, British Columbia, prepared by Jaques Whitford Limited, dated 6/9/2004.

24. Executive Summary – Phase I ESA, PCL & Eastern Packaging Plant, 291 Industrial Drive., Saint John NB prepared by Fundy Engineering, dated 10/2007.

All other terms and conditions of this Policy remain unchanged.

_____

Authorized Representative

## LEAD-BASED PAINT COVERAGE (Bodily Injury & Property Damage Only)
## ENDORSEMENT

| Named Insured<br>**Formosa Plastics Corporation, USA** | | | Endorsement Number<br>**013** |
|---|---|---|---|
| Policy Symbol<br>**GPI** | Policy Number<br>**G24890491 001** | Policy Period<br>**07/01/2010 to 07/01/2015** | Effective Date of Endorsement<br>**07/01/2010** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Section **VI.**, **EXCLUSIONS**, Subsection **N.**, **Lead-Based Paint**, is deleted in its entirety and replaced with the following exclusion:

**N.  Lead-Based Paint**

"Claims", "remediation costs", "foreign subsidiary loss" or "legal defense expenses", arising out of or related to lead-based paint.

This exclusion shall not apply to:

**1.** Third-party "claims" for "bodily injury", and any associated "legal defense expenses" or "foreign subsidiary loss", arising out of lead-based paint;

**2.** Third-party, non-governmental "claims" for "property damage", and any associated "legal defense expenses or "foreign subsidiary loss", arising out of lead-based paint; and

**3.** "Remediation costs" arising out of lead-based paint discovered in soil or groundwater.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

## SCHEDULE OF NAMED INSUREDS ENDORSEMENT

| Named Insured<br>**Formosa Plastics Corporation, USA** | | | Endorsement Number<br>**014** |
|---|---|---|---|
| Policy Symbol<br>**GPI** | Policy Number<br>**G24890491 001** | Policy Period<br>**07/01/2010 to 07/01/2015** | Effective Date of Endorsement<br>**07/01/2010** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree that the following persons, entities or organizations identified below shall be considered "named insureds" under this Policy:

### SCHEDULE OF NAMED INSUREDS

1. Formosa Plastics Corporation, Delaware (DE)
2. Formosa Plastics Corporation, Louisiana (LA)
3. Formosa Plastics Corporation, Texas (FPC TX)
4. Formosa Plastics Corporation America
5. Formosa Plastics Corporation, Illinois
6. Nan Ya Plastics Corporation, America
7. Nan Ya Plastics Corporation USA
8. Interplast Group Ltd.
9. Formosa Utility Venture, Ltd.
10. Neumin Production Company
11. Lavaca Pipeline Company
12. Formosa Hydrocarbons Company, Inc.
13. Formosa Transrail Corporation

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

## NOTICE OF CANCELLATION (90 Days) ENDORSEMENT

| Named Insured<br>**Formosa Plastics Corporation, USA** | | | Endorsement Number<br>**015** |
|---|---|---|---|
| Policy Symbol<br>**GPI** | Policy Number<br>**G24890491 001** | Policy Period<br>**07/01/2010 to 07/01/2015** | Effective Date of Endorsement<br>**07/01/2010** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Section **IX.**, **GENERAL CONDITIONS**, Subsection **A.**, **Cancellation**, of this Policy is hereby deleted in its entirety and replaced with the following:

**A. Cancellation**

1. This Policy may be cancelled only by the "first named insured", or through the "first named insured's" agent, by mailing to the Insurer at the address identified in Item **8.b.** of the Declarations, written notice stating when such cancellation shall be effective.

2. This Policy may be cancelled by the Insurer for the following reasons:

    **a.** Non-payment of premium;

    **b.** Fraud or material misrepresentation on the part of any "insured" or "foreign subsidiary",

    by mailing to the "first named insured" at the "first named insured's" last known address, written notice stating when, not less than ninety (90) days thereafter, fifteen (15) days if cancellation is for non-payment of any unpaid portion of the premium, such cancellation shall be effective. The mailing of notice shall be sufficient proof of notice. The effective date and hour of cancellation stated in the notice shall be the end of the "policy period".

    Subparagraph **2.b.**, herein, shall apply only to that "insured" that engages in the fraud or misrepresentation.  This exception shall not apply to any "insured" who is a parent corporation, subsidiary, employer of, or otherwise affiliated by ownership with, such "insured", including the "first named insured" in the event that the implicated entity is a "foreign subsidiary".

3. In the event of cancellation, the minimum-earned premium percentage indicated on the Declarations shall apply as of the date coverage is bound.  Thereafter, the remaining unearned premium, if any, shall be deemed earned by the Insurer on a *pro rata* basis over the remainder of the "policy period".  Any unearned premium amounts due the ""first named insured" following cancellation will be calculated on a *pro rata* basis and refunded within thirty (30) days of the effective date of cancellation.

All other terms and conditions of the Policy remain unchanged.

_____
Authorized Representative

## OTHER INSURANCE (Primary – Except) ENDORSEMENT

| Named Insured **Formosa Plastics Corporation, USA** | | | Endorsement Number **016** |
|---|---|---|---|
| Policy Symbol **GPI** | Policy Number **G24890491 001** | Policy Period **07/01/2010 to 07/01/2015** | Effective Date of Endorsement **07/01/2010** |
| Issued By (Name of Insurance Company) **ACE American Insurance Company** | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Section **IX.**, **GENERAL CONDITIONS**, Subsection **H.**, **Other Insurance**, is hereby deleted in its entirety and replaced with the following:

**H.  Other Insurance**

If other valid and collectible insurance is available to an "insured" or "foreign subsidiary" covering a loss also covered by this Policy, the insurance afforded by this Policy shall apply as primary insurance except for loss covered under **PPL G24890508 001**. Therefore, this Policy shall apply in excess of and shall not contribute with **PPL G24890508 001**.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

# TRANSPORTATION COVERAGE
## ENDORSEMENT

| Named Insured<br>**Formosa Plastics Corporation, USA** | | Endorsement Number<br>**017** |
|---|---|---|
| Policy Symbol<br>**GPI** | Policy Number<br>**G24890491 001** | Policy Period<br>**07/01/2010 to 07/01/2015** | Effective Date of Endorsement<br>**07/01/2010** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

I.   Section **I., INSURING AGREEMENTS**, Subsection **A.**, NEW POLLUTION CONDITIONS, of this Policy is deleted in its entirety and replaced with the following:

    **A.**   NEW POLLUTION CONDITIONS (Coverage **A.**)

    "Claims", "remediation costs", and associated "legal defense expenses", in excess of the "self-insured retention",  arising out of a "pollution condition": 1) on, at, under, or migrating from a "covered location"; or 2) resulting from "transportation", provided the "claim" is first made or the "insured" first discovers such "pollution condition" during the "policy period".  Any such "claim" must be reported to the Insurer, in writing, during the "policy period" or any applicable "extended reporting period". Any such discovery of a "pollution condition" must be reported to the Insurer in writing during the "policy period".

    The coverage afforded under this Coverage **A.** only applies to "pollution conditions" that first commence, in their entirety, on or after the inception date identified in Item **2.a.** of the Declarations to this Policy.

II.   Section **V., DEFINITIONS**, Subsection **E.**, of this Policy is hereby deleted in its entirety and replaced with the following:

    **E.**   **"Transportation"** means the movement of the "insured's" waste or products by automobile, aircraft, watercraft, or other conveyance beyond the boundaries of a "covered location" by an "insured" or foreign subsidiary, or by a person or entity, other than an "insured" or "foreign subsidiary", engaged in the business of transporting property for hire, until such time as the waste or product is unloaded from an automobile, aircraft, watercraft, railcar or other conveyance.

III.   Section **VI.**, **EXCLUSIONS**, Subsection **S.**, **Vehicles**, of this Policy is hereby deleted in its entirety and replaced with the following exclusion:

    **S.**   **Vehicles**

    "Pollution conditions" resulting from the use, maintenance or operation, including loading or unloading, of an automobile, aircraft, watercraft, or other conveyance beyond the boundaries of a "covered location".

    This exclusion shall not apply to "transportation".

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

## SCHEDULE OF NAMED INSUREDS (Broad) ENDORSEMENT

| Named Insured<br>**Formosa Plastics Corporation, USA** | | | Endorsement Number<br>**018** |
|---|---|---|---|
| Policy Symbol<br>**GPI** | Policy Number<br>**G24890491 001** | Policy Period<br>**07/01/2010 to 07/01/2015** | Effective Date of Endorsement<br>**07/01/2010** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

The entities identified below shall be considered "named insureds" under this Policy.

### Schedule of Named Insureds

1. All corporations, partnerships, companies or other entities, other than unincorporated associations (e.g., joint ventures and general partnerships), in which the "first named insured" maintains at least a fifty percent (50%) ownership interest upon the inception date identified in the Declarations to this Policy (hereinafter Affiliated Entities); and

2. All unincorporated associations (e.g., joint ventures or general partnerships) to which the "first named insured" is a party and maintains at least a fifty percent (50%) ownership interest upon the inception date identified in the Declarations to this Policy (hereinafter Affiliated Associations), but only to the extent of the "first named insured's" legal responsibility for the liabilities of the Affiliated Association.

Notwithstanding the foregoing, the "insureds" and the Insurer agree that any Affiliated Entities or Affiliated Associations, which are also "foreign subsidiaries", are not "named insureds" within the meaning of this Policy. As such, those Affiliated Entities or Affiliated Associations have no independent legal rights to any payment or indemnification under any of the Coverages afforded pursuant to this Policy.

All other terms and conditions of this Policy remain unchanged.

_____

Authorized Representative

## ANTI-STACKING ENDORSEMENT

| Named Insured<br>**Formosa Plastics Corporation, USA** | | | Endorsement Number<br>**019** |
|---|---|---|---|
| Policy Symbol<br>**GPI** | Policy Number<br>**G24890491 001** | Policy Period<br>**07/01/2010 to 07/01/2015** | Effective Date of Endorsement<br>**07/01/2010** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Section **VI.**, **EXCLUSIONS**, of this Policy is hereby amended by the addition of the following:

**Multiple Policies**

"Claims", "remediation costs" or "legal defense expenses" arising out of or related to "pollution conditions" that are also covered pursuant to Policy No. <u>PPL G24890508 001.</u>

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

## CATASTROPHE MANAGEMENT ENDORSEMENT (GPPL)

| | |
|---|---|
| **Named Insured**<br>**Formosa Plastics Corporation, USA** | **Endorsement Number**<br>**020** |

| Policy Symbol<br>**GPI** | Policy Number<br>**G24890491 001** | Policy Period<br>**07/01/2010 to 07/01/2015** | Effective Date of Endorsement<br>**07/01/2010** |
|---|---|---|---|

| |
|---|
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insureds" and the Insurer agree to the following changes to this Policy:

**Catastrophe Management-Specific Aggregate Sublimit of Liability:  $250,000**

**Catastrophe Management-Specific Self-Insured Retention:  $1,000,000**

*THE AGGREGATE SUBLIMIT OF LIABILITY INDICATED ABOVE IS SUBJECT TO, AND PAYMENTS MADE UNDER THIS LIMIT WILL ERODE, THE AGGREGATE LIMIT OF LIABILITY IDENTIFIED IN ITEM 5. OF THE DECLARATIONS TO THIS POLICY.   UNDER NO CIRCUMSTANCES SHALL THE INSURER BE LIABLE TO PAY ANY AMOUNT IN EXCESS OF THE APPLICABLE AGGREGATE LIMIT OF LIABILITY.*

**I.**   Section **I., INSURING AGREEMENTS**, of this Policy is amended to include the following:

SUPPLEMENTAL COVERAGE – CATASTROPHE MANAGEMENT

"Catastrophe management costs", in excess of the "self-insured retention", arising out of a "catastrophe management event".  Any such "catastrophe management event" must be reported to the Insurer, in writing, during the "policy period".

The coverage afforded pursuant to this Supplemental Coverage only applies to "catastrophe management events" that first commence, in their entirety, on or after the inception date identified in Item **2.a.** of the Declarations to this Policy.

**II.**   Section **III., DEFENSE AND SETTLEMENT**, Subsection **C.,** of this Policy is deleted in its entirety and replaced with the following:

**C.**   The "insured" will have the right and the duty to retain a qualified environmental consultant or "catastrophe management firm" to: **1)** perform any investigation and/or remediation of any "pollution condition" covered under this Policy; or **2)** perform "catastrophe management services" covered under this Policy, respectively.  The "insured" must receive the written consent of the Insurer prior to the selection and retention of such consultant or "catastrophe management firm", except in the event of an "emergency response".  Any costs incurred prior to such consent will not be covered under this Policy, or credited against the "self-insured retention", except in the event of an "emergency response".

**III.**   Section **V., DEFINITIONS**, of this Policy is hereby modified by addition of the following:

**"Adverse media coverage"** means national or regional news exposure in television, radio, print or internet media that is reasonably likely to have a negative impact on the "insured" with respect to its income, reputation, community relations, public confidence or good will.

**"Catastrophe management event"** means a "pollution condition":

1. That first commences, in its entirety, on or after the inception date identified in the declarations of this Policy;

2. To which coverage under this Policy more generally applies; and

3. In the good faith opinion of a "key executive", has resulted in or is reasonably likely to result in "claims", "remediation costs", "foreign subsidiary loss", or associated "legal defense expense" that will exceed the applicable "self-insured retention", and a need for "catastrophe management services" due to "adverse media coverage".

Authorized Representative

**"Catastrophe management firm"** means any firm that is approved, in writing, except in the event of an "emergency response", by the Insurer to perform "catastrophe management services" in connection with a "catastrophe management event."

**"Catastrophe management services"** means advising the "insured" or "foreign subsidiary" with respect to minimizing potential harm to the "insured" from a covered "catastrophe management event" by managing "adverse media coverage" and maintaining and restoring public confidence in the "insured", and its services or products.

**"Catastrophe management costs"** means reasonable and necessary expenses approved by the Insurer, in writing, except in the event of an "emergency response", which have been incurred:

1. For printing, advertising, mailing of materials of public relations materials;

2. For travel by directors, officers, employees or agents of the "insured", or the "catastrophe management firm", incurred at the direction of a "catastrophe management firm";

3. To secure the scene of a "catastrophe management event"; or

4. By or advanced to third-parties directly harmed by the "catastrophe management event" for medical costs; funeral costs; psychological counseling; travel expenses costs; temporary living costs or other necessary response costs.

"Catastrophe management costs" do not include any "legal defense expense".

**"Key executive"** means the Chief Executive Officer, Chief Operating Officer, Chief Financial Officer, President, General Counsel, general partner or managing partner (if the "insured" is a partnership), managing member (if the "insured" is a limited liability company) or sole proprietor (if the "insured" is a sole proprietorship) of the "insured" or "foreign subsidiary". A "key executive" also means any other person holding a title designated by the "first named insured", approved by the Insurer, and identified by endorsement to this Policy.

IV. Section **VII., REPORTING AND COOPERATION**, Subsection **C.**, of this Policy is deleted in its entirety and replaced with the following:

C. No "insured" or "foreign subsidiary" shall make or authorize an admission of liability or attempt to settle or otherwise dispose of any "claim" or "foreign subsidiary claim" without the written consent of the Insurer. Nor shall any "insured" or "foreign subsidiary" retain any consultant or "catastrophe management firm", or incur any "remediation costs" or "catastrophe management costs", respectively, without the prior written consent of the Insurer, except in the event of an "emergency response".

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

## COVERAGE LIMITATION AND REOPENER II ENDORSEMENT

| Named Insured<br>**Formosa Plastics Corporation, USA** | | | Endorsement Number<br>**021** |
|---|---|---|---|
| Policy Symbol<br>**GPI** | Policy Number<br>**G24890491 001** | Policy Period<br>**07/01/2010 to 07/01/2015** | Effective Date of Endorsement<br>**07/01/2010** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

**I.**   <u>COVERAGE LIMITATION:</u>

Coverage under this Policy is not afforded for "remediation costs" or "business interruption loss", including any associated "legal defense expenses" or "foreign subsidiary loss", with respect to any "pollution conditions" identified in the Schedule of Known Conditions Endorsement attached to this Policy.

However, the coverage limitation identified above, shall not apply to "pollution conditions" that have been reported to the "responsible person" as not being actionable pursuant to "environmental laws" in any Phase I or Phase II Environmental Site Assessment report (or its functional equivalent) specifically prepared for a "named insured" by a qualified environmental consultant.  To the extent that the qualified consultant's actionability determination is premised, in whole or in part, on the use of, or engineering controls in effect at, a "covered location", any coverage afforded pursuant to this paragraph shall be contingent upon:

    **a.**   The "insured's" or "foreign subsidiary" maintenance of said engineering controls; and

    **b.**   The continued use of the property in a manner consistent with the consultant's reported assumptions, during the "policy period".

**II.**   RE-OPENER OF COVERAGE:

In the event that "closure" is achieved for any of the "pollution conditions" addressed in Section **I.,** above, then coverage limitations as set forth in Section **I.,** above, may be deleted with respect to the specific "pollution condition" that achieves such "closure".  The coverage limitations identified in Paragraph **I.,** above, can only be deleted by endorsement to this Policy issued by the Insurer.

**III.**   For the purposes of this Endorsement, "closure" shall mean that the "insured" obtains a written No Further Action determination, or otherwise achieves closure in accordance with the regulatory requirements applicable to the subject "pollution conditions", which has been confirmed in writing by the regulatory agency or authority with jurisdiction over the "pollution conditions".

If such "closure" is contingent upon: 1) certain additional actions with respect to the subject "pollution conditions" in order to be effective; or 2) on the use of institutional or engineering controls in effect at a "covered location", then any such additional actions must be completed in order for coverage to be effective pursuant to this Endorsement, and such coverage shall be contingent upon the "insured's" or "foreign subsidiary's" continued maintenance of said engineering controls and the use of the "covered location" in a manner consistent with said institutional control, as applicable, during the "policy period" or any "extended reporting period".

All other terms and conditions of this Policy remain unchanged.

_____
                                     Authorized Representative

## LOCATION-SPECIFIC POLLUTION CONDITIONS EXCLUSIONARY (Deepwater Horizon) (GPPL) ENDORSEMENT

| Named Insured
**Formosa Plastics Corporation, USA** | | Endorsement Number
**022** |
|---|---|---|
| Policy Symbol
**GPI** | Policy Number
**G24890491 001** | Policy Period
**07/01/2010 to 07/01/2015** | Effective Date of Endorsement
**07/01/2010** |
| Issued By (Name of Insurance Company)
**ACE American Insurance Company** | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

Solely with respect to the "covered locations" identified in the Schedule of Covered Locations, below, Section **VI.**, **EXCLUSIONS**, of this Policy is hereby amended by the addition of the following:

**Petroleum Migration**

Any "pollution conditions" associated with, in whole or in part, the explosion and sinking of the Deepwater Horizon drilling rig that occurred on April 20, 2010 in the Gulf of Mexico, including, but not limited to, any "pollution conditions" related to the subsequent release and spill of petroleum, and associated containment, treatment and recovery operations.

### Schedule of Covered Locations

1. **103 Fannin Road, Point Comfort, TX 77978**

2. **101 Formosa Drive, Point Comfort, TX 77978**

3. **201 Formosa Drive, Point Comfort, TX 77978**; and

4. Any "covered location" added to this Policy during the "policy period" pursuant to any Automatic Acquisition Endorsement attached to this Policy, but solely to the extent that such "covered location" is situated in any of the following jurisdictions:

   a. Texas;
   b. Louisiana;
   c. Mississippi;
   d. Alabama;
   e. Florida;
   f. Mexico;
   g. Belize;
   h. Guatemala;
   i. Honduras;
   j. Nicaragua;
   k. Costa Rica;
   l. Panama;
   m. Columbia;
   n. Venezuela;
   o. Bermuda;
   p. Haiti;

Authorized Representative

**q.** The Dominican Republic;

**r.** The Bahamas;

**s.** Turks and Caicos Islands;

**t.** Puerto Rico;

**u.** US Virgin Islands;

**v.** British Virgin Islands;

**w.** Anguilla;

**x.** Antigua;

**y.** Barbuda;

**z.** St. John's;

**aa.** Guadeloupe;

**bb.** St. Christopher and Nevis;

**cc.** Dominica;

**dd.** Martinique;

**ee.** St. Lucia;

**ff.** Barbados;

**gg.** St. Vincent;

**hh.** The Grenadines;

**ii.** Grenada;

**jj.** Trinidad;

**kk.** Tobago;

**ll.** Barbados; or

**mm.** The Netherlands Antilles.

All other terms and conditions of this Policy remain unchanged.

Authorized Representative

## NON-OWNED DISPOSAL SITES COVERAGE (Blanket/Scheduled - New Waste and Historical Waste) ENDORSEMENT

| Named Insured **Formosa Plastics Corporation, USA** | | Endorsement Number **023** |
|---|---|---|
| Policy Symbol **GPI** | Policy Number **G24890491 001** | Policy Period **07/01/2010 to 07/01/2015** | Effective Date of Endorsement **07/01/2010** |
| Issued By (Name of Insurance Company) **ACE American Insurance Company** | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

**I.** Section **V.**, **DEFINITIONS**, Subsection **F.**, of this Policy is deleted in its entirety and replaced with the following:

**F.** **"Covered location"** means any locations specifically identified in Item **9.** of the Declarations, as modified by endorsement to this Policy, or any "non-owned disposal site", provided that any coverage afforded with respect to such "non-owned disposal sites" is limited to third-party "claims" pursuant to Subsection **D.**, above.

**II.** Solely with respect to coverage for any "non-owned disposal sites" under this Endorsement, Section **V.**, **DEFINITIONS**, Subsections **D.** and **W.**, of this Policy are deleted in their entirety and replaced with the following:

**D.** **"Claim"** means the assertion of a legal right, including but not limited to a "government action", suits or other actions alleging responsibility or liability on the part of the "insured" for "bodily injury", "property damage", or "remediation costs" arising out of "pollution conditions" to which this insurance applies.

Solely with respect to Coverage **C.** of this Policy, and with respect to the corresponding definition of "foreign subsidiary loss" in this Section **V.**, **"claim"** means the assertion of a legal right, including but not limited to a "government actions", suits or other actions alleging responsibility or liability on the part of a "foreign subsidiary" for "bodily injury", "property damage", or "remediation costs" arising out of "pollution conditions" to which this insurance applies.

With respect to any coverage afforded with respect "non-owned disposal sites" specifically scheduled onto this Policy, covered "claims" are limited to those made by or on behalf of third-parties for "pollution conditions" allegedly attributable to an "insured's" or "foreign subsidiary's" waste that is: 1) generated at a "covered location" other than a "non-owned disposal site"; and 2) received at the "non-owned disposal site" prior to the expiration date identified in Item **2.a.** of the Declarations to this Policy.

**W.** **"Non-Owned Disposal Site"** means a site located in the United States of America or Canada that has not at any time been owned or operated, in whole or in part, by any "insured" or "foreign subsidiary", which receives or has received a "named insured's" or "foreign subsidiary's" waste for disposal, provided that the "non-owned disposal site":

**1.** Is properly licensed by federal and/or state regulators with applicable jurisdiction to accept the "named insured's" or "foreign subsidiary's waste" wastes at the time of such disposal;

**2.** Was not owned or operated by any person, corporation or unincorporated association that was in bankruptcy at the time of its receipt the "named insured's" or "foreign subsidiary's" waste for disposal;

**3.** Has not, at any time prior to the inception date of this Policy, been identified on the United States EPA (CERCLA) National Priorities List or CERCLIS list, or under any functional equivalent of those listings made by any state or provincial regulatory agency pursuant to "environmental laws"; and

**4.** Is not, or was not, undergoing voluntary or regulatory-required remediation activities, at the time the "named insured's" or "foreign subsidiary's" waste was received for disposal.

**"Non-Owned Disposal Site"** shall also means the following locations:

1. **Veolia, 7665 Hwy 73, Port Arthur TX 77640**

2. **Texas Molecular, 2525 Battleground Road, Deer Park TX 77536**

3. **Clean Harbors, 2027 Battleground Road, Deer Park TX 77536**

4. **US Ecology Texas, County Road 69, Robstown TX 78380**

5. **Rineco, 1007 Vulcan Road, Benton AR 72015**

6. **Heritage-WTI, 1250 St. George St., East Liverpool OH 43920**

7. **Modern Landfill, 4400 Mt. Pisgah Road, York PA 17402**

8. **Cycle Chem, 550 Industrial Dr., Lewisberry PA 17339**

9. **Pollution Control Ind., 4343 Kennedy Ave., East Chicago IN 46312**

10. **Chemtron Corp., 35850 Schneider Ct., Avon OH 44011**

11. **FCC Environmental, 505 South Market St., Wilmington DE 19801**

12. **FCC Environmental, 1122 Hwy 190 West, Port Allen LA 70767**

13. **Envirite Corp.,730 Vogelsong Rd., York PA 17404**

14. **Lamp Environmental Industries, Inc., 11441 Fontana Lane, Independence LA 70443**


All other terms and conditions of this Policy remain unchanged.


_____
Authorized Representative

## ASBESTOS, LEAD-BASED PAINT AND PUNITIVE DAMAGES (Sublimit) ENDORSEMENT

| Named Insured<br>**Formosa Plastics Corporation, USA** | | | Endorsement Number<br>**024** |
|---|---|---|---|
| Policy Symbol<br>**GPI** | Policy Number<br>**G24890491 001** | Policy Period<br>**07/01/2010 to 07/01/2015** | Effective Date of Endorsement<br>**07/01/2010** |
| Issued By (Name of Insurance Company)<br>**ACE American Insurance Company** | | | |

Insert the policy number. The remainder of the information is to be completed only when this endorsement is issued subsequent to the preparation of the policy.

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

The "insured" and the Insurer hereby agree to the following changes to this Policy:

I.  **$25,000,000** shall be the Aggregate Sublimit of Liability for coverage afforded under this Policy, if any, for asbestos, asbestos-containing materials, lead-based paint and punitive damages.  Therefore, this Aggregate Sublimit of Liability shall be the maximum amount the Insurer shall pay for all "claims", "remediation costs", "business interruption loss", "foreign subsidiary loss" and associated "legal defense expenses" arising out of or related to asbestos, asbestos-containing materials, lead-based paint or punitive damages to which this insurance applies.  This Sublimit of Liability shall be subject to any applicable Aggregate Limits of Liability identified in the Declarations to this Policy.  Under no circumstance shall the Insurer be liable to pay any amount in excess of any applicable Aggregate Limits of Liability.

II.  Nothing in this Endorsement shall be construed to expand coverage beyond the explicit terms and conditions in this Policy.

All other terms and conditions of this Policy remain unchanged.

_____
Authorized Representative

# TERRORISM RISK INSURANCE ACT ENDORSEMENT

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| **Formosa Plastics Corporation, USA** | | | **025** |
| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
| **GPI** | **G24890491 001** | **07/01/2010 to 07/01/2015** | **07/01/2010** |
| Issued By (Name of Insurance Company) | | | |
| **ACE American Insurance Company** | | | |

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

Terrorism Premium (Certified Acts of Terrorism): **$49,880**

In consideration of the additional premium indicated above, which is included in the Premium as listed on the Declarations, the "insured" and the Insurer, hereby agree to the following Policy change(s):

**A.** With respect to any "hostile acts" or "terrorism" exclusions contained in this Policy, or attached to this Policy by endorsement, such exclusions do not apply to a "certified act of terrorism", as defined in Paragraph **C.**, below.

**B.** With respect to any one or more "certified acts of terrorism", the Insurer will not pay any amounts for which the Insurer is not responsible under the terms of the federal Terrorism Risk Insurance Act **("TRIA")**, due to the application of any clause which results in a cap on the Insurer's liability for payments for terrorism losses.

**C.** "Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to TRIA. The criteria contained TRIA for a "certified act of terrorism" include the following:

    **1.** The act resulted in insured losses in excess of $5 million attributable to all types of insurance subject to TRIA; and

    **2.** The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**D.** Notwithstanding any coverage that may otherwise be afforded for punitive damages under this Policy, if any, coverage shall not be afforded for damages arising, directly or indirectly, out of a "certified act of terrorism" that are awarded as punitive damages.

**E.** The coverage afforded under this endorsement shall expire at the earlier of the following dates:

    **1.** The end of the "policy period", as indicated on the Declarations; or

    **2.** **December 31, 2014**.

**F.** The premium for "certified acts of terrorism" coverage is calculated based in part on the federal participation in payment of terrorism losses as set forth in TRIA. The federal program established by TRIA is scheduled to terminate at the end of December 31, 2014, unless extended by the federal government.

**G.** If this "policy period" extends beyond December 31, 2014, please note that the TRIA premium, above, is premised on the parties' assumption that TRIA will later be extended  through the end of the "policy period", thereby mandating that Insurer make available coverage for "certified acts of terrorism" for the entire "policy period".  In the event that TRIA is not extended beyond December 31, 2014, or otherwise expires at some point during the "policy "period", the Insurer will refund the unearned portion of our TRIA premium to the insured on a pro-rata basis.  In the event that new TRIA extension or replacement legislation is enacted requiring the Insurer to offer coverage for terrorism that is materially different than the coverage requirements included in the current version of TRIA that expires on December 31, 2014, the Insurer reserves the right to re-price and prospectively modify terrorism coverage to conform with the statutory requirements and risks presented by any such new legislation.

All other terms and conditions of the policy remain unchanged.

_____
Authorized Agent

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| **Formosa Plastics Corporation, USA** | | | **026** |
| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
| **GPI** | **G24890491 001** | **07/01/2010 to 07/01/2015** | **07/01/2010** |
| Issued By (Name of Insurance Company) | | | |
| **ACE American Insurance Company** | | | |

### THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

**Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act.  The portion of your premium attributable to such coverage is shown in this endorsement or in the policy Declarations.

**Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program.  The federal share equals 85% of that portion of the amount of such insured losses that exceeds the applicable insurer retention.  However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31), the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

**Cap On Insurer Participation In Payment Of Terrorism Losses**

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a Program Year (January 1 through December 31) and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

Terrorism Risk Insurance Act premium: $**49,880**.

_____
Authorized Agent

Includes copyrighted material of Insurance Services office, Inc., with its permission

TRIA11b (1/08)

# NEW JERSEY CHANGES - CANCELLATION AND NONRENEWAL

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| **Formosa Plastics Corporation, USA** | | | **027** |

| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
|---|---|---|---|
| **GPI** | **G24890491 001** | **07/01/2010 to 07/01/2015** | **07/01/2010** |

| Issued By (Name of Insurance Company) |
|---|
| **ACE American Insurance Company** |

### THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

If the policy or coverage part to which this endorsement applies contains cancellation or nonrenewal provisions more favorable to the Named Insured than this endorsement, then those provisions apply.

**Any cancellation or non-renewal provisions contained in the policy to which
this endorsement is attached are deleted and replaced by the following:**

**I.**  Pursuant to New Jersey law, this policy cannot be cancelled or nonrenewed for any underwriting reason or guideline which is arbitrary, capricious or unfairly discriminatory or without adequate prior notice to the insured. The underwriting reasons or guidelines that an insurer can use to cancel or nonrenew this policy are maintained by the insurer in writing and will be furnished to the insured and/or the insured's lawful representative upon written request.

**A.  CANCELLATION**

**1.**  The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

**2.**  If this policy has been in effect for less than 60 days, we may cancel this policy by mailing or delivering to the first Named Insured and any person entitled to notice under this policy written notice of cancellation at least:

  **a.**  10 days before the effective date of cancellation if we cancel for:

  **(1)**  Nonpayment of premium; or

  **(2)**  Existence of a moral hazard, as defined in N.J.A.C. 11:1-20.2(f) as follows:

   **(a)**  "The risk, danger or probability that the insured will destroy, or permit to be destroyed, the insured property for the purpose of collecting the insurance proceeds. Any change in the circumstances of an insured that will increase the probability of such a destruction may be considered a 'moral hazard'; and

   **(b)**  The substantial risk, danger or probability that the character, circumstances or personal habits of the insured may increase the possibility of loss or liability for which an insurer will be held responsible. Any change in the character or circumstances of an individual, corporate, partnership or other insured that will increase the probability of such a loss or liability may be considered a 'moral hazard.'"

  **b.**  30 days before the effective date of cancellation if we cancel for any other reason.

**3.**  We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

**4.**  Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

**5.**  If this policy is cancelled, we will send the first Named Insured any premium refund due. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

**6.**  If notice is mailed, proof of mailing will be sufficient proof of notice.

**7.** Cancellation of Policies in Effect For 60 Days or More.

   **a.** If this policy has been in effect for 60 days or more, or is a renewal of a policy we issued, we may cancel this policy only for one or more of the following reasons:

      **(1)** Nonpayment of premium;

      **(2)** Existence of a moral hazard, as defined in N.J.A.C. 11:1-20.2(f);

      **(3)** Material misrepresentation or nondisclosure to us of a material fact at the time of acceptance of the risk;

      **(4)** Increased hazard or material change in the risk assumed which we could not have reasonably contemplated at the time of assumption of the risk;

      **(5)** Substantial breaches of contractual duties, conditions or warranties that materially affect the nature and/or insurability of the risk;

      **(6)** Lack of cooperation from the insured on loss control matters materially affecting insurability of the risk;

      **(7)** Fraudulent acts against us by the insured or its representative that materially affect the nature of the risk insured;

      **(8)** Loss of or reduction in available insurance capacity;

      **(9)** Material increase in exposure arising out of changes in statutory or case law subsequent to the issuance of the insurance contract or any subsequent renewal;

      **(10)** Loss of or substantial changes in applicable reinsurance;

      **(11)** Failure by the insured to comply with any Federal, State or local fire, health, safety or building or construction regulation, law or ordinance with respect to an insured risk which substantially increases any hazard insured against within 60 days of written notification of a violation of any such law, regulation or ordinance;

      **(12)** Failure by the insured to provide reasonable and necessary underwriting information to us upon written request therefor and a reasonable opportunity to respond;

      **(13)** Agency termination, provided:

         **a.** We document that replacement coverage at comparable rates and terms has been provided to the first Named Insured, and we have informed the first Named Insured, in writing, of the right to continue coverage with us; or

         **b.** We have informed the first Named Insured, in writing, of the right to continue coverage with us and the first Named Insured has agreed, in writing, to the cancellation or nonrenewal based on the termination of the first Named Insured's appointed agent.

      **(14)** Any other reasons in accordance with our underwriting guidelines for cancellation of commercial lines coverage.

   **b.** If we cancel this policy based on paragraph 7.a.(1) or (2) above, we will mail a written notice, stating the reason for cancellation, to the first Named Insured and any person entitled to notice under this policy, at least 10 days before the effective date of cancellation. For cancellation due to the nonpayment of premium, the notice will state the effect of nonpayment by the due date. Cancellation for nonpayment of premium will not be effective if payment of the amount due is made before the effective date set forth in the notice. If we cancel this policy for any other reason listed above, we will mail a written notice, stating the reason for cancellation, to the first Named Insured and any person entitled to notice under this policy, not more than 120 days nor less than 30 days before the effective date of such cancellation.

   **c.** Notice will be sent to the last mailing addresses known to us, by:

      **(1)** Certified mail; or

      **(2)** First class mail, if we have obtained from the post office a date stamped proof of mailing showing names and addresses.

   **d.**  We need not send notice of cancellation if you have:

      **(1)**  Replaced coverage elsewhere; or

      **(2)**  Specifically requested termination.

**B.**   **NONRENEWAL**

   **1.**  We may elect not to renew this policy for any reason permitted to cancel it. If we elect not to renew this policy, we will mail a notice of nonrenewal, stating the reasons for nonrenewal, to the first Named Insured at least 30 days but not more than 120 days before the expiration date of this policy. If this policy does not have a fixed expiration date, it shall be deemed to expire annually on the anniversary of its inception.

   **2.**  This notice will be sent to the first Named insured at the last mailing address known to us by:

      **a.**  Certified mail; or

      **b.**  First class mail, if we have obtained from the post office a date stamped proof of mailing showing the first Named Insured's name and address.

   **3.**  We need not mail or deliver this notice if you have:

      **a.**  Replaced coverage elsewhere; or

      **b.**  Specifically requested termination.

 

_____
Authorized Agent

# TRADE OR ECONOMIC SANCTIONS ENDORSEMENT

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| **Formosa Plastics Corporation, USA** | | | **028** |
| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
| **GPI** | **G24890491 001** | **07/01/2010 to 07/01/2015** | **07/01/2010** |
| Issued By (Name of Insurance Company) | | | |
| **ACE American Insurance Company** | | | |

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

This insurance does not apply to the extent that trade or economic sanctions or other laws or regulations prohibit us from providing insurance, including, but not limited to, the payment of claims. All other terms and conditions of the policy remain unchanged.

_____
Authorized Agent

# SIGNATURE ENDORSEMENT

| Named Insured | | | Endorsement Number |
|---|---|---|---|
| **Formosa Plastics Corporation, USA** | | | **029** |
| Policy Symbol | Policy Number | Policy Period | Effective Date of Endorsement |
| **GPI** | **G24890491 001** | **07/01/2010 to 07/01/2015** | **07/01/2010** |
| Issued By (Name of Insurance Company) | | | |
| **ACE American Insurance Company** | | | |

THE ONLY SIGNATURES APPLICABLE TO THIS POLICY ARE THOSE REPRESENTING THE COMPANY NAMED ON THE FIRST PAGE OF THE DECLARATIONS.

By signing and delivering the policy to you, we state that it is a valid contract.

**INDEMNITY INSURANCE COMPANY OF NORTH AMERICA**
436 Walnut Street, P.O. Box 1000, Philadelphia, Pennsylvania 19106

**BANKERS STANDARD FIRE AND MARINE COMPANY**
436 Walnut Street, P.O. Box 1000, Philadelphia, Pennsylvania 19106

**BANKERS STANDARD INSURANCE COMPANY**
436 Walnut Street, P.O. Box 1000, Philadelphia, Pennsylvania 19106

**ACE INDEMNITY INSURANCE COMPANY**
436 Walnut Street, P.O. Box 1000, Philadelphia, Pennsylvania 19106

**ACE AMERICAN INSURANCE COMPANY**
436 Walnut Street, P.O. Box 1000, Philadelphia, Pennsylvania 19106

**ACE PROPERTY AND CASUALTY INSURANCE COMPANY**
436 Walnut Street, P.O. Box 1000, Philadelphia, Pennsylvania 19106

**INSURANCE COMPANY OF NORTH AMERICA**
436 Walnut Street, P.O. Box 1000, Philadelphia, Pennsylvania 19106

**PACIFIC EMPLOYERS INSURANCE COMPANY**
436 Walnut Street, P.O. Box 1000, Philadelphia, Pennsylvania 19106

**ACE FIRE UNDERWRITERS INSURANCE COMPANY**
436 Walnut Street, P.O. Box 1000, Philadelphia, Pennsylvania 19106

GEORGE D. MULLIGAN, Secretary

JOHN J. LUPICA, President

**WESTCHESTER FIRE INSURANCE COMPANY**
1325 Avenue of the Americas, 19th Floor, New York, NY 10019

GEORGE D. MULLIGAN, Secretary

DENNIS A. CROSBY, JR., President

Authorized Agent

CC-1K11e  (02/06) Ptd. in U.S.A.



**ACE Producer Compensation
Practices & Policies**

ACE believes that policyholders should have access to information about ACE's practices and policies related to the payment of compensation to brokers and independent agents.  You can obtain that information by accessing our  website  at http://www.aceproducercompensation.com or by calling the  following toll-free  telephone number: 1-866-512-2862.

ALL-20887 (10/06)

IL P 001 01 04

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- l  Foreign agents;
- l  Front organizations;
- l  Terrorists;
- l  Terrorist organizations; and
- l  Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site – http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

# EXHIBIT 2

Case 2:20-cv-14338-RPM-JSA   Document 85-5   Filed 01/22/24   Page 64 of 186
Case 6:17-cv-00047   Document 1   Filed in TXSD on 07/31/17   Page 1 of 26
PageID: 1026

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| **SAN ANTONIO BAY ESTUARINE** | ) | Civil Action No. |
| **WATERKEEPER and S. DIANE WILSON,** | ) | |
| | ) | |
| Plaintiffs, | ) | **COMPLAINT FOR DECLARATORY** |
| | ) | **AND INJUNCTIVE RELIEF AND** |
| vs. | ) | **CIVIL PENALTIES** |
| | ) | |
| **FORMOSA PLASTICS CORP., TEXAS,** | ) | (Federal Water Pollution Control Act, |
| **FORMOSA PLASTICS CORP., U.S.A., and** | ) | 33 U.S.C. § 1251 et seq.) |
| **FORMOSA PLASTICS CORP., AMERICA,** | ) | |
| Defendants. | ) | |

## INTRODUCTION

1.      San Antonio Bay Estuarine Waterkeeper ("Waterkeeper") and S. Diane Wilson (collectively "Waterkeepers" or "Plaintiffs") bring this enforcement suit under section 505(a)(1) of the Clean Water Act, 33 U.S.C. §1365(a)(1), against Formosa Plastics Corporation, Texas, Formosa Plastics Corporation, U.S.A., and Formosa Plastics Corporation, America (collectively "Formosa," or "Formosa Plastics") for illegally discharging plastic pellets and polyvinyl chloride ("PVC"), dispersion (specialty) polyvinyl chloride ("SPVC"), and other plastic powders (collectively "plastics") through its stormwater and wastewater into Cox Creek and Lavaca Bay in violation of Formosa's Texas Pollutant Discharge Elimination System ("TPDES") permit. These violations have occurred and are continuing to occur at Formosa's 2,500-acre plastics manufacturing plant in Point Comfort, Texas ("the Plant" or "the Facility").

1

Case 2:20-cv-14338-RPM-JSA   Document 85-5   Filed 01/22/24   Page 65 of 186
Case 6:17-cv-00047   Document 1   Filed in TXSD on 07/31/17   Page 2 of 26
PageID: 1027

2.      Waterkeepers seek injunctive and declaratory relief under the Clean Water Act, 33 U.S.C
§§ 1365(a) and (d), and 28 U.S.C §§ 2201, 2202 (declaratory judgment), to prevent further
illegal discharges and the resulting harm to Cox Creek, Lavaca Bay, Matagorda Bay, and the
surrounding wetlands, beaches and their wildlife, as well as the harm to Waterkeepers.
Waterkeepers also seek an order requiring Formosa to remediate and mitigate the harm caused
by the illegally discharged plastics.

3.      Formosa's TPDES permit specifically prohibits the discharge of floating solids, including
plastics, into Lavaca Bay and Cox Creek.

4.      On January 31, 2016, Waterkeepers began collecting samples of Formosa's illegally
discharged plastics.  Since that time through July 23, 2017 and ongoing, Waterkeepers have
gathered more than 1,637 samples over 20 miles of shoreline in Lavaca Bay and Matagorda Bay,
as well as along Cox Creek and surrounding wetlands and beaches.  The plastics have been
found from Six Mile to Indianola and Port O'Connor.  The following aerial photo correctly
depicts the location of the Formosa plant and relevant significant landmarks near the plant.

Case 2:20-cv-14338-RPM-JSA    Document 85-5    Filed 01/22/24    Page 66 of 186
Case 6:17-cv-00047   Document 1   Filed in TXSD on 07/31/17   Page 3 of 26
PageID: 1028



5.     Cox Creek, Lavaca Bay, and Matagorda Bay are areas of sport and commercial fishing

and also are habitat for turtles, birds, fish, shrimp and other marine and wetland wildlife.

Endangered whooping cranes winter at Powderhorn Ranch State Park and Aransas National

3

Case 2:20-cv-14338-BRM-JSA   Document 85-5   Filed 07/22/24   Page 67 of 186
Case 6:17-cv-00047   Document 1   Filed in TXSD on 07/31/17   Page 4 of 26
PageID: 1029

Wildlife Refuge, which border Matagorda Bay just south of Formosa.  Endangered turtles regularly swim in Lavaca Bay.

6.      Penalties in this case can total up to $104,828 per day, because each day Formosa has illegally discharged pellets it has violated the law twice: for the illegal discharge and for the failure to report the discharge to TCEQ.  33 U.S.C. § 1319(d); 40 C.F.R. § 19.4; 30 TAC § 307.4(b)(2 – 4); 30 TAC § 305.125(9). Penalties are paid to the federal government.

7.      In determining appropriate penalties, the Clean Water Act requires the Court to consider the seriousness of violations, Formosa's economic benefit from the violation, Formosa's history of repeated violations of laws, whether Formosa's recent efforts to comply with the law are in good-faith, and the economic impact of the penalty on a company like Formosa Corp., USA, which had $1.36 billion of pretax income in 2016, and other matters as justice may require. 42 U.S.C. § 1319(d).

8.      Formosa's ongoing violations of the Clean Water Act have caused, and unless abated, will continue to cause significant harm to the Cox Creek, Lavaca Bay, and Matagorda Bay ecosystems that Waterkeepers use and enjoy.

## JURISDICTION AND VENUE

9.      Jurisdiction over this action is conferred by 28 U.S.C. § 1331 (federal question) and 33 U.S.C. § 1365(a) (Clean Water Act jurisdiction). An actual, justiciable controversy exists between Waterkeepers and Formosa Plastics. The requested relief is proper under 28 U.S.C. §§ 2201, 2202, and 33 U.S.C. §§ 1319(d), 1365(a), (d).

10.     Pursuant to Section 505(b)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A), Waterkeepers notified Formosa and its registered agent of its violations of the Act and of

4

Case 2:20-cv-14338-RM-JSA   Document 85-5   Filed 07/22/24   Page 68 of 186
Case 6:17-cv-00047   Document 1   Filed in TXSD on 07/31/17   Page 5 of 26
PageID: 1030

Waterkeepers' intent to sue under the Act by letter dated and postmarked April 6, 2017. A copy of the Notice of Intent is attached to this Complaint as **Exhibit 1** and is incorporated herein by reference. Waterkeepers also notified the Administrator of the United States EPA, the Regional Administrator of EPA, and the Executive Director of the TCEQ. More than 60 days have passed since Waterkeepers sent the notice.

11.     Formosa's violations are continuing because there is a strong likelihood, based on past conduct, that Formosa will continue to discharge plastics in violation of its permit and the Clean Water Act.

12.     Until significant and permanent changes to the facility and its operations are made, Formosa will continue to illegally discharge plastics continuously and/or intermittently.

13.     Formosa's violations continue daily under the "continuing violations" doctrine, because Formosa has failed to remedy or clean up the discharged plastics, which have "persistent effects that are amenable to correction."

14.     Formosa's plastics remain in and around Cox Creek, Lavaca Bay, and Matagorda Bay, and have been there since at least January 31, 2016.

15.     Venue lies in the Southern District of Texas, pursuant to 33 U.S.C. § 1365(c)(1), because the events giving rise to this claim occurred at the Formosa facility, located in Point Comfort, Texas, in Calhoun County, within the Southern District of Texas.

## PARTIES

16.     Plaintiff SAN ANTONIO BAY ESTUARINE WATERKEEPER is an unincorporated association that was started in 2012 as a project of the Calhoun County Research Watch. Calhoun County Research Watch is a 501(c)(3) non-profit organization founded in 1989.

Case 2:20-cv-14338-DPM-JSA   Document 85-5   Filed 07/22/24   Page 69 of 186
Case 6:17-cv-00047-MJJ   Document 9   Filed 07/31/17   Page 6 of 26
PageID: 1031

Waterkeeper is part of a national network of Waterkeeper organizations, the Waterkeeper Alliance.  The board of Waterkeeper meets as needed, and its executive director is Plaintiff S. Diane Wilson. Each Waterkeeper Alliance member has a designated Waterkeeper.  Bob Lindsey is that person for the San Antonio Bay Estuarine Waterkeeper.

17.     The mission of Waterkeeper is to monitor and pro-actively protect Lavaca, Matagorda and San Antonio Bays and to educate the public, while reporting relevant findings to the appropriate authorities.  Waterkeeper is committed to engaging volunteers, marine biologists, environmental advocates from both Calhoun County Resource Watch and Texas Injured Workers, commercial fishermen, and other members of the community to identify violations of the CWA and promote cleanup and recovery efforts.  Waterkeeper also promotes the preservation of local wetlands and waterways for proper commercial and sport fishing and other recreational uses, such as swimming and other watersports to further the appreciation of these beautiful natural resources.

18.     Waterkeeper believes it is important that the public be aware of threats to the Bays. Waterkeeper engages media sources to publicize areas of concern, such as the harmful pollution of waterways by chemical plants and others.  Waterkeeper hosts public meetings to educate the community, comments on permit applications at environmental agencies, notifies government agencies when there are problems in the waterways, and files lawsuits when other alternatives are unavailing.

19.     Members of Waterkeeper have seen Formosa's plastics on the shores of Cox Creek and Lavaca Bay and have reported the plastics to TCEQ and EPA.

Case 2:20-cv-14338-BRM-JSA   Document 85-5   Filed 01/22/24   Page 70 of 186
Case 6:17-cv-00047   Document 1   Filed in TXSD on 07/31/17   Page 7 of 26
PageID: 1032

20.      In July 2013, Waterkeeper requested an administrative contested case hearing on

Formosa Plastic's application for a renewal and amendment to its TPDES permit.  In that

request, Waterkeeper described the ongoing, extensive littering of the area with plastics and

asked TCEQ to prohibit such discharges

21.      Members of Waterkeeper include sport and commercial fishermen.  They are concerned

about the effects of plastics on fish, birds, and marine wildlife.  Waterkeeper is well aware of the

fragile balance of life in Lavaca Bay and that harm to aquatic species can harm not just those

species and the ecosystem but, also, the livelihoods of commercial fishermen, shrimpers,

oystermen and the passions of those people and of recreational fishers.

22.      Members of Waterkeeper walk the beaches of Lavaca Bay and swim and boat in its

waters.  They are offended by the littering of the Bay and its shores with plastics.  They are

concerned about the aesthetic damage to and environmental health of the beaches, wetlands,

shores and bays and the wildlife that depend on those resources.

23.      Waterkeeper is distressed that, after years of complaints to state and federal agencies,

Formosa has not taken adequate steps to prevent the illegal discharge of plastics.

24.      Waterkeeper's members' use and enjoyment of the areas near and downstream of

Formosa's discharges have been, are being, and will continue to be diminished because of

Formosa's Clean Water Act violations. Unless the requested relief is granted, Formosa's Clean

Water Act violations will continue to injure Waterkeeper.

25.      Plaintiff S. DIANE WILSON has spent much of her life working in the local bays

surrounding Calhoun County; these include Lavaca/Matagorda Bays and San Antonio Bays.  Ms.

Wilson is the fourth generation in her family to fish the bounties of these bays. For forty years,

Case 2:20-cv-14338-RFM-JSA  Document 85-5  Filed 01/22/24  Page 71 of 186
Case 6:17-cv-00047  Document  Filed in TXSD on 07/31/17  Page 8 of 26
PageID: 1033

she worked as a commercial fisherman, shrimper, oysterman, and fin fisher, and as a manager at

a fish house.  She has retired from those professions but continues in the shrimping industry, as a

net builder and mender.  She has also worked to protect the bays from pollution and degradation.

The bays not only support her financially but, also, they are precious to her.

26.     From time to time, Ms. Wilson goes out on a skiff into Lavaca and Matagorda Bays.  She

swims with her children and grandchildren in Matagorda Bay at Magnolia Beach.

27.     Ms. Wilson has participated formally at EPA and TCEQ to ask the agencies to require

that any industrial discharges into the Lavaca Bay system are as protective of the bays as

possible.  She has asked that permits contain the most stringent measures and the lowest levels of

toxins.  She filed comments on permits and complained formally to government agencies

when industries have not complied with permit terms.  She has been involved in litigation against

those who pollute the bays.

28.     Since at least 2009, Ms. Wilson has complained to EPA and TCEQ about Formosa's

illegal discharge of plastics into Lavaca Bay.  Since that time, she has been notified that the

agencies have informed Formosa that the discharge of pellets violates the Clean Water Act.  And

she has seen new and continuous discharged plastics, even after investigations and findings of

violations by EPA and TCEQ.

29.     Ms. Wilson has often seen Formosa's plastics while on the shores of Lavaca Bay.  She

has seen them on the shore of Cox Creek, near the Interstate causeway, at 6-mile (in the

northwest corner of Lavaca Bay), Black Rock, Magnolia Public Beach, and Port Lavaca boat

launch, among other places.  She has helped collect samples of the plastic pellets and PVC,

SPVC, and other plastic powders from around Lavaca and Matagorda Bays, and Cox Creek.

Case 2:20-cv-14338-BRM-JSA   Document 85-5   Filed 07/22/24   Page 72 of 186
Case 6:17-cv-00047   Document 85-5 in TXSD on 07/31/17   Page 9 of 26
PageID: 1034

30.     Ms. Wilson cares deeply about the aesthetic beauty and the environmental health of the

bay, wetlands, and shores, and the wildlife dependent on those resources. She detests the littering

of Texas beaches and wetlands and is saddened when she sees the plastics and knows that they

can cause even more harm to aquatic species.  Ms. Wilson knows firsthand about the delicate

balance of the ocean's ecosystem.  During her lifetime, she has witnessed the decrease in shrimp,

oysters and other species in the bays.  She understands that harm to one species can cause harm

to other species.  She has worked with oystermen to help revive oyster reefs in the bay. She

worries that fish, oysters, shrimp, turtles, shore birds and other aquatic species in the bay will be

harmed by ingesting the plastic pellets and PVC, SPVC, and other plastic powders.  That worry

is enhanced, because the toxins can adhere to plastic pellets, meaning that species in the bay

could be ingesting additional toxins when they ingest Formosa's plastic pellets.  The possibility

of toxins adhering to Formosa's plastic pellets is even more daunting to Ms. Wilson because of

residual mercury in the middle of Lavaca Bay from a former Alcoa superfund site.

31.     Ms. Wilson's financial livelihood could be negatively affected by the plastics in the bay

and shores.  If fewer shrimp populate the bay, due to ingestion of toxic plastic pellets, fewer

shrimpers will need work on their nets from her.  Less shrimping in the bay would harm her

financially.  Further, if consumers are concerned about eating fish and shrimp from a bay littered

with plastic pellets and PVC, SPVC, and other plastic powders, Ms. Wilson's income could be

harmed.

32.     Based on these concerns, Ms. Wilson's use and enjoyment of the areas near and

downstream of the Plant's discharges have been, are being, and will continue to be diminished

because of Formosa's Clean Water Act violations. Unless the requested relief is granted,

9

Case 2:20-cv-14338-BRM-JSA Document 85-5 Filed 01/22/24 Page 73 of 186
Case 6:17-cv-00047-RM Document 1 Filed 07/31/17 USDC Colorado Page 10 of 26
PageID: 1035

Formosa's Clean Water Act violations will continue to injure Plaintiff.

33.     FORMOSA PLASTICS CORP., TEXAS, is the owner and an operator of the

Plant, which has operated since 1983 and is permitted to discharge effluent pursuant to

TPDES permit No. WQ0002436000.    FORMOSA PLASTICS CORP., TEXAS, is a

wholly owned subsidiary of FORMOSA PLASTICS CORP., U.S.A.  FORMOSA

PLASTICS CORP., U.S.A, is an operator of the Plant.  Formosa Plastics Corp., U.S.A.,

is a privately-held corporation affiliated with Formosa Plastics Group of Taiwan, a group

founded in 1954 with annual revenues of more than $74 billion.  Formosa Plastics Corp.,

U.S.A., is one of Formosa Group's most profitable entities.  In 2016, Formosa Plastics

Corporation, U.S.A. posted more than $1.36 billion in net income.

34.     FORMOSA PLASTICS CORP., AMERICA, is a corporation also affiliated with

Formosa that is registered in Texas and Delaware and may be an operator of the Plant.

35.     FORMOSA PLASTICS CORP., TEXAS, FORMOSA PLASTICS CORP.,

U.S.A. and FORMOSA PLASTICS CORP., AMERICA, all have the same registered

agent in Texas – Corporation Service Company, 211 E. 7th St., Suite 620, Austin, Texas

78701-3218.

## FEDERAL STATUTORY BACKGROUND

36.     Congress enacted the Clean Water Act to "restore and maintain the chemical, physical,

and biological integrity of the Nation's waters." 32 U.S.C. § 1251.  The national goal of the act

was to eliminate the discharge of pollutants into navigable water by 1985, and the interim goal

was to insure that there is "water quality which provides for the protection and propagation of

fish, shellfish, and wildlife and provides for recreation in and on the water."  *Id.*

10

Case 2:20-cv-14330-BRM-JSA Document 85-5 Filed 01/22/24 Page 74 of 186
Case 6:17-cv-00047 Document 1 Filed in TXSD on 07/31/17 Page 17 of 26
PageID: 1036

37. The Clean Water Act prohibits the point source discharge of pollutants to waters of the United States, unless the discharge is in compliance with a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to the Act. 33 U.S.C. § 1342(a).

38. The NPDES permitting scheme is the primary mechanism for regulating discharges of pollutants. NPDES permits must include conditions that will ensure compliance with the Clean Water Act. The CWA allows federal permitting and enforcement of the CWA to be delegated to state agencies. That power has been delegated to the State of Texas, where the TCEQ issues "TPDES" permits.

39. Once regulated by a TPDES permit, a facility's discharges must strictly comply with all of the terms and conditions of that permit.

## CLEAN WATER ACT ENFORCEMENT PROVISIONS

40. The Clean Water Act allows citizens to enforce a violation of an "effluent standard or limitation." 33 U.S.C. § 1365(a)(1). An effluent standard or limitation includes a Clean Water Act TPDES permit or condition thereof.

41. Citizens must provide notice of any alleged violations 60 days prior to commencing suit. After 60 days have passed, citizens may bring an action in federal district court to enforce ongoing Clean Water Act violations.

42. 33 U.S.C. § 1319(g)(6)(B) bars the civil penalty remedy in citizen suits brought for permit violations that are also the target of diligent prosecution by the State under a State law comparable to the law laid out in 33 U.S.C. § 1319(g), unless the citizen suit is noticed before the State administrative action is commenced and is filed within 120 days of being noticed.

43. This suit falls within the exception to the bar of §1319(g)(6)(B) and is not barred.

11

Case 2:20-cv-14338-BRM-JSA   Document 85-5   Filed 01/22/24   Page 75 of 186
Case 6:17-cv-00047   Document 1   Filed in TXSD on 07/31/17   Page 12 of 26
PageID: 1037

44.     The citizen suit provision of the Clean Water Act grants jurisdiction to United States

District Courts to impose an injunction requiring compliance with the Act and to impose

appropriate civil penalties of up to $52,414 per violation per day. 33 U.S.C. §§ 1365(a).

Additionally, the District Court may award costs of litigation (including expert witness costs and

reasonable attorneys' fees) to citizen plaintiffs. 33 U.S.C. §§ 1365(d).

## STATEMENT OF FACTS

### A. Background – Formosa's Plant and TPDES Permit

45.     Formosa's Plant has 16 production units that produce plastic products, including small

pellets.  Formosa manufactures caustic soda, ethylene dichloride (EDC), vinyl chloride monomer

(VCM), polyvinyl chloride (PVC) suspension resin, specialty polyvinyl chloride (SPVC)

dispersion, blending, and copolymer resins, ethylene, high density polyethylene (HDPE), liner

low density polyethylene (LLDPE), polypropylene (PP), and ethylene glycol.

46.     Formosa's TPDES permit requires stormwater from specific parts of the Plant to be

routed to a wastewater treatment plant it operates onsite and that also treats process wastewater.

That treated storm and wastewater are discharged directly into Lavaca Bay through a pipe that

extends westward from the Plant.  The point where the pipe discharges wastewater is called

Outfall 001.

47.     Formosa refers to the parts of the Plant from which stormwater is sent to the water

treatment plant as "inside battery limits."  "Inside battery limits" areas are curbed so that the

stormwater is theoretically retained and sent to the water treatment plant.

48.     Formosa's TPDES permit allows it to discharge some stormwater without being treated at

the water treatment plant.  Formosa describes this stormwater as "non-contact" or "non-process

12

Case 2:20-cv-14338-BRM-JSA   Document 85-5   Filed 01/22/24   Page 76 of 186
Case 6:17-cv-00047R   Document   Filed in TXSD on 07/31/17   Page 13 of 26
PageID: 1038

area" stormwater.   The "non-contact" stormwater comes from parts of its facility Formosa calls "outside battery limits."  The "outside battery limits" stormwater drains into trenches and is discharged directly into Cox Creek through permitted outfalls.

49.      Formosa's stormwater that is "outside battery limits" regularly comes into contact with plastics.

50.      Formosa's current practices for inspecting its outside battery limits stormwater and managing it before it is discharged into Cox Creek are inadequate to prevent discharges of plastics, particularly when there are rain events.

51.      Formosa discharges its wastewater and "contact" or "process area" stormwater at permitted outfall 001, and "non-process area" stormwater at permitted outfalls 002, 003, 004, 005, 006, 007, 008, 009, 010, 011, 012, 013.

52.      Some plastics produced by Formosa are solids that float on the surface of the water, while others are suspended or sink in water.

53.      Formosa's TPDES permit prohibits the discharge of "floating solids or visible foam in other than trace amounts" from all permitted outfalls.

54.      Formosa's TPDES permit requires stormwater that is discharged through outfalls 006, 007, 008, 010, and 011 to contain "no visible floating solids, foam or oil."

55.      TCEQ rules prohibit the discharge of "floating debris and suspended solids" into surface waters. 30 Texas Admin. Code 307.4(b)(2). This rule is incorporated by reference into Formosa's TPDES permit.

56.      The Executive Director of TCEQ has concluded that any discharge of floating solids violates Formosa's permit:  "[RESPONSE 2] The draft permit prohibits Formosa

13

Case 2:20-cv-14338-BRM-JSA   Document 85-5   Filed 01/22/24   Page 77 of 186
Case 6:17-cv-00047-RM   Document 91   Filed 07/31/17   Page 14 of 26
PageID: 1039

from discharging any kind of floating solids. The Executive Director has determined that

it is not necessary to specify that polyethylene pellets are a solid, or to specify that if

Formosa discharges polyethylene pellets it would be a violation of 30 TAC § 307.4(b)(2

– 4)."[1]

57.     Formosa's TPDES permit and Texas law require Formosa to report discharges

that may endanger human health or safety or the environment.  30 Tex. Admin. Code §

305.125(9).  This includes the discharge of plastics.

58.     The Executive Director of TCEQ has stated: "[RESPONSE 3] Formosa must

notify the TCEQ within 24 hours of any noncompliance, including the discharge of

polyethylene pellets."[2]

59.     In 2015, Formosa had the opportunity to review the TCEQ Executive Director's

2015 conclusions above (RESPONSES 2 & 3) regarding the terms of its TPDES permit,

including the permit's requirements of no discharge of floating solids and reporting any

discharges to TCEQ within 24 hours.  In its Response to Requests for Hearing on its

TPDES Permit filed with the TCEQ Chief Clerk, Formosa agreed: "[i]n the event some

polyethelyne pellets and PVC dust becomes entrained in stormwater runoff and is

discharged into Lavaca Bay via one of the outfalls, then this would indisputably be a

permit violation which must be reported to TCEQ within 24 hours."

---

[1]  TCEQ Executive Director's Response to Public Comment, TPDES Permit No.
WQ00024360000, Formosa Utility Venture, Ltd. and Formosa Plastics Corp., TX, at 8–9
(August 17, 2015).
[2]  TCEQ Executive Director's Response to Public Comment, TPDES Permit No.
WQ00024360000, Formosa Utility Venture, Ltd. and Formosa Plastics Corp., TX, at 9 (August
17, 2015).

Case 2:20-cv-14338-BRM-JSA Document 85-5 Filed 01/22/24 Page 78 of 186
Case 6:17-cv-00047-RM Document 1 Filed 06-15 XSD on 07/11/17 Page 15 of 26
PageID: 1040

60.     On information and belief, Formosa not has reported to TCEQ a discharge of
plastics from its facility over the last 5 years.

**B. Formosa's Plastics Discharges in Violation of the Clean Water Act**

61.     Since 2004, Formosa has known or should have known of systemic problems with
containing plastic pellets and PVC powders at its Plant.  In 2004, EPA documented problems
with Formosa's settling pond spilling plastic pellets.

62.     Since at least 2009, Plaintiff Wilson has complained to EPA and TCEQ about Formosa's
illegal discharge of plastics.

63.     In 2010, an EPA surprise inspection team observed that Formosa had illegally discharged
plastic pellets.  EPA documented pellets immediately downstream of Formosa's permitted
outfalls and on the shores of Lavaca Bay near Highway 35.  EPA specifically documented plastic
pellets illegally discharged outside of Formosa's outfalls 006, 007, 008 and 009, which discharge
into Cox Creek.

64.     In its 2010 report, which Formosa received, EPA reported four concerns about Formosa's
operation of the Plant.  One concern determined by EPA was "discharges of pellets and possible
plastics from the storm drainage outfalls of the facility."  EPA reported "discharge of plastic
pellets" and "poor housekeeping" as "indicators of solid waste concerns."

65.     In 2010, Plaintiff Wilson notified EPA that a local resident attending a barbecue
near Formosa had found pellets up to his wrist eight feet from the shore of Lavaca Bay.

66.     Around 2010, a Formosa employee recognized the problems of pellets draining
from loading areas.  That employee recommended changes to a supervisor to control
pellets, but his recommendations were ignored.

Case 2:20-cv-14338-BRM-JSA   Document 85-5   Filed 01/22/24   Page 79 of 186
Case 6:17-cv-0004F   Document 81-5   Filed in TXSD on 07/31/17   Page 16 of 26
PageID: 1041

67.     In 2013, 151 "nurdle nerds" petitioned TCEQ about the problems with Formosa's

discharges, explaining, "On any given day, a visit to the boat launching area at Cox Creek

(just east of Formosa) or adjacent shores will unearth PVC pellets."  A "nurdle" is

another word for plastic pellets.

68.     In 2013, Plaintiff Wilson notified TCEQ and Formosa, during comments to the agency on

Formosa's TPDES permit application, about plastic pellets being discharged by Formosa.

69.     In August 2013, the Union of Commercial Oystermen and several individual shrimpers

and oystermen complained to TCEQ, during the TPDES permit proceeding, of Formosa's

ongoing discharge of plastic pellets, stating, "Polyethylene pellets have been found in Lavaca

Bay, coming from the Formosa facility."

70.     Formosa received the 2013 comments regarding pellets on its permit application at TCEQ

and did not dispute that pellets have been discharged by Formosa and found in Lavaca Bay.

71.     In 2016, Plaintiff Wilson again notified TCEQ Region 14 (in Corpus Christi) of illegal

discharges of plastics into Cox Creek and Lavaca Bay.

72.     In response to the 2016 complaints of Plaintiff Wilson, TCEQ undertook investigations in

March and September 2016.  As a result of each investigation, TCEQ determined that Formosa

had violated its TPDES permit by discharging plastic pellets into nearby waterways and onto the

shore.[3]  In the 2016 investigations, TCEQ photographed Formosa's illegally discharged pellets in

the water and sediment.  Formosa did not dispute that the pellets came from its Plant.

73.     TCEQ located Formosa's plastic pellets both in the water and on the shore.  The "Site

Evaluation Map" prepared by TCEQ in conjunction with its September 2016 investigation shows

---

[3]  TCEQ Investigation of Formosa Plastics, Investigation #1313144, May 13, 2016, and TCEQ
Investigation of Formosa Plastics, Investigation #1358247, October 24, 2016.

Case 2:20-cv-14338-BRM-JSA   Document 85-5   Filed 01/22/24   Page 80 of 186
Case 6:17-cv-00047   Document 1   Filed in TXSD on 07/31/17   Page 17 of 26
PageID: 1042

the shore locations at which TCEQ found pellets (yellow arrows). That map is set out

immediately, following.



74. In its May 2016 investigation, TCEQ noted that Formosa was already aware of the issue

of discharging of plastic pellets through its outfalls.

75. Neither EPA nor the State of Texas has fined Formosa for these violations, nor

commenced and diligently prosecuted an action for these violations.

76. No agency has required Formosa to effectively manage or treat all stormwater or

wastewater to ensure that plastics are removed from the water prior to discharge.

Case 2:20-cv-14338-BRM-JSA   Document 85-5   Filed 01/22/24   Page 81 of 186
Case 6:17-cv-00047   Document 1   Filed in TXSD on 07/31/17   Page 18 of 26
PageID: 1043

77.     Starting on January 31, 2016, members of Waterkeeper began collecting evidence of

Formosa's illegally discharged plastics.

78.     Waterkeeper members have found plastics littering over 20 miles of shoreline, beaches

and wetlands around Matagorda Bay, Lavaca Bay and Cox Creek.

79.     From January 31, 2016 through July 23, 2017 and ongoing, members of Waterkeeper

have collected over 1,637 pellet samples on 375 distinct days as well as thousands of photos and

videos.

80.     The following chart records the sampling done by Waterkeeper through July 23, 2017:

| Month | # Samples of Plastics | # Days Sampled |
|---|---|---|
| **January 2016** | 4 | 1 |
| **February 2016** | 12 | 9 |
| **March 2016** | 3 | 3 |
| **April 2016** | 8 | 4 |
| **May 2016** | 58 | 18 |
| **June 2016** | 61 | 15 |
| **July 2016** | 68 | 19 |
| **August 2016** | 97 | 23 |
| **September 2016** | 95 | 24 |
| **October 2016** | 99 | 24 |
| **November 2016** | 91 | 24 |
| **December 2016** | 140 | 29 |
| **January 2017** | 144 | 30 |
| **February 2017** | 109 | 22 |

Case 2:20-cv-14338-BRM-JSA   Document 85-5   Filed 01/22/24   Page 82 of 186
Case 6:17-cv-0004R   Document    Filed in TXSD on 07/31/17   Page 19 of 26
PageID: 1044

| | | |
|---|---|---|
| **March 2017** | 106 | 28 |
| **April 2017** | 108 | 20 |
| **May 2017** | 168 | 30 |
| **June 2017** | 157 | 30 |
| **July 2017** | 109 | 22 |
| **TOTAL** | **1637** | **375** |

**C. Seriousness of Formosa's Discharges**

81.    The plastics are persistent and do not degrade in water or on soil within a year.

82.    The plastics may not degrade in water or on soil for as long as ten years.

83.    Fish, turtles, shore birds and other marine species are known to eat plastic pellets.

84.    Local fishermen have caught fish from Cox Creek with plastic pellets in their guts.

85.    Formosa's plastics that are not trapped on shores, or cleaned up, could circulate into the Gulf of Mexico.

86.    Formosa's plastics litter the beaches and shoreline around Lavaca Bay, Matagorda Bay and Cox Creek.  The pellets are unattractive and degrade the natural environment.

87.    In 2017, independent contractors began trying to clean up the illegally discharged pellets for Formosa.  According to one person working on the clean up of the plastics in May 2017, they had already gathered hundreds of 50-pound bags of pellets discharged by Formosa.

88.    Waterkeeper members have seen and documented new plastics discharged by Formosa in or along the shores of Cox Creek, Lavaca Bay and Matagorda Bay after Formosa's contractor has performed clean-up operations at the different sites.

Case 2:20-cv-14338-BRM-JSA   Document 85-5   Filed 01/22/24   Page 83 of 186
Case 6:17-cv-0004R   Document 1   Filed 07/31/17   Page 20 of 26
PageID: 1045

**D. Formosa's Past Non-Compliance with Regulatory Requirements**

89.     Formosa has a long history of contaminating Cox Creek, as well as groundwater and soils at the Plant in violation of environmental law.

90.     In 2006, EPA began an environmental investigation of Formosa and found violations of the Clean Air Act, the Resource Conservation and Recovery Act, the Clean Water Act, and the Emergency Planning and Community Right-to-Know Act. EPA and Formosa entered into a consent decree in 2010, which required Formosa to undertake compliance actions valued at $13,352,000 and required Formosa to pay a fine of $2.8 million. *U.S. v. Formosa Plastics Corp.*, No. 6:09-CV-00061 (S.D. Tex.).

91.     In 2013, after failing to comply with all terms of the 2010 consent decree in case No. 6:09-CV-00061, Formosa agreed to pay the United States an additional $1,475,000 in penalties.

92.     In 2012, Formosa signed an agreement with EPA regarding hazardous vinyl chloride and 1, 2-dichloroethane that it had discharged into the groundwater at its Plant.  Formosa had not reported the discharge to EPA.  The hazardous wastes could not be removed from the aquifer. Formosa was required under federal hazardous waste laws to contain the contaminated water, at an estimated cost of $20,000,000. This clean up has been managed by EPA pursuant to the Resource Conservation Recovery Act (RCRA).  In 2016, contaminants of concern were still at high levels in the groundwater at Formosa.

93.     Formosa has also contaminated the groundwater adjacent to its facility, under property owned by the Texas Department of Transportation (TxDOT).

94.     Formosa has spilled a number of hazardous contaminants across its Plant, in addition to those addressed in the 2010 and 2012 settlements of environmental cases.

Case 2:20-cv-14338-BRM-JSA Document 85-5 Filed 01/22/24 Page 84 of 186
Case 6:17-cv-00064-RM Document 1 Filed 07/31/17 Page 21 of 26
PageID: 1046

95.     In 2016, new areas of groundwater contaminated by hazardous chemicals by Formosa were identified.  The newly identified groundwater contamination contains hazardous contaminants at concentrations above TCEQ's protective levels of concern.  The 2016 report documented contamination from spills of hazardous pyrolization gasoline and naptha at the Formosa olefins OSBL (outside battery limits) tank farm.  These spills contaminated both the soil and groundwater.

96.     In July 2011, Formosa was assessed penalties of $68,600 by TCEQ as part of an Agreed Order to resolve violations of the Clean Water Act at the Plant.

97.     Until March 2013, it was a "common practice" for the wastewater treatment unit at Formosa to violate its TPDES permit by averaging "abnormally" high compliance samples with other samples to arrive at mean values, which mean values it, then, reported to TCEQ. Formosa's pre-2013 "common practice" of sending "abnormally" high value water samples to an outside lab and, then, averaging the results violated TCEQ regulations and reflected, at best, Formosa's belief that its routine sampling results were unreliable.

98.     Formosa has agreed to pay penalties assessed by TCEQ as part of multiple Agreed Orders to resolve violations of the Clean Air Act at the Plant in 2010, 2012, 2014, 2015, and 2017.

99.     In May 2017, Formosa was assessed penalties of $209,251 by TCEQ as part of an Agreed Order to resolve industrial and hazardous waste violations at the Plant.

100.     In 2010, after an on-site inspection, the Occupational Safety and Health Administration concluded that Formosa had violated worker safety laws and, as a result, that workers were illegally exposed to PVC, SPVC, and other plastic powders at the facility.

Case 2:20-cv-14338-BRM-JSA    Document 85-5    Filed 01/22/24    Page 85 of 186
Case 6:17-cv-0004R    Document    Filed in TXSD on 07/31/17    Page 22 of 26
PageID: 1047

**E. Protection for Witnesses May be Necessary**

101.    On many occasions, while Waterkeepers have been legally gathering Formosa's plastics in public waters and on public shores, representatives of the Calhoun County sheriff's office have monitored Waterkeepers' activities.  According to the sheriff's office, the deputies have responded to phone calls from Formosa regarding the sampling.  No illegal activity has ever been alleged.

102.    Formosa employs 1,910 employees and 795 contractors at its Point Comfort Facility. Calhoun County has approximately 22,000 residents.  16.8% of the residents in Calhoun County live in poverty.

103.    Formosa has a history of retaliation against workers who complain about workplace safety and environmental compliance.

104.    Potential witnesses in this lawsuit have already expressed fear that Formosa will retaliate against their relatives or friends who work at the Plant if these witnesses provide testimony.


**FIRST CLAIM FOR RELIEF**

**Violations of Provision Prohibiting Discharge of Solids**

**(Violations of 33 U.S.C. Sections 1311(a), 1342)**

105.    Plaintiff incorporates and re-alleges all preceding paragraphs.

106.    Formosa's exceedances of the effluent limitations set within its TPDES Permit constitute violations of Formosa's TPDES Permit, as well as 30 Texas Admin. Code 307.4(b)(2-4), sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§ 1311(a), 1342, and regulations implementing the Clean Water Act at 40 C.F.R. § 122.41(a).

Case 2:20-cv-14338-BRM-JSA Document 85-5 Filed 01/22/24 Page 86 of 186
Case 6:17-cv-00047-RM Document 1 Filed in TXSD on 07/31/17 Page 23 of 26
PageID: 1048

107.     These violations include, but are not limited to, violations of Formosa's TPDES Permit's requirements of "no discharge of floating solids or visible foam in other than trace amounts" from any outfalls, "no visible floating solids, foam or oil" from outfalls 006, 007, 008, 010, and 011, and no discharge of "floating debris and suspended solids" into surface waters.

108.     As defined by the Clean Water Act, Formosa is a "person" responsible for discharging "pollutants" from a "point source" into the "waters of the United States" in violation of the "effluent limitations" contained in the applicable TPDES Permit. 33 U.S.C. § 1362.

109.     Each day of violation constitutes a separate and distinct violation under the Clean Water Act.

110.     Formosa's violations have been occurring since at least January 2016 to the present, and are ongoing. Given Formosa's past practices and history of non-compliance with environmental laws, these violations are reasonably likely to recur, absent redress from this Court.

111.     Formosa has failed to remedy its violations of the Clean Water Act and, therefore, remains in violation of the law.


## SECOND CLAIM FOR RELIEF

### Violations of Monitoring and Reporting Requirements

### (Violations of 33 U.S.C. Sections 1311(a), 1342)

112.     Plaintiffs incorporate and re-alleges all preceding paragraphs

113.     Formosa has failed to report discharges of plastics to TCEQ.

23

Case 2:20-cv-14338-BRM-JSA Document 85-5 Filed 01/22/24 Page 87 of 186
Case 6:17-cv-0004R Document 1 Filed 07/31/17 Page 24 of 26
PageID: 1049

114.     Formosa's failure to report discharges of pellets violates Formosa's TPDES Permit, 30

Tex. Admin. Code § 305.125(9), sections 301(a) and 402 of the Clean Water Act, 33 U.S.C. §§

1311(a) and 1342, and regulations implementing the Clean Water Act at 40 C.F.R. § 122.41(a).

115.     Each day of violation constitutes a separate and distinct violation under the Clean Water

Act.  A report to TCEQ is required for each day that Formosa discharges pellets.

116.     These violations, also, have been occurring since at least January 2016 to the present, and

are ongoing. There is a reasonable likelihood they will recur, absent redress from this Court.


**RELIEF REQUESTED**

Wherefore, Plaintiffs respectfully request that this Court grant the following relief:

A.     Declare that Formosa has violated and is in ongoing violation of its TPDES Permit and

Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311 and 1342, and 40 C.F.R. §

122.41(a), since at least January 31, 2016;

B.     Issue an injunction ordering Formosa to stop discharging plastics into Cox Creek and

Lavaca Bay in violation of its TPDES permit and the Clean Water Act, and, specifically, require

Formosa to adopt procedures reasonably calculated to prevent future discharge of plastics and to

undertake for a period of five years following judgment monitoring calculated to demonstrate

that discharges of plastics have ceased.

C.     Order Formosa to take specific actions to remediate and/or mitigate the environmental

harm caused by its violations.

D.     Enter a money judgment imposing, pursuant to Sections 309(d) and 505(a) of the Clean

Water Act, 33 U.S.C. § 1319(d), and 1365(a), and the Adjustment of Civil Monetary Penalties

Case 2:20-cv-14338-BRM-JSA    Document 85-5    Filed 01/22/24    Page 88 of 186
Case 6:17-cv-00004   Document 1   Filed in TXSD on 07/31/17   Page 25 of 26
PageID: 1050

for Inflation, 40 C.F.R. Part 19, appropriate civil penalties against Formosa up to a maximum

amount of  $52,414 per day per violation for all violations of the Clean Water Act;

E.      Retain jurisdiction over this matter until such time as Formosa has come into compliance

with the requirements of the Clean Water Act and fully complied with any remedial orders of

this Court;

F.      Issue an order awarding Plaintiffs their litigation expenses, including reasonable attorney

fees, costs, and expert witness fees, as authorized by Section 505(d) of the Clean Water Act, 33

U.S.C. § 1365(d); and

G.      Award such other relief, as this Court deems appropriate.

DATED this 31 day of July 2017.

Respectfully submitted,

_____
Erin Gaines
State Bar No. 24093462
Amy Johnson
State Bar No. 10679550
Enrique Valdivia
State Bar No. 20429100
TEXAS RIOGRANDE LEGAL AID
4920 N. I-35
Austin, TX 78751
512-374-2739 Telephone
512-447-3940 Fax
egaines@trla.org
*Attorneys for Plaintiff, S. Diane Wilson*

David Frederick
State Bar No. 07412300
FREDERICK, PERALES, ALLMON &
ROCKWELL, PC
1206 San Antonio

25

Case 2:20-cv-14388-BRM-JSA   Document 85-5   Filed 01/22/24   Page 89 of 186
Case 6:17-cv-00004   Document 1   Filed in TXSD on 07/31/17   Page 26 of 26
PageID: 1051

Austin, TX 78701
(512) 469-6000 Telephone
dof@lf-lawfirm.com
*Attorney for Plaintiffs, S. Diane Wilson and San*
*Antonio Bay Estuarine Waterkeeper*

David T. Bright
State Bar No. 02991490
SICO HOELSCHER HARRIS & BRAUGH, LLP
802 N. Carancahua, Suite 900
Corpus Christi, Texas 78401
(361) 653-3300 Telephone
(361) 653-3333 Fax
dbright@shhblaw.com
*Attorney for Plaintiffs, S. Diane Wilson and San*
*Antonio Bay Estuarine Waterkeeper*

## **EXHIBITS**

Exhibit 1 – Plaintiff's Notice of Intent to Sue Letter (April 6, 2017) without attachments

# EXHIBIT  3



# TEXAS RIOGRANDE LEGAL AID, INC.

## Austin Office
4920 North IH-35
Austin, Texas 78751
Telephone (512) 374-2700, Fax (512) 447-3940

April 6, 2017

**Via U.S. Certified Mail No.: 7014 1200 0001 9442 1190**
Mr. Rick Crabtree
Vice President/General Manager
Formosa Plastics Corporation, Texas
P.O. Box 700
Point Comfort, Texas 77978

**Via U.S. Certified Mail No.: 7014 1200 0001 9442 1343**
Mr. Jason Lee
Chairman of the Board
Formosa Plastics Corporation, Texas
9 Peach Tree Hill Road
Livingston, NJ 07039-5702

  Re: Notice of Intent to File Citizen Suit for Violations of the Clean Water Act by
  Formosa Plastics Corporation, TPDES Permit # WQ0002436000

Dear Mr. Crabtree, Mr. Lee, and all persons copied on the notice list:

We write on behalf of Diane Wilson and San Antonio Bay Estuarine Waterkeeper
(collectively "Complainants") to provide 60 days notice of our intent to sue Formosa
Plastics Corporation in federal district court to halt significant, chronic, and ongoing
violations of the Clean Water Act (CWA), 33 U.S.C. § 1251, et seq., from past and
ongoing illegal discharges of plastic pellets and plastic residue dust from Formosa's Point
Comfort, Texas, facility. Despite numerous notifications of these violations, Formosa's
refusal to comply with the law has been so longstanding that local citizens have been
compelled to undertake their own monitoring and have collected over 1,064 samples
along over 20 miles of shoreline in Cox Creek, Lavaca Bay, and Matagorda Bay from
January 31, 2016 to the present date to document Formosa's illegal discharges.

Under Section 505 of the Clean Water Act and its implementing regulations, citizens are
entitled to bring suit in federal court against a facility to enjoin violations of effluent
standards or National Pollutant Discharge Elimination System (NPDES) permits and to
seek penalties for such violations.[1] Citizens must provide 60 days' notice of their

---

[1] 33 U.S.C. § 1365.

*60-Day Notice of Intent to Sue for Clean Water Act Violations*
*Page 2 of 14*

intention to sue to the alleged violator and must provide a copy of the notice to the Administrator of the United States Environmental Protection Agency (EPA), the Regional Administrator of the EPA, the chief administrative officer of the water pollution control agency for the state where the violations are occurring, and the registered agent of the alleged violator if it is a corporation.[2]

The CWA provides for civil penalties of up to $52,414 for each violation per day occurring after November 2, 2015 and assessed on or after January 15, 2017.[3]  If Complainants are forced to sue Formosa, Complainants will request that full penalties be levied against Formosa.  Those civil penalties are not awarded to Complainants but instead are paid to the U.S. government – or can be used for approved environmental projects. Formosa illegally discharged and failed to report those discharges to the State of Texas, as required by law.[4]

Although Formosa has been illegally discharging plastic pellets and plastic residue dust for many years, this notice encompasses Formosa's ongoing daily violations commencing January 31, 2016, for a total of 432 days to date. Since then Formosa has committed at least two separate violations of the Clean Water Act per day, and these violations are ongoing. Given the longstanding nature of illegal discharges from this facility, we believe these violations will continue until Formosa makes significant changes to its operations, and this notice letter includes all similar violations that occur after this notice letter. We intend to enjoin the violations described below and ensure future compliance with the CWA, obtain civil penalties and cleanup for past noncompliance, recover attorney fees and costs of litigation, and obtain other appropriate relief, as allowed by the CWA.[5]

Formosa's illegal discharges are entering Cox Creek and Lavaca Bay, which connect to many other bays including Chocolate Bay, Cox Bay, Keller Bay, and the larger Matagorda Bay System, and the pellets likely are throughout those water systems.  These bays are near habitat to the endangered whooping crane. Whooping cranes winter at the Aransas National Wildlife Refuge near Rockport, Texas, approximately 33 miles from Point Comfort.  Whooping Cranes also winter at Powderhorn Ranch.  Samples of pellets have been found at Port O'Connor on Matagorda Bay and near Powderhorn Ranch, and we believe the pellets may be littering the habitat of and harming the endangered whooping crane but have not had access to those properties.

As this letter explains in depth, Formosa's illegally discharged plastic pellets not only litter the beaches and waterways and spoil the aesthetic beauty of the bays and waterways, but also the pellets are ingested by marine birds, turtles, and fish to their detriment. Once released into the marine environment, the pellets adsorb toxic metals and become a mechanism for transferring toxic metals into the food chain.  In fact, in the fall

---

[2] 40 C.F.R. § 135.2(a)(1).
[3] *See* 33 U.S.C. § 1319(d); 40 C.F.R. § 19.4.
[4] 30 Tex. Admin. Code § 305.125(9) requires Formosa to report any permit noncompliance which may endanger human health or safety, or the environment.
[5] *See* 33 U.S.C. § 1365.

*60-Day Notice of Intent to Sue for Clean Water Act Violations*
*Page 3 of 14*

of 2016, one local fisherman found plastic pellets in the gut of a redfish he caught in Keller Bay. He had found pellets in the guts of another redfish a few years earlier in Redfish Lake. Another fisherman found pellets in the gut of a black drum that he caught in Karankawa Bay. Oyster reefs are also in the vicinity of Formosa's discharges.

Almost 25 years ago, in 1992, the EPA released a 130-page report entitled *Plastic Pellets in the Aquatic Environment: Sources and Recommendations.*[6] The report concluded that plastic debris "can have economic, esthetic, and ecological impacts... One debris that has become of particular concern to EPA is the plastic pellet."[7] EPA estimated that plastic pellets persist in the environment for one to ten years.[8] EPA hailed the importance of using "significant penalties...if pellets are present in [a company's] storm-water discharge in violation of their permit."[9] EPA also worked with industry to recommend multiple specific measures to prevent discharge of plastic pellets and encouraged industry to become part of a plastics industry-led effort to reduce illegal discharges of pellets.

Even though many plastics companies around the world have heeded the recommendations of EPA and the industry group Operation Clean Sweep, Formosa is not among them. Instead, Formosa has continued to illegally discharge pellets, necessitating this notice of intent to sue.

We are interested in negotiating a prompt resolution of these issues, provided Formosa makes significant, structural and permanent changes to its activities to prevent future illegal discharges and agrees to clean up the plastics it has left in Texas' bays and waterways and on Texas' wetlands and beaches. If an acceptable resolution is not possible, however, we intend to seek all appropriate relief after this 60-day notice period.

## 1. FORMOSA'S POINT COMFORT FACILITY

Formosa Plastics has an 1,800-acre facility in Point Comfort, Texas, where it operates seventeen plants and support facilities. Formosa manufactures "caustic soda, ethelyne dichloride (EDC), vinyl chloride monomer (VCM), polyvinyl chloride (PVC) suspension resin, specialty polyvinyl chloride (SPVC) dispersion, blending, and copolymer resins, ethelyne, high density polyethelyne (HDPE), liner low density polyethelyne (LLDPE), polypropylene (PP), and ethylene glycol."[10]

We believe Formosa's illegal discharges of plastic pellets and dust result from improper housekeeping at the facility, which means Formosa has neglected to vacuum, sweep and

---

[6] U.S. EPA, *Plastic Pellets in the Aquatic Environment: Sources and Recommendations, Final Report,* EPA 842-B-92-010, December 1992, *available at*
http://www.waterboards.ca.gov/water_issues/programs/tmdl/docs/303d_policydocs/340.pdf.
[7] *Id.* at 1.
[8] *Id.* at 18.
[9] *Id.*
[10] Formosa's application for TPDES Permit No. WQ0002436000, Technical Report 1.0, at 1 (Feb. 2, 2010).

San Antonio Bay
71403-004037

*60-Day Notice of Intent to Sue for Clean Water Act Violations*
*Page 4 of 14*

dispose of plastic pellets before they are discharged. Conceivably, there are structural problems at the facility that could lead to the discharge. For instance, Formosa's PVC settling pit may continue to overflow its contents into the stormwater system, as it did in 2004 and 2010. Additionally, Formosa's stormwater and/or wastewater discharge systems are inadequately designed so that they do not adequately trap and collect the plastic pellets and dust.

## 2. CLEAN WATER ACT VIOLATIONS

### a. Formosa's history of illegally discharging plastic pellets

Formosa discharges pellets into waters of the United States, thereby violating the Clean Water Act. Formosa has known for many years that it regularly discharges plastic pellets and plastic dust residues into Cox Creek and Lavaca Bay. In a 2004 inspection of Formosa, EPA discovered that Formosa's PVC settling pond was overflowing, with particulates from the pond being discharged into the stormwater system.[11] In 2010, EPA conducted an unannounced inspection of Formosa, as part of an ongoing compliance action. During the inspection, EPA documented Formosa's onsite problems with pellets and PVC dust. Again, in 2010, Formosa's PVC settling pond was overflowing into the stormwater system. EPA also documented plastic pellets discharged downstream from Formosa's outfalls leading into Cox Creek. At that time, EPA documented similar plastic pellets on the shore of Lavaca Bay. (*See* attached EPA Report, Exhibit A). EPA determined the violations to be "serious." Formosa was also found in violation of worker safety laws by the Occupational Health and Safety Administration in 2010 due to problems with exposure to PVC dust at the facility. This was after multiple complaints to the agency in 2008.

Local residents have been complaining to EPA, the Texas Commission on Environmental Quality (TCEQ), and Formosa for years about illegal discharges of plastic pellets. In July 2010, Complainant Diane Wilson notified EPA that a resident at a barbecue near Formosa had found pellets up to his wrist eight feet from the shore. In 2013, 151 "nurdle nerds" petitioned TCEQ about the problems with Formosa's discharges, explaining, "On any given day, a visit to the boat launching area at Cox Creek (behind Formosa) or adjacent shores will unearth PVC pellets."[12] In July 2013, Complainants Diane Wilson and the San Antonio Bay Estuarine Waterkeeper cited their concerns about illegal discharges of pellets in their comments requesting a contested case hearing on Formosa's Texas Pollutant Discharge Elimination System (TPDES) permit. (A TPDES permit is the version of the federally required Clean Water Act permit administered by Texas). In August 2013, in a request for a contested case hearing on Formosa's same permit

---

[11] *See* U.S. EPA June 15-17, 2010 Inspection Report at 27, attached as Exhibit A (describing the 2004 inspection).

[12] Petition to Texas Commission on Environmental Quality, *Protect Texas Bays from toxic plastic and chemical dumping,* available at https://www.causes.com/actions/1773233-sign-the-petition-to-texas-commission-on-environmental-quality

*60-Day Notice of Intent to Sue for Clean Water Act Violations*
*Page 5 of 14*

application, the Union of Commercial Oystermen and several individual shrimpers and oystermen also highlighted Formosa's ongoing discharge of plastic pellets ("Polyethylene pellets have been found in Lavaca Bay, coming from the Formosa facility") and requested clarification from TCEQ in the revised permit that these discharges were violations of the permit and were required to be reported within 24 hours.[13]

In August 2015, in its Response to Comments on the proposed draft wastewater permit, TCEQ's Executive Director responded to the concerns about pellets by reassuring commenters that discharges of the pellets were a clear violation of Formosa's permit and TCEQ regulations, and thus that no new permit conditions needed to be added to address this concern:

> "[RESPONSE 2] The draft permit prohibits Formosa from discharging any kind of floating solids. The Executive Director has determined that it is not necessary to specify that polyethylene pellets are a solid, or to specify that if Formosa discharges polyethylene pellets it would be a violation of 30 TAC § 307.4(b)(2 – 4). ... If anyone observes the discharge of any solid, including polyethylene pellets, they should contact the TCEQ Region 14 Office in Corpus Christi... If the Executive Director finds that Formosa is out of compliance with the terms or conditions of its permit, or with TCEQ regulations, it may be subject to enforcement."[14]

In 2016, complainant Diane Wilson and Ronnie Hamrick again notified TCEQ Region 14 of illegal discharges of pellets into Cox Creek and Lavaca Bay. In response to these complaints, TCEQ undertook two investigations – in March and September 2016 – into the problem and determined that Formosa had violated its TPDES permit both times by discharging plastic pellets into nearby waterways.[15] TCEQ noted in its first investigation report that the facility was already aware of the issue of discharging plastic pellets through its outfalls.[16] TCEQ photographed pellets in the water and sediment in its investigation reports (*see* attached Exhibits B and C). Unfortunately, despite Formosa's knowledge of these discharges and the investigations and findings of violations by the TCEQ and EPA, Formosa's illegal discharge of pellets has not stopped and continues to this day.

Formosa's disregard for compliance with environmental laws has an even longer history. In 2009, Formosa paid a $3 million fine and entered into a consent decree with EPA

---

[13] Comments submitted by Amy Johnson and Enrique Valdivia of Texas RioGrande Legal Aid on behalf of clients, via fax to TCEQ on Formosa TPDES Permit No. WQ0002436000, August 2, 2013, at 4.
[14] Executive Director's Response to Public Comment, TPDES Permit No. WQ00024360000, Formosa Utility Venture, Ltd. and Formosa Plastics Corp., TX, at 8–9 (August 17, 2015).
[15] TCEQ Investigation of Formosa Plastics, Investigation #1313144, May 13, 2016, attached as Exhibit B; TCEQ Investigation of Formosa Plastics, Investigation #1358247, October 24, 2016, attached as Exhibit C.
[16] Exhibit B at 11.

*60-Day Notice of Intent to Sue for Clean Water Act Violations*
*Page 6 of 14*

regarding environmental law violations for air, water and hazardous waste. But Formosa did not comply with that consent decree and eventually paid an additional $1.5 million in fines.

### b. Evidence of ongoing illegal discharges

As explained above, Formosa's illegal discharges preceded the date of the pellet sampling undertaken throughout 2016, but this notice alerts Formosa to illegal discharges of plastic pellets and dust into Cox Creek and Lavaca Bay since January 31, 2016. The illegal discharges occur regularly and are ongoing, as documented by thousands of samples, photographs, and videos Complainants have compiled over the past 14 months. The pellets have been found dispersed over at least 20 miles of shoreline in Lavaca Bay, Matagorda Bay, as well as Cox Creek and surrounding wetlands and beaches. The sampled shoreline of Lavaca Bay stretches from Six Mile to Indianola and Port O'Connor, on the opposite side of the bay from Formosa Plastics. Significantly, nearby to Indianola is the recently purchased Powderhorn Ranch that is now being considered as a state park and is also habitat to the endangered whooping crane. A map we created of the sampling locations shows wide geographic dispersal of the pellets. A larger version of the map is attached as Exhibit D.

## Plastic Pellets Sampling Locations



In September 2016, TCEQ also located Formosa's plastic pellets both in the water and on the shore on a variety of locations. The yellow arrows indicate locations of pellets found by TCEQ's investigation in Cox Creek and Cox Bay, as shown below. [17]

---

[17] TCEQ's "Site Evaluation Map," Exhibit C at 46.

*60-Day Notice of Intent to Sue for Clean Water Act Violations*
*Page 7 of 14*



Complainants' collected samples and photographs show repeated and ongoing violations of the CWA, continuously since January 31, 2016. To date, citizens have collected over 1,064 pellet samples on 258 distinct days as well as hundreds of photos and videos. The following chart summarizes the number of samples and days sampled for each month since sampling began on January 31, 2016:

| Month | # Samples | # Days Sampled |
|---|---|---|
| January 2016 | 4 | 1 |
| February 2016 | 12 | 9 |
| March 2016 | 3 | 3 |
| April 2016 | 8 | 4 |
| May 2016 | 58 | 18 |
| June 2016 | 61 | 15 |
| July 2016 | 68 | 19 |
| August 2016 | 97 | 23 |

*60-Day Notice of Intent to Sue for Clean Water Act Violations*
*Page 8 of 14*

| | | |
|---|---|---|
| September 2016 | 95 | 24 |
| October 2016 | 99 | 24 |
| November 2016 | 91 | 24 |
| December 2016 | 140 | 29 |
| January 2017 | 144 | 30 |
| February 2017 | 109 | 22 |
| March 2017 | 57 | 13 |
| **TOTAL** | **1064** | **258** |

### c. Specific provisions of Formosa's TPDES permit violated

Section 301(a) of the CWA prohibits the discharge of pollutants from a point source to waters of the United States except in compliance with, among other conditions, a National Pollutant Discharge Elimination System (NPDES) permit issued pursuant to Section 402 of the CWA.[18] In Texas, TCEQ has been delegated the responsibility of authorizing discharges into waters of the United States by issuing Texas Pollutant Discharge Elimination System (TPDES) permits under the CWA.[19]

Formosa is violating the CWA by violating express conditions in its TPDES permit No. WQ0002436000.[20] Formosa's TPDES permit prohibits the "discharge of floating solids or visible foam in other than trace amounts" from all external (001, 002, 003, 004, 005, 006, 007, 008, 009, 010, 011, 012, 013) and internal Outfalls (101, 201, and 901).[21] In addition, Formosa's permit requires non-process area storm water that is discharged through outfalls 006, 007, 008, 010, and 011 to contain "no visible floating solids, foam, or oil."[22] We believe the discharge of pellets and dust is not only through the outfalls that discharge into Cox Creek, but also through Outfall 001 which discharges directly into the middle of Lavaca Bay through an underwater pipe. As TCEQ confirmed in its investigation reports from May and October of 2016, any discharge of pellets and plastic

---

[18] 33 U.S.C. § 1311(a); 33 U.S.C. § 1342(b).
[19] EPA-TNRCC Memorandum of Agreement Concerning the National Pollutant Discharge Elimination System, 1998, *available at* https://www.epa.gov/sites/production/files/2013-09/documents/tx-moa-npdes.pdf.
[20] 30 T.A.C. §§ 305.125(1).
[21] TPDES Permit No. WQ0002436000, Effluent Limits and Monitoring Requirements Condition 3, Pages 2b, 2e, 2h, 2l, 2m, 2n, and 2o.
[22] TPDES Permit No. WQ0002436000, Other Requirement 20, Page 18 (also requiring the permittee to "maintain records detailing monitoring performed, results, and whether the sampled water was routed for discharge.")

San Antonio Bay
71403-004042

*60-Day Notice of Intent to Sue for Clean Water Act Violations*
*Page 9 of 14*

dust in more than a trace amount from Formosa's facility into Cox Creek or Lavaca Bay violates Formosa's TPDES permit and the CWA.[23]

Additionally, Formosa has failed to report these illegal discharges of pellets since January 31, 2016 to TCEQ as required by law. As TCEQ's Executive Director stated in the Response to Public Comment for Formosa's most recent TPDES permit amendment and renewal, "Formosa must notify the TCEQ within 24 hours of any noncompliance, including the discharge of polyethylene pellets. As part of the notifications, Formosa must include steps it has taken or plans to take to reduce, eliminate, and prevent recurrence of the noncompliance, and to mitigate its adverse effects. Specifically, the draft permit requires Formosa to report any noncompliance that may endanger human health or safety, or the environment to the TCEQ within 24 hours of becoming aware of the noncompliance. Additionally, Formosa must provide a written submission of such information within five working days of becoming aware of the noncompliance."[24] Despite these reporting requirements, Formosa's ongoing illegal discharges over the past several years, and several investigations by federal and state agencies of the pellets, we believe Formosa has not reported to TCEQ its illegal discharges of pellets since January 31, 2016 and ongoing.

### 3. HARMS FROM PLASTIC PELLETS AND DUST

#### a. The ongoing danger of plastic pellets in the marine environment

Scientific literature is replete with descriptions of the harm to marine species caused by plastic pellets. As was explained in the introduction to this notice, the effects of Formosa's illegal discharge of plastic pellets on the marine environment have been witnessed firsthand by at least two local sports fishermen who saw plastic pellets in the guts of fish. These occurrences dramatically evince the risk to the marine environment.

Plastic pellets accumulate in the marine environment, and the dangers from this accumulation have been well-known and documented for decades. A peer-reviewed scientific paper from 30 years ago explained, "plastics present a problem in the environment because they float, are non-biodegradable, and only slowly degrade upon exposure to ultraviolet radiation."[25]

As Formosa has explained in its permit application to TCEQ, it, like other companies, mixes in additives to make pellets. It is not clear whether Formosa mixes in the additives or uses a chemical process so that the additives are chemically bound to the pellets. If the additives are simply mixed in, they can leach out easily. If chemical reactions are used to

---

[23] *See* TCEQ Investigation Reports, *supra* note 15, Exhibit B at 3, Exhibit C at 3.
[24] Executive Director's Response to Public Comment, TPDES Permit No. WQ00024360000, Formosa Utility Venture, Ltd. and Formosa Plastics Corp., TX, at Response 3, Page 9; *see also* TPDES Permit No. WQ0002436000, Provision No. 7a; 30 T.A.C. § 305.125(9).
[25] Marie Y. Azarello and Edward S. van Vleet, *Marine birds and plastic pollution,* 37 Marine Ecology Progress Series 295, 295–96 (1987).

*60-Day Notice of Intent to Sue for Clean Water Act Violations*
*Page 10 of 14*

add the additives, they cannot seep out.[26]  Formosa's method of mixing in additives to its pellets will affect whether those additives are seeping out into the Matagorda and Lavaca Bay ecosystems.  If the additives are simply mixed in, there is potential for toxins to seep into the marine ecosystem.  The levels of toxins in plastics can be thousands of times higher than those typically found in seawater.[27]  Thus, depending on the process by which Formosa makes it pellets, its discharge could also include illegal toxins.  More discovery is needed to determine whether by discharging plastic pellets, Formosa is also putting toxins into Cox Creek and the Lavaca and Matagorda Bay systems.  At the moment, only Formosa knows whether this is the effect of illegally discharging plastic pellets.

Furthermore, a 2009 study concluded that "in the marine environment, plastic debris such as pellets, fragments and microplastics have been shown to contain organic contaminants including polychlorinated biphenyls (PCBs), polycyclic aromatic hydrocarbons, petroleum hydrocarbons, organochlorine pesticides (2,20 -bis(p -chlorophenyl)-1,1,1 trichloroethane (DDT) and its metabolites; together with hexachlorinated hexane (HCH)), polybrominated diphenylether (PBDEs), alkylphenols and BPA at concentrations ranging from ng g–1  to m g g–1."[28]

Marine species including seabirds, turtles, mussels, and fish ingest plastic pellets.  Seabirds eat plastics, including plastic pellets,[29] which are estimated to remain possibly up to a year in their stomachs.[30]  Mussels were found to retain plastics for 48 days.[31]  Eighty species of sea birds are known to ingest plastic debris.[32]  Plastic pellets have been recovered from the digestive tracts of flounders, lobsters, white perch, and silversides.[33]

### b. The accumulation of toxins on plastic pellets

In addition to being composed of toxins, plastic pellets in the marine environment "adsorb trace metals rapidly."[34] This means that metals adhere or attach to the pellets.  Plastic pellets in the marine environment enable "metals to be transported considerable distances while buoyant.  The association of trace metals with plastics also has implications for the transfer of these contaminants into the foodchain.  Thus,

---

[26] EPA report, *supra* note 6, at 14.
[27] California EPA State Water Resources Control Board, Preproduction Plastic Debris Program, http://www.waterboards.ca.gov/water_issues/programs/stormwater/plasticdebris.shtml (last visited Feb. 24, 2017).
[28] Richard C. Thompson et al., *Plastics, the environment and human health:  current consensus and future trends,* 364 Philosophical Transactions of the Royal Society B 2153, 2156 (2009).
[29] Van Franeker et al., *Sea birds, gyres and global trends in plastic pollution,* 203 Environmental Pollution 89, 89 (2015).
[30] *Id.* at 93.
[31] *Id.*
[32] EPA report, *supra* note 6, at 30.
[33] *Id.* at 35.
[34] Luke A. Holmes et al., *Adsorption of trace metals to plastic resin pellets in the marine environment,* 160 Environmental Pollution 42, 47 (2012).

*60-Day Notice of Intent to Sue for Clean Water Act Violations*
*Page 11 of 14*

invertebrates, fish, birds and mammals that mistake plastics for food… have the potential to mobilize metals in their acidic, enzyme-rich digestive systems. Consequently, metals may be either bioaccumulated or released back into seawater in a more soluble and biologically available form. Clearly, these and other potential impacts of plastic-metal interactions in the aquatic environment merit further study."[35]

In Lavaca Bay, the transport of metals is of particular concern, since a former Alcoa mercury superfund site exists in the bay. Whether mercury has adhered and is adhering to Formosa's illegally discharged pellets merits review and is worrisome.

In addition to metals, organic pollutants can adhere to plastic pellets, which "can become orders of magnitude more concentrated on the surface of plastic debris than in the surrounding sea water."[36] The introduction of plastic pellets into Lavaca Bay is more than a mere eyesore. They create a danger to the aquatic environment.

### c. International industry efforts to eliminate plastic pellets in the environment

Formosa is likely aware of Operation Clean Sweep, an international effort to reduce plastic pellet loss, run by the Plastics Division of the American Chemistry Council and the Society of the Plastics Industry. Operation Clean Sweep has a goal of "achieving zero pellet, flake, and powder loss."[37] Operation Clean Sweep has a 32-page manual describing how to reduce resin pellet loss into the environment.[38] Formosa can follow the recommendations of the plastics industry to find the best ways to stop trashing Cox Creek and Lavaca and Matagorda Bays and to clean up the pellet litter it has sent onto the shores and the bay. Formosa Plastics has ignored the warnings of its own industry.

*Posters from EPA's 1992 Report on Plastic Pellets in the Aquatic Environment, including an Operation Clean Sweep Poster:* [39]

---

[35] *Id.*
[36] Thompson, *supra* note 28, at 2156.
[37] Operation Clean Sweep, https://opcleansweep.org (last visited Feb. 24, 2017).
[38] Operation Clean Sweep Manual, https://opcleansweep.org/Manual (last visited Feb. 24, 2017).
[39] EPA Report, *supra* note 6, at 94, 95.

San Antonio Bay
71403-004045

*60-Day Notice of Intent to Sue for Clean Water Act Violations*
*Page 12 of 14*



Figure 31.  A Poster Distributed during the 1987 SPI Marine Debris Campaign.



Figure 32.  Advertisement for the 1991 SPI *Operation Clean Sweep* Campaign.

## 4. COMPLAINANTS

This notice is filed on behalf of Diane Wilson and the San Antonio Bay Waterkeeper, whose contact information follows:

Diane Wilson
600 Ramona Rd.
Seadrift, Texas 77983
(361) 218-2353

San Antonio Bay Estuarine Waterkeeper
Bob Lindsey, Waterkeeper
(361) 389-2701
Diane Wilson, Executive Director
(361) 218-2353
600 Ramona Rd.
Seadrift, Texas 77983

## 5. CONCLUSION

Complainants demand that Formosa take immediate, structural, and permanent steps to stop its illegal discharge of plastic pellets and dust and clean up the litter strewn across the bays and beaches. If this does not happen within 60 days, we intend to file suit against Formosa to secure appropriate relief for all violations described in this notice letter, and for any similar violations that occur after the date of this notice letter.

*60-Day Notice of Intent to Sue for Clean Water Act Violations*
*Page 13 of 14*

Complainants are motivated by a desire to keep the waters of the region clean, and seek a permanent resolution to Formosa's plastic pellets and PVC dust problem. Despite the 2004 and 2010 EPA investigation findings and the 2016 investigations by TCEQ, the pellet discharges are ongoing.

**Please contact us within 20 days of the date of this notice letter if Formosa is serious about resolving this dispute with Complainants prior to litigation and the associated increase in fees and expenses it would entail.** We can be reached through Texas RioGrande Legal Aid attorney, Erin Gaines, at 512-374-2739 or egaines@trla.org.

Sincereley,

Erin Gaines
Amy Johnson
Enrique Valdivia
TEXAS RIOGRANDE LEGAL AID
4920 N. I-35
Austin, TX 78751
egaines@trla.org
512-374-2739
*Attorneys for Diane Wilson*

David Frederick
FREDERICK, PERALES, ALLMON &
ROCKWELL, PC
1206 San Antonio
Austin, TX 78701
(512) 469-6000
dof@lf-lawfirm.com
*Attorney for San Antonio Bay Estuarine Waterkeeper*

**Copy of Notice Sent via U.S. Certified Mail to: 7014 1200 0001 9442 1374**
Scott Pruitt, Administrator
USEPA Headquarters
William Jefferson Clinton Building
Mail Code: 1101A
1200 Pennsylvania Ave, NW
Washington, DC 20460

San Antonio Bay
71403-004047

*60-Day Notice of Intent to Sue for Clean Water Act Violations*
*Page 14 of 14*

**Copy of Notice Sent via U.S. Certified Mail to:  7014 1200 0001 9442 2388**
Samuel Coleman
Acting Regional Administrator
USEPA Region 6
Mail code: 6RA
1445 Ross Ave, Suite 1200
Dallas, TX 75202-2733

**Copy of Notice Sent via U.S. Certified Mail to:  7014 1200 0001 9442 2395**
Richard A. Hyde, MC 109
Executive Director
TCEQ
P.O. Box 13087
Austin, TX 78711-3087

**Copy of Notice Sent via U.S. Certified Mail to:  7012 3050 0000 9542 8857**
Corporation Service Company
Registered Agent for Formosa Plastics Corporation, Texas
211 E. 7th St, Suite 620
Austin, TX 78701

**Attachments:**
Exhibit A –EPA Investigation Report and photos, October 2010
Exhibit B – Excerpts from TCEQ Investigation Report with photos, May 13, 2016
Exhibit C – Excerpts from TCEQ Investigation Report with photos, Oct 24, 2016
Exhibit D – Map of Complainants' Sampling Locations around Lavaca Bay,
             Matagorda Bay, and Cox Creek

# EXHIBIT 4

**To:**      John Pastuck/FPC Environmental Dept.[jpastuck@fpcusa.com]
**From:**    Norberto J Torres /FPC Insurance Dept
**Sent:**     2017-04-12T21:30:08Z
**Importance:**    Normal
**Subject:**   RE: Intent to file Lawsuit
**Received:**     2017-04-12T21:30:08Z

OK I'll hold on to it for now and see how things go.
Thanks.
Norberto

**From:** John Pastuck/FPC Environmental Dept.
**Sent:** Wednesday, April 12, 2017 5:27 PM
**To:** Norberto J Torres /FPC Insurance Dept
**Subject:** Re: Intent to file Lawsuit

Very hard to say at this point. We will most likely meet in the near future. It may be best to see how that goes. So far it is only an intent to sue.

John Pastuck

On Apr 12, 2017, at 12:07 PM, Norberto J Torres /FPC Insurance Dept <ntorres@fpcusa.com> wrote:

John,
Do you think this will be settled before a lawsuit is filed and this becomes a formal pollution claim.
I am just wondering before we put our pollution carrier on notice.
Norberto

**From:** John Pastuck/FPC Environmental Dept.
**Sent:** Friday, April 07, 2017 2:30 PM
**To:** Norberto J Torres /FPC Insurance Dept; Karen Ho / FPC Insurance Department
**Subject:** Intent to file Lawsuit

FYI
John Pastuck
Formosa Plastics Corporation, U.S.A.
Corporate EHS&C Department
Office (973)716-7387
Mobile (862) 485-5543

FRMSA_INSLIT_0000801

# EXHIBIT  5

**From:** Erin Gaines <egaines@trla.org>
**Sent:** Monday, April 10, 2017 5:05 PM
**To:** Bob Stewart
**Subject:** Re: Formosa - D

**Follow Up Flag:** Follow up
**Flag Status:** Flagged

CONFIDENTIAL - SETTLEMENT NEGOTIATIONS

Thank you for the plan.

As you requested, here is what remedies our clients are seeking in a negotiation. Our clients' main goal is to change processes at the plant so that pellets no longer are discharged, and to have monitoring to track future compliance. We will also want Formosa to clean up the pellets that have already been discharged.

In order to negotiate specific recommendations, our expert along with attorneys and clients, would need to inspect Formosa's facility as soon as possible. While we hope to reach a quick and non-litigated settlement, we could not agree to restrict our expert's use of her observations while on the site in any future litigation.

In addition to those changes, our clients will seek environmental mitigation and attorneys fees and costs.

Two additional documents that we would like to review are:
1) any description of Formosa's Total Housekeeping Management (THM) program (referenced in the plan you sent); and
2) any current Stormwater Pollution Prevention Plans (SWPPPs) for the Formosa facility.

Erin

--
Erin Gaines
Attorney
Texas RioGrande Legal Aid
4920 N. I-35
Austin, TX 78751
(512) 374-2739 (office)
(512) 447-3940 (fax)
egaines@trla.org

On 4/10/2017 2:29 PM, Bob Stewart wrote:
> As you requested, attached are the plans submitted to TCEQ.  No response to date on the plans.  Bob

1

KHH-003776

# EXHIBIT  6

| | |
|---|---|
| **From:** | Erin Gaines <egaines@trla.org> |
| **Sent:** | Friday, July 07, 2017 3:23 PM |
| **To:** | Bob Stewart |
| **Subject:** | Response to Formosa's latest offer |
| **Attachments:** | Response to Formosa Offer -- 07072017.pdf |

Bob, see our attached response to Formosa's offer from June 13. If you want to talk about any of it further, feel free to give me a call at 512-374-2739.

Erin

--
Erin Gaines
Attorney, Texas RioGrande Legal Aid
4920 N. I-35
Austin, TX 78751
512-374-2739 (office)
512-447-3940 (fax)
egaines@trla.org

KHH-003990

# EXHIBIT 7

May 22, 2017

Mr. Robert Stewart
Kelly, Hart & Hallman, LLP
303 Colorado, Suite 2000
Austin, Texas 78701-3924

<u>**CONFIDENTIAL SETTLEMENT DISCUSSIONS**</u>

<u>Regarding</u>:    Formosa Plastics and citizen suit notice letter; possible settlement
framework

Dear Bob:

    To the end of making discussions June 2nd as productive as possible, Diane Wilson
and the San Antonio Bay Estuarine Waterkeeper (collectively, "we") have developed a
possible framework for settlement of the claims made in our April 6th Clean Water Act
notice of intent to sue.  This letter presents that framework.

    This letter does not state a set of extreme objectives from which we expect to
retreat.  While it is not a take-it-or-leave-it statement of our positions, our final positions
before filing suit will not back off much, if any, from those stated here.  We realize that
litigation is a long and precarious slog, but we are confident we have funding to make
that slog, we have folks experienced with such litigation, and we believe the evidence is
uncommonly unfavorable to Formosa.  We expect litigated penalties would far exceed
the costs of a settlement along the lines outlined, here.

    We seek by settlement or litigation to maximize three objectives: (1) stopping the
discharges of pellets and powders (including any solids from Formosa's plastic
production processes), (2) cleaning up the discharged pellets and powders, and (3)
mitigating the environmental harm done.

    At the outset, we do honestly commend Formosa on its commitment to improved
housekeeping measures and improved mechanical control measures at the plant.  It is not
the case that we think Formosa is doing nothing sincere to address the problem. However,
we do not believe Formosa's current efforts alone will stop the discharge.

KHH-000648

Confidential Settlement Letter
May 22, 2017
Page 2

## 1. Stopping the discharges of pellets and powders

The engineering solution:  If the discharges are to be stopped, we believe it will be necessary to route all storm water that comes into contact with pellets or powders to the central wastewater treatment plant, while ensuring compliance with existing permit effluent limitations.  We do not think the distinction we understand Formosa to draw between "contact" and "non-contact" storm water streams is logically justified.  At the current time, Formosa is comingling real non-contact stormwater (e.g. stormwater runoff from undeveloped and stabilized areas, other non-industrial areas, etc.), with flows that are contact stormwater. We would characterize as "contact" storm water any storm water that has come in contact with areas where manufacturing, processing or materials handling (i.e., storage, loading, unloading, transportation, or conveyance of any raw material, intermediate product, final product, by-product or waste product) occurs or where such activities occurred in the past and significant materials remain exposed to storm water.  Formosa's proposed changes to its existing gate and outfall system will not reliably and sufficiently remove pellets and powders on an ongoing basis, especially during wet weather events.  Furthermore, those methods will not stop the discharge of chemicals, some of them hazardous, that have "escaped" containment in the past in the same sorts of ways the pellets, etc., have escaped, and booms and screens will not remove those from storm water flows.

Because the current treatment methods of the CWTP are designed primarily for dissolved and suspended constituents and at best incidentally for removing floating pellets and powders, a new screening process would also need to be added to the central wastewater treatment, after the equalization tanks and prior to the existing pre-treatment. This would include fine screens, small enough to entrap pellets, used to filter off as many pellets as possible at the beginning of the treatment process.

Monitoring:  Fund long-term quarterly monitoring, by a third party agreed to by us and Formosa, at sites around Cox Creek and Lavaca Bay. The monitoring needs to be for both pellets and powders.  We could agree to a protocol for determining the presence of pellets or powders deposited after some date.

## 2. Cleaning up the discharged pellets and powders.

Clean-up efforts: Formosa's current clean-up efforts would be continued until an agreed-upon level of clean-up is achieved and this would be formalized in any agreement. We need additional information about the current proposed scope, methods, and extent of the clean-up to discuss further details on this issue – if there is a current plan with this information, we request to see it as soon as possible. In addition, we propose setting up a conference call between us, Formosa, and the clean-up contractors before June 2nd in

KHH-000649

Confidential Settlement Letter
May 22, 2017
Page 3

order to ask more questions so that our conversations on June 2nd are as productive as possible.

## 3. Mitigate the environmental damage done.

Mitigation:  We applaud the cleanup efforts that Formosa explained to us during the site visit, and as noted above, would like to ensure they continue.  But, the damage to the bay has been long-running, and residual effects of past discharges will likely continue into the distant future.  So, we think substantial mitigation must be a component of any settlement.

Endowment or other guarantied funding for Green Lake Park:  Calhoun County purchased 6,400 acres of parkland and lake in 2012.  The county has developed a master plan for the park.  It is our understanding that the county currently lacks funding to implement the plan and to maintain the park.  We want Formosa to help with park funding.  We believe a $7.5 million endowment from Formosa would allow the county to move forward quickly and professionally to implement the master plan.  An endowment is the most simple means of helping with park funding, but we are not wedded to that funding mechanism.  If Formosa prefers some other funding mechanism, we would expect a reasonably short time horizon, say, five years, and a contractual commitment that is not contingent on subjective determinations.

Purchase and deed restriction on 245 wetlands acres:  As we understand it, in 1999 Formosa dedicated 245 wetland acres to the Formosa-Tejano wetlands and Formosa largely funds necessary maintenance as is necessary and the educational activities that occur there with Calhoun County ISD.  We want Formosa to dedicate an additional 245 wetlands acres and fund educational activities similar to those currently in place for the Formosa-Tejano Wetlands.  This acreage might adjoin the Formosa-Tejano Wetlands or Green Lake Park, or might be located in a nearby area that is of similar environmental and educational quality to the existing wetlands.

Penalties:  If the monitoring scheme indicates that future discharges of pellets and powder have occurred, we anticipate an escalating scale of liquidated penalty amounts, calculated to drive Formosa to further improvements at the plant, that would be paid to a segregated county parks fund, an agreed-upon non-profit environmental advocacy group, or some other mutually agreed upon project.

Costs and fees:  We expect Formosa to pay the reasonable and necessary costs and attorneys' fees of developing the suit to this point and of the formalizing of the settlement terms.

KHH-000650

  <u>Timeline</u>:  We hope we can have a substantive, productive conversation on June 2nd.  Please know that we will only consider delaying the filing of a lawsuit after the end of the 60 day notice period if we can come out of this June 2nd meeting with substantial agreement on settlement concepts.

  We look forward to further discussions on June 2nd.

      Sincerely,

      Erin Gaines
      Amy Johnson
      Enrique Valdivia
      TEXAS RIOGRANDE LEGAL AID
      4920 N. I-35
      Austin, TX 78751
      egaines@trla.org
      512-374-2739
      ***Attorneys for Diane Wilson***

      David Frederick
      FREDERICK, PERALES, ALLMON &
      ROCKWELL, PC
      1206 San Antonio
      Austin, TX 78701
      (512) 469-6000
      dof@lf-lawfirm.com
      ***Attorney for San Antonio Bay Estuarine
      Waterkeeper***

KHH-000651

# EXHIBIT 8

SETTLEMENT CONFIDENTIAL

# ACTION ITEMS FROM 06-02-17 MEETING

Following is Formosa's response to action items generated from our 06-02-17 meeting.

**CONVERTING ADDITIONAL NON-CONTACT STORMWATER AREAS TO CONTACT AREAS**:
The idea was proposed by TRLA's expert to identify those areas that have a high load or high potential for pellets and collect the water from these areas. Several options were studied and are discussed below.

Option #1: Formosa evaluated installing additional tankage within these high load areas which would allow for recovery of the water and pellets. Although technically feasible it was determined to be impractical. Therefore, this option was removed from further consideration.

Option #2: Formosa studied this option in two parts, part one being the Poly One loading area and part two being the Poly Two loading area.

The Poly One loading area would implement a physical separation system whereby pellets would be separated from the water and recovered. The water would then be discharged back to the outfall 6 drainage system.

Within the Poly Two loading area the water would be collected back to the cooling tower to replace cooling tower makeup and any excess water more than needed as makeup would create additional cooling tower blowdown. The blowdown from the cooling tower would be discharged to the Wastewater Unit for treatment.

The concern for Option #2, for Poly Two loading area described above, is the increased flow to the Wastewater Unit. An increase in influent will result in increased contaminant loading which will cause the permitted discharge parameters to increase. Subsequently, Formosa will need to amend the wastewater permit to account for increased discharge flow and contaminant loading. Considering this, we do not believe that amending the permit is a viable means to collect the water from the pellet high load areas.

Option #3: Construct a South Storm Pond. As discussed below, Formosa is studying the construction of a collection pond that would receive water from Outfalls 006, 008 and 009. The

SETTLEMENT CONFIDENTIAL

collected pellets would be recovered and water recycled for use.  In conjunction with this, each Poly Unit is evaluating further recovery of non-contact stormwater for additional pellet recovery per rain event and to minimize loading upon the stormwater Outfalls.  Also, the Poly One Loading area will install additional mechanical control measures.

Considering the options described above, Formosa believes that Option #3 is the only one identified that is practical and worthwhile for further evaluation.

**South Storm Pond**:

Formosa is considering building a collection pond, referred to as the South Storm Pond.  The conceptual design would be a pond that would collect storm water from Outfalls 006, 008 and 009.  These Outfalls drain all of the PolyOlefins (plastics manufacturers) Units and PolyOlefins loading areas.

The idea is to have the water from the Outfalls drain and/or be pumped into the pond.  Any pellets in the water would accumulate within the pond.  A portion of the water/pellets within the pond would be recovered back to our raw water pond where it will be treated to produce industrial grade water and ultra-pure water.  Pellets that accumulate within the Storm Pond will be recovered.

Based on average flows from Outfalls 006, 008 and 009 (each one ~ 100 MGD – million gallons/day), a pond sized large enough to collect this volume of water is impractical.  However, the pond size will be evaluated in comparison to a volume of water that would be representative of an initial "flush".

**STRAINERS AT CWTP**:

TRLA suggested that FPC install strainers (additional mechanical control measure) at the Wastewater Plant (CWTP) between the equalization tanks and downstream treatment equipment.  TRLA's expert suggested fine-mesh strainers be used to eliminate the potential of pellets ultimately reaching Outfall 001 (discharge to Lavaca Bay).

Any fine-mesh strainers used within CWTP immediately downstream of any of the EQ tanks will plug due to total suspended solids (TSS) in the wastewater streams at this point.  This in turn will restrict throughput into and through CWTP.  Since the wastewater is treated through

SETTLEMENT CONFIDENTIAL

multiple stages of clarification and filtration whereby the solids are removed, the addition of additional mechanical controls within the CWTP are unnecessary.

However, Formosa is planning to install a filter system on the treated water that is discharged at Outfall 001. At this point, the TSS loading is minimal such that pluggage should not occur, therefore making operation of the strainer more effective and efficient. The purpose of the effluent filter system is to eliminate any potential release of pellets through Outfall 001 during the typically biannual emptying of the open top effluent sump (regular sampling throughout all other periods of operation has proven to us that pellets are not released through this outfall).

**MONITORING**:

Formosa is in agreement that a third party consultant could be utilized to monitor Lavaca Bay and its shorelines for the presence of pellets on a quarterly basis. However, it should be noted that there is currently no way to qualify the difference between a "new pellet" versus a "legacy pellet". Given this inability, the monitoring program would essentially serve as a tool to continue cleanup activities in the bay where pellets are found rather than to identify new releases. However, Formosa is studying the practicality of a monitoring and sampling system at the Outfalls which we believe to be better indications of a new release. Details are below.

### Monitoring for On-Going Compliance

Videography: Formosa has met with our IT Department and is studying the use of high-resolution cameras at the Outfalls. These cameras would allow operations personnel to view the Outfalls for evidence of pellet discharge on a more continuous basis.

Continuous Slip Stream Sampling: We plan on testing a sample system at Outfall 006. This sample system will be used to quantify the number of pellets reaching the Outfall and potentially be discharged. If functional, Formosa will implement this sample system at all applicable Outfalls.

### Monitoring to determine level of Clean-up Operations:

The criteria for verifying a successful "clean-up" would have to be agreed upon by all parties (TCEQ, TRLA and FPC) involved in order for the monitoring program to be effective. In addition, the monitoring program would need to minimize adverse effects of the cleanup operations on the surrounding habitat. We have reviewed similar

SETTLEMENT CONFIDENTIAL

situations that occurred in California and the corrective actions that ensued.  The cases used measurable success criterion for what is considered "clean".  For example, it could be based on the number of pellets found at random sampling locations over a period of time or free floating pellets found that would constitute an unacceptable condition.

Additionally, we feel that this type of monitoring program would also be welcomed by the TCEQ, and are willing to invite the interested parties to participate in developing that program.  FPC envisons that a detailed scope and sampling regimen would be worked out and agreed upon by all parties as discussions evolve.  Upon completion of each quarterly event a summary report would be prepared and submitted to both parties.

**PELLETS INCLUDED IN CLARIFIER SOLIDS LOADING**:

The concern was raised by TRLA's expert that the clarification floating removal capacity might not be enough to remove all of the pellets that may enter the system with the TSS.  Formosa has reviewed the applicable data related to solids loading within the Wastewater Unit and pellets were not specific in the design data.  However, Formosa has not had a problem meeting compliance with the TSS permit limit.  Essentially, the clarifiers are overdesigned. Further details are provided below.

Formosa reviewed the data for the Wastewater Treatment clarifiers.  For our physical treatment capacity, we are on average using about 2% of the floating solids removal capacity and during maximum cases are using about 8% of the floating solids removal capacity.  This means there is about 80,000 lbs/day of available floating solids removal capacity for any pellets that may happen to not be removed upstream in the production units.  We are more than confident that the physical treatment capacity is well oversized for the removal of pellets.

KHH-000706

# EXHIBIT  9

**From:** "Frank Wedig, Esq./TXLS" <FWedig@ftpc.fpcusa.com>
**Sent:** Fri, 11 Aug 2017 20:30:07 +0000
**To:** "Klink, David" <David.Klink@Chubb.com>, ACE Apollo Casualty Risk Environmental FNOL <CasualtyRiskEnvironmentalFirstNotice@chubb.com>
**CC:** claire.juliana@aon.com, Norberto J Torres /FPC Insurance Dept <ntorres@fpcusa.com>, Karen Ho / FPC Insurance Department <KHo@fpcusa.com>, bob.stewart@kellyhart.com, steve.ravel@kellyhart.com
**Subject:** RE: Formosa Plastics Corporation (Policy Number GPI G24890491 001)
**Attachments:**
· San Antonio Bay Estuarine Warterkeeper vs. FPC-TX.pdf  *(1719 kb)*
· San Antonio Bay Estuarine Warterkeeper vs. FPC USA.pdf  *(1701 kb)*
· San Antonio Bay Estuarine Warterkeeper vs. FPC America.pdf  *(1716 kb)*

RE:  Formosa Plastics Corporation

Policy Number:  GPI G24890491 001

Policy Period:  7/1/2010 – 7/1/2019 (extended per Endorsement 26)


    Please find attached copies of a lawsuit recently served on Formosa Plastics Corporation, Texas; Formosa Plastics Corporation, USA and Formosa Plastics Corporation, America.  Plaintiffs' complaint contains pollution allegations.


    By copy of this notice, I am providing email addresses for Claire Juliana who is pollution claim consultant for Formosa's broker and for Bob Stewart and Steve Ravel with the Kelly Hart lawfirm who are defending Formosa in this lawsuit.


    After review, please let me know if you need any additional information.


Best regards,

Frank Wedig

*Legal Services*

Formosa Plastics Corporation, Texas

201 Formosa Drive

Point Comfort, TX  77978

(361)987-7682


fwedig@ftpc.fpcusa.com

ACE00000987
CONFIDENTIAL

**From:** Frank Wedig, Esq./TXLS
**Sent:** Friday, August 04, 2017 4:57 PM
**To:** Rick Crabtree/FPC Vice President and General Manager; Bob Stewart
(bob.stewart@kellyhart.com)
**Subject:** FW: LAVACA BAY ENVIRONMENTAL LAWSUIT AGAINST FPC TX; FPC USA & FPC
America

Rick & Bob,

        Please find attached notice of lawsuit recently served on FPC-TX, FPC-USA
and FC-A.

Best regards,

Frank

---

**From:** Lucia Joseph / FPC USA Legal Division
**Sent:** Friday, August 04, 2017 4:38 PM
**To:** Frank Wedig, Esq./TXLS; Alice Nightingale/ FPC USA Legal Division
**Cc:** Lucia Joseph / FPC USA Legal Division; Debbie Durham/TXLS
**Subject:** LAVACA BAY ENVIRONMENTAL LAWSUIT AGAINST FPC TX; FPC USA & FPC
America

Frank & Alice,

As anticipated, the attached complaints were received today through CSC this
afternoon.

Thanks.

ACE00000988
CONFIDENTIAL

*Lucia Joseph*

Legal Department

***Formosa Plastics Corporation, U.S.A.***

9 Peach Tree Hill Road

Livingston, NJ 07039

Phone: 973-716-7424

Fax: 973-716-7222

Email: ljoseph@fpcusa.com

---

This communication is solely for use by the intended recipient and may contain information that is privileged, confidential or copyrighted under applicable law. If you are not the intended recipient, you are hereby formally notified that any use, copying or distribution of this communication, in whole or in part, is strictly prohibited. Unless explicitly stated, this communication does not constitute a contract offer, a contract amendment, or an acceptance of a contract offer. This communication also does not constitute consent to the use of sender's contact information for direct marketing purposes or for transfers of data to third parties.

---

*This communication is solely for use by the intended recipient and may contain information that is privileged, confidential or copyrighted under applicable law. If you are not the intended recipient, you are hereby formally notified that any use, copying or distribution of this communication, in whole or in part, is strictly prohibited. Unless explicitly stated, this communication does not constitute a contract offer, a contract amendment, or an acceptance of a contract offer. This communication also does not constitute consent to the use of sender's contact information for direct marketing purposes or for transfers of data to third parties.*

ACE00000989
CONFIDENTIAL

# EXHIBIT  10

**From:** Chubb North American Claims <do-not-reply@chubb.com>
**Sent:** Tue, 15 Aug 2017 17:02:05 -0400
**To:** CLAIRE.JULIANA@AON.COM, fwedig@ftpc.fpcusa.com
**CC:** NA WorkView Redirect Prod <NAWorkViewRedirectProd@naworkviewprod.com>
**Subject:** KY17K2192058 FORMOSA PLASTICS CORPORATION, USA - Chubb North American Claims Acknowledgement

---

# CHUBB®

**Chubb North American Claims**
**P.O. Box 5122**
**Scranton, PA 18505**
**Fax (877) 395-0131**
**ChubbNAClaimsCustomerService@chubb.com**

Re: Insured :  FORMOSA PLASTICS CORPORATION, USA
Policy No.: G24890491
Claimant :  San Antonio Bay Estuarine Waterkeeper et al
Claim No.: KY17K2192058
Your Ref. : 6:17-cv-00047

Chubb North American Claims ("Chubb") acknowledges receipt of the first notice of loss you recently submitted. The claim number assigned to this matter is referenced above.

The above claim has been assigned to David Klink for handling, including a review/evaluation of your policy terms and conditions. David will contact you shortly to discuss next steps in the handling of your claim, but in the meantime, if you have any questions, please feel free to contact David directly at 2013565123.

We thank you for your business. It is important to us, as is our delivery of best-in-class claims service. In this regard, to review a summary of our service objectives, please refer to the attachment - "Chubb Service Level Commitments".


Very truly yours,

Chubb North American Claims

ACE and Chubb are now one



*Highlighted text provides additional information via popups*

# EXHIBIT  11

CHUBB North American Claims - Environmental
10 Exchange Pl., 9th Fl.
Jersey City, NJ 07302

201-356-5123 *tel*
866-635-5698 *fax*

David.klink@chubb.com

**David Klink**
Claims Director

October 30, 2017

**VIA ELECTRONIC MAIL AND CERTIFIED MAIL, RRR**

C H U B B®

Frank Wedig
Formosa Plastics Corporation, Texas
9 201 Formosa Drive
Point Comfort, TX 77978

Re:    First Named Insured:        Formosa Plastics Corporation USA
       Named Insured:             Formosa Plastics Corporation, Texas
       Named Insured:             Formosa Plastics Corporation America
       Matter:                    San Antonio Bay Estuarine Waterkeeper vs.
                                  Formosa Plastics Corp., Texas
       Location:                  Point Comfort, Texas et al
       Policy No.:                G24890491 001
       Claim No.:                 KY17K2192058

Mr. Wedig:

Chubb North American Claims ("Chubb" or the "Insurer") previously acknowledged receipt of the above-referenced claim made by Formosa Plastics Corporation USA, Formosa Plastics Corporation, Texas and Formosa Plastics Corporation America (collectively "Formosa" or the "Insured"). The purpose of this letter is to discuss certain issues that may preclude or otherwise limit the insured's right to coverage for the referenced matter, and to reserve Chubb's rights with respect to such issues.

**The Claim**

According to the information received to date, on or about July 31, 2017, San Antonio Bay Estuarine Waterkeeper ("Waterkeeper") filed a lawsuit alleging that Formosa has discharged plastic pellets, polyvinyl chloride ("PVC"), and polyvinyl chloride ("SPVC"), into Cox Creek and Lavaca Bay.

**The Policy**

The Global Premises Pollution Liability Insurance Policy G24890491 001 ("the Policy") provides claims-made coverage with a Policy Period from July 1, 2010 to July 1, 2019. The policy has a limit of liability of $45,000,000 per pollution condition limit of liability and a $45,000,000 aggregate limit. The policy is subject to a $1,000,000 self-insured retention per pollution condition.

**Coverage Discussion**

**A. Self-Insured Retention.** As an initial matter, the policy self-insured retention is $1,000,000. Accordingly, Chubb shall have no duties under the Policy until this retention first has been satisfied, and all rights are reserved in this regard.

1

ACE00000329
CONFIDENTIAL

**B. Pollution Conditions Coverage.** Coverage insuring agreement part A provides coverage for "claims" arising out of a "pollution condition" at a "covered location". In order for coverage to apply the "claim" must first be made against the insured and reported to Chubb during the "policy period". Additionally the "pollution condition" must have first commenced during the "policy period".

Chubb reserves the right to limit or deny any costs not associated with a "pollution condition" or for a "pollution condition" not emanating from a "covered location".

**C. Potential Coverage Issues.** Per Exclusion F First-Party Property Damage, there is no coverage for damage to property owned by the insured and Chubb reserved the right to limit or deny coverage based on Exclusion F. Additionally, per Exclusion H Insured's Internal Expenses, there is no coverage for costs incurred by an insured for services performed by its employees. Chubb reserves the right to limit or deny coverage based on Exclusion H.

**D. Additional Information and/or Coverage Issues.** Chubb has consented to the retention of the retention of Formosa's choice. Please note that Chubb will only reimburse costs at the prevailing panel counsel rate. Additionally counsel will be required to follow the Chubb litigation guidelines. Please have your selected defense counsel contact me as soon as possible about this matter. Additionally, please confirm that all applicable insurance policies have been placed on notice of this loss. Please provide Chubb with copies of those tenderers. There may be additional Policy provisions that apply to this matter. This letter addresses only those provisions that appear pertinent at this time in light of the facts currently known and available to us.

Chubb reserves all rights with regard to the above referenced provisions, as well as all other rights, remedies, and defenses under the Policy, at law, and in equity. These reservations include, but are not limited to the right to amend this letter to address additional coverage issues as they may arise, based upon the Policy and/or any additional facts that may come to Chubb's attention. Nothing contained in this letter, and no action on our part in investigating these matters, should be construed as an admission of coverage or as a waiver of any right, remedy, or defense that may be available to Chubb.

We hope this letter was helpful in identifying for you the potential coverage issues for this claim. If you have any questions, however, or disagree with any aspect of the foregoing position or analysis, please do not hesitate to contact the undersigned right away.

If you have any questions in the interim, please contact me at (201) 356-5123.

Sincerely,


David Klink


CC:     Norberto Torres
        Formosa Plastics Corporation USA
        9 Peach Tree Hill Rd
        Livingston, NJ 07039

2

ACE00000330
CONFIDENTIAL

# EXHIBIT  12

**From:** Steve Ravel <steve.ravel@kellyhart.com>
**Sent:** Thu, 25 Oct 2018 01:46:50 +0000
**To:** "Klink, David" <David.Klink@Chubb.com>
**CC:** ntorres@fpcusa.com, "Karen Ho / FPC Insurance Department (KHo@fpcusa.com)"
<KHo@fpcusa.com>, claire.juliana@aon.com, Rick Crabtree/FPC Vice President and General
Manager <RickC@ftpc.fpcusa.com>
**Subject:** [EXTERNAL] Insured: Formosa Plastics; Claim # KY17K2192058.
**Attachments:**
· 092618 Letter to Bayer.pdf *(85 kb)*
· 092618 Letter to Bayer_Exhibits.pdf *(2 mb)*

Attorney Client and Joint Interest Privileges Invoked


Mr. Klink,


As I believe you were informed, I have been representing the Formosa companies in connection
with the above referenced claim.  I have been asked to reach out to you and bring you up to
speed.  I know of no better way  to move you up the learning curve as efficiently as possible than to
send you, as a start, a comprehensive mediation statement prepared about a month ago.  Same is
attached


I am at your service to provide whatever data and background you request.


My cell phone number is 512-413-0635 and is usually the best way to reach me by phone.


Our team  looks forward to working with you.

ACE00001549
CONFIDENTIAL

J. Stephen Ravel

Partner, Austin Office

---

**KELLY ⓚ HART**

303 Colorado Street,  Suite 2000

Austin, Texas 78701

(512) 495-6429 (phone)

(512) 495-6401 (fax)

steve.ravel@kellyhart.com    www.kellyhart.com

CONFIDENTIAL NOTICE: This electronic transmission and any documents or other writings sent with it constitute confidential information which is intended only for the named recipient and which may be legally privileged.  If you have received this communication in error, do not read it.  Please reply to the sender at Kelly Hart & Hallman LLP that you have received the message in error.  Then delete it.  Any disclosure, copying, distribution or the taking of any action concerning the contents of this communication or any attachment(s) by anyone other than the named recipient is strictly prohibited.

---

**From:** Steve Ravel
**Sent:** Wednesday, September 26, 2018 6:22 PM
**To:** Karl Bayer
**Cc:** alyson@karlbayer.com
**Subject:** FW: Letter to Bayer and Exhibits

Mediator Bayer,

Attached is the Formosa Defendants' pre-mediation submission. A few hard copy attachments will be delivered in the morning.

ACE00001550
CONFIDENTIAL

J. Stephen Ravel

Partner

---

**KELLY ⓚ HART**

303 Colorado Street, Suite 2000

Austin, Texas 78701

(512) 495-6429 (phone)

(512) 495-6401 (fax)

steve.ravel@kellyhart.com   www.kellyhart.com

CONFIDENTIAL NOTICE: This electronic transmission and any documents or other writings sent with it constitute confidential information which is intended only for the named recipient and which may be legally privileged.  If you have received this communication in error, do not read it.  Please reply to the sender at Kelly Hart & Hallman LLP that you have received the message in error.  Then delete it.  Any disclosure, copying, distribution or the taking of any action concerning the contents of this communication or any attachment(s) by anyone other than the named recipient is strictly prohibited.

---

**From:** Tamara D. Herrington
**Sent:** Wednesday, September 26, 2018 6:20 PM
**To:** Steve Ravel; Diana Nichols
**Subject:** Letter to Bayer and Exhibits

ACE00001551
CONFIDENTIAL

**Tamara Herrington**

*Legal Secretary*

---

KELLY ⊕ HART

303 COLORADO STREET, SUITE 2000

AUSTIN, TEXAS 78701

TELEPHONE (512) 495-6422

FAX (512) 495-6920

*tamara.herrington@kellyhart.com*

*www.kellyhart.com*

CONFIDENTIAL NOTICE: This electronic transmission and any documents or other writings sent with it constitute confidential information which is intended only for the named recipient and which may be legally privileged. If you have received this communication in error, do not read it. Please reply to the sender at Kelly Hart & Hallman LLP that you have received the message in error. Then delete it. Any disclosure, copying, distribution or the taking of any action concerning the contents of this communication or any attachment(s) by anyone other than the named recipient is strictly prohibited.

ACE00001552
CONFIDENTIAL

# EXHIBIT   13

| From: | Steve Ravel |
| Sent: | Wednesday, September 26, 2018 6:25 PM |
| To: | Mary Bachynsky/FPC Environmental Dept. (mbachynsky@fpcusa.com) (mbachynsky@fpcusa.com); John Pastuck/FPC Environmental Dept.; Rick Crabtree/FPC Vice President and General Manager |
| Cc: | Bob Stewart; Diana Nichols |
| Subject: | FW: Letter to Bayer and Exhibits |
| Attachments: | 092618 Letter to Bayer.pdf; 092618 Letter to Bayer_Exhibits.pdf |

Attached is the mediation submission just delivered to Mr. Bayer.  It will be the centerpiece of tomorrow afternoon's prep.

Look forward to seeing y'all.


J. Stephen Ravel
Partner



303 Colorado Street, Suite 2000
Austin, Texas 78701
(512) 495-6429 (phone)
(512) 495-6401 (fax)
steve.ravel@kellyhart.com   www.kellyhart.com

CONFIDENTIAL NOTICE: This electronic transmission and any documents or other writings sent with it constitute confidential information which is intended only for the named recipient and which may be legally privileged.  If you have received this communication in error, do not read it.  Please reply to the sender at Kelly Hart & Hallman LLP that you have received the message in error.  Then delete it.  Any disclosure, copying, distribution or the taking of any action concerning the contents of this communication or any attachment(s) by anyone other than the named recipient is strictly prohibited.

**From:** Steve Ravel
**Sent:** Wednesday, September 26, 2018 6:22 PM
**To:** 'Karl Bayer'
**Cc:** alyson@karlbayer.com
**Subject:** FW: Letter to Bayer and Exhibits

Mediator Bayer,

Attached is the Formosa Defendants' pre-mediation submission. A few hard copy attachments will be delivered in the morning.



J. Stephen Ravel
Partner



303 Colorado Street, Suite 2000
Austin, Texas 78701
(512) 495-6429 (phone)

KHH-002696

(512) 495-6401 (fax)
steve.ravel@kellyhart.com   www.kellyhart.com

CONFIDENTIAL NOTICE: This electronic transmission and any documents or other writings sent with it constitute confidential information which is intended only for the named recipient and which may be legally privileged.  If you have received this communication in error, do not read it.  Please reply to the sender at Kelly Hart & Hallman LLP that you have received the message in error.  Then delete it.  Any disclosure, copying, distribution or the taking of any action concerning the contents of this communication or any attachment(s) by anyone other than the named recipient is strictly prohibited.

**From:** Tamara D. Herrington
**Sent:** Wednesday, September 26, 2018 6:20 PM
**To:** Steve Ravel; Diana Nichols
**Subject:** Letter to Bayer and Exhibits

**Tamara Herrington**
*Legal Secretary*



303 COLORADO STREET, SUITE 2000
AUSTIN, TEXAS 78701
TELEPHONE (512) 495-6422
FAX (512) 495-6920
tamara.herrington@kellyhart.com
www.kellyhart.com

CONFIDENTIAL NOTICE: This electronic transmission and any documents or other writings sent with it constitute confidential information which is intended only for the named recipient and which may be legally privileged.  If you have received this communication in error, do not read it.  Please reply to the sender at Kelly Hart & Hallman LLP that you have received the message in error.  Then delete it.  Any disclosure, copying, distribution or the taking of any action concerning the contents of this communication or any attachment(s) by anyone other than the named recipient is strictly prohibited.

KHH-002697

# EXHIBIT   14

**To:**      Frank Wedig, Esq./TXLS[FWedig@ftpc.fpcusa.com]
**Cc:**      Karen Ho / FPC Insurance Department[KHo@fpcusa.com]; John Pastuck/FPC Environmental
Dept.[jpastuck@fpcusa.com]
**From:**    Norberto J Torres /FPC Insurance Dept
**Sent:**    2018-10-03T13:07:24Z
**Importance:**      Normal
**Subject:**  Pellet Claim
**Received:**      2018-10-03T13:07:24Z

Good Morning Frank,

I understand that Mediation on the Pellet claim took place last week and was
unsuccessful. I don't believe the Pollution Carrier participated in the discussions
but since the mediation did not result in any settlement we need to keep them
in the loop as you begin to prepare further on this case. Under the pollution
policy we are required to choose counsel from their panel list as legal fees
erode the $1MM deductible under the pollution policy.

If you have any questions, please don't hesitate to contact myself @ x7295 or
Karen Ho at extension 7429.

Have a good day.

Norberto J. Torres
Sr. Corporate Insurance Manager

 Formosa Plastics

9 Peach Tree Hill Road, Livingston, NJ 07039
T: 973.716.7295, E: ntorres@fpcusa.com

# EXHIBIT   15

| | |
|---|---|
| **From:** | Klink, David |
| **To:** | steve.ravel@kellyhart.com |
| **Cc:** | Norberto J Torres /FPC Insurance Dept; M. Claire Juliana |
| **Subject:** | Formosa Plastics; Claim # KY17K2192058. |
| **Date:** | Tuesday, December 04, 2018 3:15:51 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | Defense LSA (Final 5-24-18).pdf |

Steve,

Attached are our litigation guidelines.  Please let me know if you have any questions.

**David Klink**
**Claims Director, Environmental**

10 Exchange Pl., 9th Fl, Jersey City, NJ, 07302, USA
O 201.356.5123
E david.klink@chubb.com

Chubb Insured

This email (including any attachments) is intended for the designated recipient(s) only, and may be confidential, non-public, proprietary, and/or protected by the attorney-client or other privilege. Unauthorized reading, distribution, copying or other use of this communication is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) should not be deemed a waiver of any privilege or protection. If you are not the intended recipient or if you believe that you have received this email in error, please notify the sender immediately and delete all copies from your computer system without reading, saving, printing, forwarding or using it in any manner. Although it has been checked for viruses and other malicious software ("malware"), we do not warrant, represent or guarantee in any way that this communication is free of malware or potentially damaging defects. All liability for any actual or alleged loss, damage, or injury arising out of or resulting in any way from the receipt, opening or use of this email is expressly disclaimed.

                                                                                   AON-FORMOSA-0003133

# EXHIBIT   16

**From:** Steve Ravel
**Sent:** Tuesday, December 04, 2018 5:38 PM
**To:** 'Rick Crabtree/FPC Vice President and General Manager'; Mary Bachynsky/FPC Environmental Dept. (mbachynsky@fpcusa.com) (mbachynsky@fpcusa.com); 'John Pastuck/FPC Environmental Dept.'
**Cc:** Bob Stewart; Diana Nichols
**Subject:** FW: Ps settlement proposal
**Attachments:** Ps settlement proposal  12042018.pdf

Just received.  I am reviewing it now

J. Stephen Ravel
Partner, Austin Office



303 Colorado Street,  Suite 2000
Austin, Texas 78701
(512) 495-6429 (phone)
(512) 495-6401 (fax)
steve.ravel@kellyhart.com   www.kellyhart.com

CONFIDENTIAL NOTICE: This electronic transmission and any documents or other writings sent with it constitute confidential information which is intended only for the named recipient and which may be legally privileged.  If you have received this communication in error, do not read it.  Please reply to the sender at Kelly Hart & Hallman LLP that you have received the message in error.  Then delete it.  Any disclosure, copying, distribution or the taking of any action concerning the contents of this communication or any attachment(s) by anyone other than the named recipient is strictly prohibited.

**From:** Amy Johnson [mailto:amy@savagejohnson.com]
**Sent:** Tuesday, December 04, 2018 5:00 PM
**To:** Steve Ravel; Diana Nichols; J. R. Johnson
**Cc:** Erin Gaines; David Frederick; David Bright; Jennifer Richards; Enrique Valdivia; Spring Beckman
**Subject:** Ps settlement proposal

Greetings Counsel,

Attached please find a response to Formosa's settlement proposal.

Thank you,

Amy

*Amy R. Johnson*
5836 SE Madison St.
Portland, OR 97215
*503-939-2996*

KHH-003572

# EXHIBIT   17

| | |
|---|---|
| **From:** | Rick Crabtree/FPC Vice President and General Manager |
| **Sent:** | Friday, December 14, 2018 3:39 PM |
| **To:** | 'Bob Stewart' |
| **Cc:** | John Hyak/TXEHS; Matt Brogger/FTEHSF |
| **Subject:** | RE: Proposal - Confidential |
| **Attachments:** | Reply to Settlement Agreement - Document 12-14-18.docx |

Hi Bob,

Please see the attached that we discussed.  Let me take a look after you finish word smithing.

Thanks,
Rick

---

**From:** John Hyak/TXEHS
**Sent:** Friday, December 14, 2018 1:57 PM
**To:** Rick Crabtree/FPC Vice President and General Manager; Matt Brogger/FTEHSF; 'Bob Stewart'
**Subject:** Proposal - Confidential

All:

Attached is the revised counterproposal.

John T. Hyak

1

KHH-000556

# EXHIBIT   18

| | |
|---|---|
| **From:** | Rick Crabtree/FPC Vice President and General Manager <RickC@ftpc.fpcusa.com> |
| **Sent:** | Thursday, January 17, 2019 5:10 PM |
| **To:** | Bob Stewart |
| **Subject:** | RE: Ps settlement response |
| **Attachments:** | Ps Jan 2019 settlement response    .pdf; Counter Revisions.docx |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

Attached are the technical issue counters we discussed.

---

**From:** Steve Ravel [mailto:steve.ravel@kellyhart.com]
**Sent:** Friday, January 04, 2019 5:14 PM
**To:** Rick Crabtree/FPC Vice President and General Manager
**Cc:** Bob Stewart; Diana Nichols
**Subject:** FW: Ps settlement response

Settlement response from Plaintiffs,  just received.  I will sit down and study it now.

Rick,  do I need to send it elsewhere within Formosa or do you prefer to take care of that?

Heads held high.


J. Stephen Ravel
Partner

---

**KELLY ❨K❩ HART**

303 Colorado Street, Suite 2000
Austin, Texas 78701
(512) 495-6429 (phone)
(512) 495-6401 (fax)
steve.ravel@kellyhart.com   www.kellyhart.com

CONFIDENTIAL NOTICE: This electronic transmission and any documents or other writings sent with it constitute confidential information which is intended only for the named recipient and which may be legally privileged.  If you have received this communication in error, do not read it.  Please reply to the sender at Kelly Hart & Hallman LLP that you have received the message in error.  Then delete it.  Any disclosure, copying, distribution or the taking of any action concerning the contents of this communication or any attachment(s) by anyone other than the named recipient is strictly prohibited.

---

**From:** Amy Johnson [mailto:amy@savagejohnson.com]
**Sent:** Friday, January 04, 2019 5:05 PM
**To:** Steve Ravel; Diana Nichols; J. R. Johnson
**Cc:** Erin Gaines; David Frederick; David Bright; Jennifer Richards; Enrique Valdivia; Spring Beckman
**Subject:** Ps settlement response

Attached please find Plaintiffs' settlement response.

Thank you,

1

KHH-003960

Amy Johnson

**Amy R. Johnson**
5836 SE Madison St.
Portland, OR 97215
*503-939-2996*

_____

This communication is solely for use by the intended recipient and may contain information that is privileged, confidential or copyrighted under applicable law. If you are not the intended recipient, you are hereby formally notified that any use, copying or distribution of this communication, in whole or in part, is strictly prohibited. Unless explicitly stated, this communication does not constitute a contract offer, a contract amendment, or an acceptance of a contract offer. This communication also does not constitute consent to the use of sender's contact information for direct marketing purposes or for transfers of data to third parties.

KHH-003961

# EXHIBIT   19

| | |
|---|---|
| **From:** | Diana Nichols |
| **Sent:** | Wednesday, August 07, 2019 7:08 PM |
| **To:** | John.Riley@hklaw.com |
| **Cc:** | Steve Ravel |
| **Subject:** | 01.23.19 Formosa Settlement Offer |
| **Attachments:** | Letter to David Frederick Erin Gaines and Amy Johnson (4) - esigned by S. Ravel.PDF; Additional Settlement Items.PDF; Settlement Confidential.PDF; Formosa Response to Technical Offer 1_4_19.PDF; Redline of Formosa Response to Technical Offer 1_4_19.PDF |

Diana L. Nichols
Senior Counsel



KELLY KH HART

303 Colorado Street, Suite 2000
Austin, Texas 78701
(512) 495-6407 (phone)
(512) 495-6401 (fax)
diana.nichols@kellyhart.com      www.kellyhart.com

CONFIDENTIAL NOTICE: This electronic transmission and any documents or other writings sent with it constitute confidential information which is intended only for the named recipient and which may be legally privileged.  If you have received this communication in error, do not read it.  Please reply to the sender at Kelly Hart & Hallman LLP that you have received the message in error.  Then delete it.  Any disclosure, copying, distribution or the taking of any action concerning the contents of this communication or any attachment(s) by anyone other than the named recipient is strictly prohibited.

KHH-000261

# EXHIBIT   20

**To:**        John Pastuck/FPC Environmental Dept.[jpastuck@fpcusa.com]
**From:**      Norberto J Torres /FPC Insurance Dept
**Sent:**      2019-04-29T22:24:25Z
**Importance:**        Normal
**Subject:**   Pellet claim
**Received:**          2019-04-29T22:24:25Z

John, when you get a minute can you please provide an update/status on the pellet claim. Any activities
after trial? I will be with underwriters later today and tomorrow and questions on this item will come up.
Thanks

Norberto

# EXHIBIT   21

**To:**      Rick Crabtree/FPC Vice President and General Manager[RickC@ftpc.fpcusa.com]
**From:**    Norberto J Torres /FPC Insurance Dept
**Sent:**    2019-04-30T00:56:44Z
**Importance:**      Normal
**Subject:**   RE: Pellet claim
**Received:**        2019-04-30T00:56:45Z

Thank you. Very helpful.
Norberto

On Apr 29, 2019 8:22 PM, Rick Crabtree/FPC Vice President and General Manager wrote:
  Still in trial mode. The first stage was trial to present evidence followed by briefs on liability. The
  lawyers for both sides are submitting their briefs by May 9th. The judge noted that it may take 1 to 6
  months for his review in pretrial discussions with the lawyers. If the judge finds no liability for FPC,
  then the trial is over. If the judge finds FPC had any violations and is liable, then we will go to second
  stage with trial to determine penalty.
  Any questions, please send to me and copy Frank.
  Thanks,
  Rick
  **From:** Norberto J Torres /FPC Insurance Dept
**Sent:** Monday, April 29, 2019 2:37 PM
**To:** Rick Crabtree/FPC Vice President and General Manager
**Subject:** Pellet claim
  Hello Rick,
  When you get a minute can you please provide an update/status on the pellet claim. Any
  activities after trial? I will be with underwriters later today and tomorrow and questions on
  this item will come up. Thanks
  Norberto

# EXHIBIT 22

**To:**       'M. Claire Juliana'[claire.juliana@aon.com]
**Cc:**       Karen Ho / FPC Insurance Department[KHo@fpcusa.com]; Amy Wen[amy.wen@aon.com];
Brian Murtagh[brian.murtagh@aon.com]
**From:**     Norberto J Torres /FPC Insurance Dept
**Sent:**     2019-05-23T11:21:38Z
**Importance:**     Normal
**Subject:**  RE: FPCUSA Pellet Allegations Claim - Chubb Claim KY17K2192058
**Received:**     2019-05-23T11:21:39Z

Good Morning Claire,

Thanks I did not notice the claim on the loss run, got it now.

At the moment I don't know how involved Chubb is in this matter. I don't know if they had representation at the phase one trial? In any case NO I have not sent this update to Chubb, you can release to them as warranted.

Lexington is aware of this case but they are not defending it, we are at our expense, we do have a $5MM SIR on our Umbrella Policy and no primary GL but I believe there is limited pollution liability coverage within the umbrella policy which Amy or Brian can advise you of.

Thank you for your assistance and if you want to have a call on any of this I am available to discuss. Have a nice day,

Norberto J. Torres
Sr. Corporate Insurance Manager

 **Formosa Plastics**

9 Peach Tree Hill Road, Livingston, NJ 07039
T: 973.716.7295, E: ntorres@fpcusa.com

**From:** M. Claire Juliana [mailto:claire.juliana@aon.com]
**Sent:** Wednesday, May 22, 2019 4:21 PM
**To:** Norberto J Torres /FPC Insurance Dept
**Cc:** Karen Ho / FPC Insurance Department; Amy Wen; Brian Murtagh
**Subject:** RE: FPCUSA Pellet Allegations Claim - Chubb Claim KY17K2192058

Good afternoon Norberto,

I believe that this update is relating to the San Antonio Bay Estuarine Waterkeeper lawsuit. According to the attached loss run, the claim is listed on page 3. I am also reattaching Chubb's coverage position letter for your convenience.

Was the status update shared with Chubb? Is Lexington currently funding the defense?

Kind regards,

Claire

M. Claire Juliana | Director - Environmental Claims Advocacy
Aon | Specialty | Environmental
One Liberty Plaza | New York, NY 10006
Telephone: 212-441-2392 | Fax: 847-953-3810 | Cell: 201-470-2954
E-Mail: claire.juliana@aon.com

**CONFIDENTIALITY STATEMENT:** This email message, including any attachment(s), contains information that may be confidential. This information is intended only for the use of the individuals or entities listed above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or action taken in reliance on the contents of these documents is strictly prohibited. If you have received this information in error, please notify sender immediately and arrange for the return or destruction of these documents.

**From:** Norberto J Torres /FPC Insurance Dept
**Sent:** Wednesday, May 22, 2019 3:35 PM
**To:** Brian Murtagh ; Amy Wen ; M. Claire Juliana

**Cc:** Karen Ho / FPC Insurance Department
**Subject:** FPCUSA Pellet Allegations Claim

Brian,

Please provide the Lexington folks the following which serves as our update on this claim. The initial trial was about a month or so ago.

Still in trial mode. The first stage was trial to present evidence followed by briefs on liability. The lawyers for both sides are submitting their briefs by May 9th. The judge noted that it may take 1 to 6 months for his review in pretrial discussions with the lawyers. If the judge finds no liability for FPC, then the trial is over. If the judge finds FPC had any violations and is liable, then we will go to second stage with trial to determine penalty.

Claire,

Per you request, this is the latest update on the Waterkeeper claim. I did not see it listed on the Chubb Loss Run, can you please look into that to make sure we don't get into a notification issue in future if it goes there.

Regards,

Norberto J. Torres
Sr. Corporate Insurance Manager

 **Formosa Plastics**

9 Peach Tree Hill Road, Livingston, NJ 07039
T: 973.716.7295, E: ntorres@fpcusa.com

This communication is solely for use by the intended recipient and may contain information that is privileged, confidential or copyrighted under applicable law. If you are not the intended recipient, you are hereby formally notified that any use, copying or distribution of this communication, in whole or in part, is strictly prohibited. Unless explicitly stated, this communication does not constitute a contract offer, a contract amendment, or an acceptance of a contract offer. This communication also does not constitute consent to the use of sender's contact information for direct marketing purposes or for transfers of data to third parties.

# EXHIBIT   23

**From:** "M. Claire Juliana" <claire.juliana@aon.com>
**Sent:** Thu, 23 May 2019 15:18:10 +0000
**To:** "Klink, David" <David.Klink@Chubb.com>
**Subject:** [EXTERNAL] RE: FPCUSA Pellet Allegations Claim - Chubb Claim KY17K2192058

I will do that.


Kind regards,

Claire

---

**From:** Klink, David <David.Klink@Chubb.com>
**Sent:** Thursday, May 23, 2019 11:08 AM
**To:** M. Claire Juliana <claire.juliana@aon.com>
**Subject:** RE: FPCUSA Pellet Allegations Claim - Chubb Claim KY17K2192058


Claire,


Thank you for the update.  No, we had not been informed that this matter was going to trial.  My assumption for the lack of communication is that the insured recognizes the indemnification coverage issues with this matter and that defense costs have not approached the SIR.  I would however like an update on this matter.  Please have the insured have defense counsel prepare a litigation report as soon as possible.


Regards,


CHUBB

**David Klink**
Senior Claims Director, Environmental

10 Exchange Pl., 9th Fl, Jersey City, NJ, 07302, USA
O 201.356.5123
E david.klink@chubb.com

Chubb. Insured.™

---

ACE00000376
CONFIDENTIAL

**From:** M. Claire Juliana [mailto:claire.juliana@aon.com]
**Sent:** Thursday, May 23, 2019 9:37 AM
**To:** Klink, David
**Subject:** [EXTERNAL] FPCUSA Pellet Allegations Claim - Chubb Claim KY17K2192058

Good morning David,

Norberto shared the following update on the captioned claim with me:

> **Still in trial mode. The first stage was trial to present evidence followed by briefs on liability. The lawyers for both sides are submitting their briefs by May 9th. The judge noted that it may take 1 to 6 months for his review in pretrial discussions with the lawyers. If the judge finds no liability for FPC, then the trial is over. If the judge finds FPC had any violations and is liable, then we will go to second stage with trial to determine penalty.**

He was uncertain whether Chubb had been appraised – so he asked that I share this with you.

Let me know if you need additional information.

Kind regards,

Claire

M. Claire Juliana  | Director - Environmental Claims Advocacy
Aon | Specialty | Environmental
One Liberty Plaza| New York, NY 10006
Telephone: 212-441-2392  | Fax: 847-953-3810  | Cell: 201-470-2954

E-Mail: claire.juliana@aon.com

**CONFIDENTIALITY STATEMENT:**   This email message, including any attachment(s), contains information that may be confidential. This information is intended only for the use of the individuals or entities listed above.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution, or action taken in reliance on the contents of these documents is strictly prohibited. If you have received this information in error, please notify sender immediately and arrange for the return or destruction of these documents.

This email (including any attachments) is intended for the designated recipient(s) only, and may be confidential, non-public, proprietary, and/or protected by the attorney-client or other privilege. Unauthorized reading, distribution, copying or other use of this communication is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) should not be deemed a waiver of any privilege or protection. If you are not the intended recipient or if you believe that you have received this email in error, please notify the sender immediately and delete all copies from your computer system without reading, saving, printing, forwarding or using it in any manner. Although it has been checked for viruses and other malicious software ("malware"), we do not warrant, represent or guarantee in any way that this communication is free of malware or potentially damaging defects. All liability for any actual or alleged loss, damage, or injury arising out of or resulting in any way from the receipt, opening or use of this email is expressly disclaimed.

ACE00000378
CONFIDENTIAL

# EXHIBIT 24

**From:** Steve Ravel <steve.ravel@kellyhart.com>
**Sent:** Wed, 29 May 2019 15:27:44 +0000
**To:** "Klink, David" <David.Klink@Chubb.com>
**CC:** Rick Crabtree/FPC Vice President and General Manager <RickC@ftpc.fpcusa.com>, ntorres@fpcusa.com
**Subject:** [EXTERNAL] Claim # KY 17K2192058.
**Attachments:**
· Ravel to Chubb re Formosa litigation (2).pdf  *(34 kb)*

Mr. Klink,

Formosa asked me to share the attached update with you.  Please reply with questions and/or comments if you wish.  As the letter states, both sides post-trial briefing and proposed findings of fact and conclusions of law are available for your review.

J. Stephen Ravel

Partner

KELLY ⓚ HART

303 Colorado Street, Suite 2000

Austin, Texas 78701

(512) 495-6429 (phone)

(512) 495-6401 (fax)

steve.ravel@kellyhart.com    www.kellyhart.com

CONFIDENTIAL NOTICE: This electronic transmission and any documents or other writings sent with it constitute confidential information which is intended only for the named recipient and which may be legally privileged.  If you have received this communication in error, do not read it.  Please reply to the sender at Kelly Hart & Hallman LLP that you have received the message in error.  Then delete it.  Any disclosure, copying, distribution or the taking of any action concerning the contents of this communication or any attachment(s) by anyone other than the named recipient is strictly prohibited.

**From:** Ashlyn R. Nichols
**Sent:** Wednesday, May 29, 2019 10:17 AM

ACE00001601
CONFIDENTIAL

**To:** Steve Ravel
**Subject:** Ravel to Chubb re Formosa litigation (2)

ACE00001602
CONFIDENTIAL

# EXHIBIT   25

Case 2:20-cv-14388-BRM-JSA Document 85-6 Filed 01/23/24 Page 166 of 186
Case 6:17-cv-00047 Document 135 Filed on 06/27/19 in TXSD Page 1 of 21
PageID: 1128

United States District Court
Southern District of Texas

**ENTERED**

June 27, 2019

David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| SAN ANTONIO BAY ESTUARINE | § | |
| WATERKEEPER, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 6:17-CV-0047 |
| | § | |
| FORMOSA PLASTICS CORP, TEXAS, *et al*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND ORDER**

## I.    INTRODUCTION

This case is brought pursuant to State of Texas laws and the Water Pollution Control Act

("Act"), 33 U.S.C. § 1251 et. seq. Before the Court are the parties:  (a)[1] proposed findings of fact

and conclusions of law; (b) the testimonial evidence; (c) the arguments of counsel; and, (d) the

documentary evidence presented by both the plaintiff, San Antonio Bay Estaurine Waterkeeper

and S. Diane Wilson ("Waterkeeper") and the defendants, Formosa Plastics Corp., Texas and

Formosa Plastics Corp, U.S.A. ("Formosa")[2].

After a several day, non-jury trial, the case was taken under advisement by the Court to

consider only the question of liability, if any, on the part of Formosa for alleged violations of

State and federal law.  After a careful review of the evidence, pleadings, arguments of counsel

and the applicable law, the Court determines that:  (a) it has jurisdiction over Waterkeeper's suit;

---

[1] The Court has drawn upon the findings of facts and conclusions of law filed by the plaintiffs and defendants in formulating this Memorandum.
[2] After a review of the evidence, the Court is of the opinion and concludes that Formosa Texas and Formosa Plastics Corp U.S.A. jointly direct, manage and control Formosa Texas as it relates to matters concerning Formosa Permit and Compliance with state and federal law.  *See* [Section X(c)].

ACE00018856
CONFIDENTIAL

and (b) Formosa has historically and continues to violate its Texas Pollutant Discharge Elimination System permit ("TPDES") and consequently the cwa.

## II.    THE ACT AND AUTHORITY OF STATES

The Clean Water Act ("CWA") makes unlawful the discharge of any pollutant by any person that is not discharged pursuant to a permit [33 U.S.C.A. § 1311(a)].    Therefore, discharges of pollutants are lawful if the discharging person holds a National Pollutant Discharge Elimination System ("NPDES") Permit that meets the requirements of the CWA. [33 U.S.C.A. § 1342].    Specifically, Section 1342 of the Act provides that upon the approval of the Environmental Protection Agency ("EPA"), states may create and administer a State Pollutant Discharge Elimination System ("SPDES") permit program. *Id.*    Texas has an SPDES Permit Program administered by the Texas Commission on Environmental Quality ("TCEQ") with which the authority to issue permits for the discharge of pollutants into the State waters. *See* [Tex. Water Code § 26.027].    Therefore, Texas law prohibits the "discharge [of] sewage, municipal waste, recreational waste, agricultural waste, or industrial waste into or adjacent to any water in the state" except as authorized by TCEQ. *Id.* at § 26.121.    Formosa is a permittee.

The CWA requires that program administrators establish reporting mechanisms necessary for determining when permittees are in violation of federal effluent standards. [33 U.S.C.A. § 1318(a)].    These reports are publicly available [33 U.S.C.A. § 1318(b)].    Also, Texas law requires as a condition of all permits, that permittees report any non-compliance that endangers human health or safety, or the environment. [30 Tex. Admin. Code §305.125(9)]. Initial reports of non-compliances may be made orally within the first 24 hours; however, a written report is required within five days. *Id.* at §305.125(9)(A).

ACE00018857
CONFIDENTIAL

## III.    WATERKEEPER'S MISSION AND THE RELIEF SOUGHT

Waterkeeper is a 501(c)(3), non-profit organization that has as its mission the preservation of local wetlands and waterways in Lavaca and Matagorda Bays and Cox Creek.  In keeping with this mission, Waterkeeper enlisted volunteers, marine biologists and environmental advocates to monitor the water ways and collect evidence that it contends supports its claim that Formosa has and continues to violate the Act has failed to report its conduct to state or federal agencies pursuit to its Permit.

Waterkeeper seeks a declaratory judgment that Formosa has violated, and on an ongoing basis, continues to violate its TPDES Permit under the Act, pursuant to 28 U.S.C. §§ 1311, 1342 and 40 C.F.R. § 122.41(a).  Waterkeeper also seeks monetary damages, attorney's fees and injunctive relief.  Jurisdiction over such disputes is conferred on this Court by 28 U.S.C. § 1311 and 33 U.S.C. 1365(a) of the Act.

### A.    Waterkeeper's Notice Timely

Pursuant to 40 C.F.R. § 505(b)(1)(A), Waterkeeper notified Formosa of its allegations and gave notice of its intent to file suit.  Notice was also provided to the EPA and the TCEQ.  The record shows that more than 60 days expired between the notice given and the filing of this suit, which notice satisfied the requirement of the Act.  *See* 33 U.S.C.A § 1365(b)(1).  At the time that Waterkeeper commenced this suit, neither the EPA nor TCEQ had commenced a civil or criminal action against Formosa to enforce compliance with its TPDES Permit.  The Court determines that the citizen's notice requirement(s) are met.

### B.    Waterkeeper's Challenge to Permit Renewal

In July of 2013, Waterkeeper challenged Formosa's application for a renewal and amendment to its TPDES Permit due to alleged past violations of its Permit and the CWA.  After

3 / 21

ACE00018858
CONFIDENTIAL

hearings and some delay, Formosa's Permit was renewed on June 10, 2016, as Permit # WQ0002436000. This Permit is the subject of Waterkeeper's suit and allegations that Formosa continues to violate it Permit, State and federal law.

## IV.    FORMOSA'S WASTEWATER AND STORMWATER DISCHARGES

Formosa was issued its original water discharge Permit in 1993. On June 10, 2016, Formosa's TPDES Permit was renewed to expire on January 1, 2020.    The Permit allows Formosa to treat and discharge wastewater and stormwater and discharge it into Lavaca Bay and into Cox Creek, both waterways are "navigable waters" of the United States.

Formosa has 13 permitted wastewater or stormwater Outfalls from the plant (Outfalls 001-013). Outfall 001 discharges treated wastewater and process (or contact) stormwater. Outfalls 002-013 discharges non-process (or non-contact) stormwater. Two of these Outfalls (numbered 001 and 011) discharge to conveyances that lead to Lavaca Bay. Six Outfalls (numbered 002, 003, 004, 005, 010 and 013) discharge to conveyances that lead to Cox Creek, south of State Highway 35. The remaining five wastewater Outfalls (numbered 006, 007, 008, 009, and 012) discharge to conveyances that lead to Cox Creek north of State Highway 35.

The primary function of the wastewater system that discharges from Outfall 001 into Lavaca Bay is to remove or dissolve organic waste. While it has some functions capable of removing plastic pellets and PVC powder from the wastewater prior to discharge, Formosa is aware that these functions have proven inadequate based on the quantity of plastic pellets and PVC powder that move through the system. Remedial measures taken at the outfall recently have also proved to be inadequate.

4 / 21

ACE00018859
CONFIDENTIAL

Case 2:20-cv-14324-BRM-JSA Document 65-6 Filed 01/23/24 Page 170 of 186
Case 3:17-cv-13864-BRM Document 85-5 Filed 06/27/19 on JXSD Page 4 of 21
PageID: 1132

### A. Permit Restrictions

Formosa's 2016 Permit prohibits the "discharge of floating solids or visible foam in other than trace amounts" from Outfall 001. *See* (Ex 2 at 71403-000224). This prohibition is not new but is the exact same Permit terms found in Formosa's original TPDES Permit issued in 1993. *See* (Ex 88 at FPC048636). The Permit also prohibits the "discharge of floating solids or visible foam in other than "trace amounts" from Outfalls 002, 003, 004, 005, 006, 007, 008, 009, 010, 011, and 012. *See* (Ex 2 at 71403-000235-000236). Moreover, TCEQ rules prohibit the discharge of "floating debris and suspended solids" into surface waters. *See* [30 Texas Admin. Code 307.4(b)(2); *see also* (Ex 2 at 71403-000242)].

The Permit also requires Formosa to report, in writing, within 24 hours, any floating solids violations. In determining whether the Permit has been violated, the TCEQ conducts inspections from time-to-time utilizing a "visual sightings" method to determine compliance. The discharge of any floating solids constitutes a violation of the Permit. *See* 30 Tex. Admin. Code § 307.4(b)(2-4). Formosa has not disputed the visual sightings method for determining compliance or interpretation of its Permit by which compliance is determined.

### B. What Constitutes A "Trace Amounts"

The term trace "means "a very small amount; a barely discernible quantity of a constituent, especially when not quantitatively determined, because of minuteness. *See* [Webster's New International Dictionary, 2nd Ed. (unabridged)(1957). This definition is consistent with the definition found in Black's Law Dictionary, science and scientific understanding and use in laboratories. The Court's understanding is confirmed by the testimony of Dr. Jeremy Conkle, an expert in the field. He testified that "trace organic contaminants are not easily identifiable in the environment." He testified further that it is "very difficult to detect"

5 / 21

ACE00018860
CONFIDENTIAL

these contaminants and often takes advanced instrumentation to concentrate them for analysis. (Trial Tr. Vol. 2, 36:10-16).

## V.    TCEQ'S COMPLIANCE ROLE AND COMPLAINT INVESTIGATED

In determining whether floating solids have been discharged in "other than trace amounts," TCEQ inspectors conduct visual inspections of the water bodies that receive Formosa's discharges. If upon visual inspection, floating solids are readily apparent, the inspectors document their finding, any may photograph any evidence of floating solids as a record of a violation.  TCEQ has recently done just that – visually determined and photographed amount of plastic pellets discharged that it holds constitute more than trace amounts.

On March 10 and 14, 2016; September 7, 8 and 13, 2016; April 2018; June 2018; and January 2019, TCEQ determined that Formosa had violated its Permit.  The March 2016 and April 2018 photographs show plastics in Cox Creek show plastics in Lavaca Bay.   (Ex 74 at FPC002716-002718 and Ex 75 at 71403-008239). Likewise, in January 2019, photos show plastics in Cox Creek and Lavaca Bay. (Ex 145).

Formosa's Permit requires it to report prohibited discharges within 24 hours to TCEQ, *i.e.,* any floating solids violations.  The Permit also requires Formosa to report any permit non-compliance, that may endanger human health, safety, or the environment as required by the State Administrative Code.  The TCEQ confirms that reportable discharges, that endanger the human health, safety, or the environment, include the discharge of plastic pellets and PVC powder.

Formosa agreed, during the 2016 permitting process, that it was required to report any unlawful discharge of plastic pellets and PVC powder to TCEQ.  It also affirmed that it understood the meaning of the effluent limitations contained in its Permit and further confirmed

ACE00018861
CONFIDENTIAL

that its understanding was the same as that defined by TCEQ. *See* [Ex 11 at 71403-001828 - 001829); and Ex 5 at 71403-000165].

On April 11, June 12 and June 26, 2018, TCEQ conducted on-site investigations of the Formosa plant that included examination of Outfall 001. (Ex 12) The April 11, 2018, TCEQ investigation was based on citizen complaints of Formosa's plastic pellet discharges at Lavaca Bay and Cox's Creek from one or more of the stormwater Outfalls and observed floating white debris [PVC powder] and plastic pellets in the Bay near Outfall 001.

TCEQ also observed floating white debris that appeared similar to the debris seen near Outfall 001 in the plant at the sump that precedes the in-plant inlet to the pipe leading to Outfall 001. Formosa employees acknowledge to the investigators at the time that Formosa had observed plastic pellets at the Outfall 001 during weekly cleaning of its cone filter in the outflow path.

Citizens also filed complaints that plastic pellets were being discharged from Outfall 001 and were observed on June 21 and again on June 26, 2018. At the time, TCEQ investigated those complaints and again found floating pellets and white debris near the discharge from Outfall 001. It collected water samples from the sump and from the sampling spigot down-flow from the sump. It also collected water samples near the outflow of Outfall 001 and from the north shoreline of Lavaca Bay. Laboratory analyses of the white debris [PVC powder] in each sample were consistent with one another, "indicating that it is likely the same material" found on Formosa's facility.

TCEQ received further complaints on October 8, 2018, of PVC powder and plastic pellets in Lavaca Bay. The agency investigator on October 9, 2018, documented PVC powder and plastic pellets at several places along the shoreline of Lavaca Bay and informed Formosa of

7 / 21

ACE00018862
CONFIDENTIAL

its findings.    Another TCEQ on-site investigation occurred on January 17, 2019. The investigation results documented numerous instances of discharged plastic pellets or floating solids at Outfalls 001, 006, 008 and 009.

## VI.    WATERKEEPER AND WILSON'S COLLECTIONS

Plaintiffs offered testimony of plaintiff Diane Wilson and members David Sumpter, Bobby Lindsey, Ronnie Hamrick, Dale Jurasek, and Cheyenee Jurasek.    These witnesses provided detailed, credible testimony regarding plastics discharged by Formosa, as well as photographs, videos, and 30 containers containing 2,428 samples of plastics in gallon zip lock bags and plastic bottles of plastic pellets.

Dale Jurasek testified about conditions at Formosa and also supplied notes recording that he informed Formosa in 2000 that plastics being discharged into Lavaca Bay and Cox Creek. Waterkeeper also offered testimony of interested citizens Michael Mang, Myron Spree and Van Rozner.  Mr. Mang and Mr. Spree testified that plastics were being discharged by Formosa.  As well, the produced photographs and videos documenting the discharges.   Rozner, a former Formosa employee, testified and his testimony confirmed problems at Formosa's facility that were leading to the discharges.   The reports and the testimony of three independent experts, Dr. Aiza Jose-Sanchez (Exs. 35, 36, 37, 38 and 238), Dr. Jeremy Conkle (Exs. 33, 34 and 39) and Ms. Donna Phillips (Exs. 39 and 189) were offered by Waterkeeper.   Although Formosa made *Daubert* objections to the testimony of Dr. Jose-Sanchez and Dr. Jeremy Conkle, those objections are overruled.  The Court accepts their testimony as reasonable and credible.  Drs. Conkle and Jose-Sanchez used reliable principles and methods to analyze factually relevant scientific and technical information.

8 / 21

ACE00018863
CONFIDENTIAL

The expert opinion of Dr. Conkle provided compelling and reliable first-hand practical and scientific information about the discharges.  He is a Texas A&M scientist and provided thoroughly researched information about the Cox Creek and Lavaca Bay systems, describing why plastic pellets found on the Lavaca Bay shores came from Outfall 001.  Dr. Conkle described how Hurricane Harvey flushed Cox Creek.  He physically viewed discharges at the Bays, took scientific samples of the discharges, observed Waterkeeper's sampling, and tested plastic pellets in his laboratory. The Court finds that the methodology Dr. Conkle used in this case is reliable and similar to what he uses in his professional capacity [Ex. 33].

Dr. Jose-Sanchez, an environmental engineer with a Ph.D., in civil engineering from the University of Texas, has 24 years of experience consulting for the public and private sector in stormwater and wastewater engineering.  She conducted a site visit to Formosa's facility and reviewed extensive information to form her opinions, including but not limited to:  the facility's stormwater and wastewater systems, audits and forms completed by Formosa, internal emails and plans for improvements by Formosa, bids from third parties to Formosa for improvements, cleanup amounts and dates from Formosa's third party contractor from Cox Creek and Lavaca Bay, TCEQ investigation reports, and evidence from Waterkeeper and other local resident witnesses about discharges of plastics and powder.  *Id*.at 180:25-182:3. The Court finds that the methodology she used in this case is reliable and similar to what she uses in her professional capacity.

Donna Phillips has 28 years of investigation and management experience regulating industrial discharges at TCEQ.  (Ex. 39) This experience informed her opinions about the definition and enforcement of applicable permit terms.  She traversed Cox Creek and confirmed visually illegal discharges by Formosa.  Her testimony was relevant and based on regulatory and

9 / 21

ACE00018864
CONFIDENTIAL

technical information used for analyzing evidence presented in similar cases. The Court accepted her testimony as relevant and reliable.

In rebuttal, Formosa offered the testimony of three plant employees and two independent experts. None of whom testified as stormwater or wastewater engineer concerning the condition of Formosa's current discharge system. None rebutted the evidence that Formosa was and had discharged substantial quantities of plastic pellets and PVC powder into Cox Creek and into Lavaca Bay in violation of its Permit.

Finally, Waterkeeper has collected 1,626 samples on 582 distinct days on Lavaca Bay between January 31, 2016 and March 12, 2019. *See* [Ex 63, Ex 254, *see also* Ex 468; 133], and, at least 110 videos and 44 photos taken by Waterkeepers from Lavaca Bay from January 2016 through February 2019. *See* [Exs. 263-295].

## VII.  FORMOSA'S RESPONSE

On June 10, 2016, Formosa's plant manager, Rick Crabtree, officially responded to the March 2016 investigative finding of illegal discharges of plastic pellets. Formosa characterized the violation as: "a fail[ure] to prevent the unauthorized discharge of floating solids of floating solids or visible foam in other than trace amounts." Formosa did not dispute that the discharge had occurred nor did it question what was meant by the permit term "trace amounts". Instead, Formosa offered a theory concerning how it could discharge plastic pellets from various Outfalls and be within the "trace amount" restriction.

After agreeing to the "trace amount permit limitation, Formosa since has attempted to quantify "trace amounts" based on its permitted mercury discharge limit using its permitted daily average limit of mercury, 0.03 pounds per day, as a basis. (Ex. 137). It then converts 0.03 lbs/per day and concludes that equals 0.0003 pounds of discharge per minute. This formula permits

10 / 21

ACE00018865
CONFIDENTIAL

Formosa to convert a daily rate to a per minute rate. Under Formosa's theory each day Formosa could discharge 9,626 plastic pellets from the Outfall 006; 7,512 plastic pellets from Outfall 008; and 10,922 plastic pellets from Outfall 009 (Ex. 137). However, no expert evidence supports using these numbers as constituting a "trace amount" for purposes of compliance. Moreover, Formosa admitted that TCEQ does not agree with Formosa's method.

### A.    *TCEQ Notice of Enforcement*

After TCEQ gave a notice of violation, it directed Formosa to comply with the Permit by June 13, 2016. That compliance date was not met and the documentation submitted to TCEQ was determined to be "inadequate to resolve the outstanding violation." TCEQ investigated Formosa's facility and sites along Cox Creek and Lavaca Bay again on September 7, 8 and 13, 2016, and found that plastic pellets [were] still being discharged through the stormwater outfalls 006, 008, and 009 and [that the] clean up activities at Cox Creek have not been completed. Additional documentation concerning corrective actions was requested by TCEQ.

On May 1, 2017, TCEQ issued a notice of enforcement to Formosa, informing Formosa that the compliance documentation submitted to TCEQ "did not appear to resolve the outstanding violations because "the clean-up of Cox Creek as well as planned facility upgrades were not completed within the compliance time frame." (Ex 4 at 71403- 000017, 000022)

### B.    *Formosa's Contentions*

Formosa contends that its Permit does not define the term "trace amounts", therefore, what constitutes trace amounts is ambiguous. However, this position is inconsistent with a previous position taken by Formosa during administrative and/or court proceedings. Hence, Formosa has judicially admitted that the terms "trace amount[s]" does not render its Permit unenforceable.

11 / 21

ACE00018866
CONFIDENTIAL

Formosa also asserts that the permitted stormwater Outfalls are designed and operate to prevent the discharge of plastic pellets and other floating solids in quantities greater than trace amounts.  It is undisputed that plastic pellets and other floating solids as well as PVC powder pass through or escape Formosa's "prevent" system and are discharged into the waterways.  In light of this revelation, Formosa argues that because the Permit does not establish an absolute measurement of weight or a relative measurement of concentration levels, Formosa is in compliance when it complies with the prevent requirements of its own system.

Formosa's reliance on its designed and operated procedures to prevent discharge of plastic pellets and others floating solids was unacceptable to TCEQ.  Therefore, to argue that it is in compliance because it has received annual reports from its independent environmental consultant(s) is to ignore the strictures of the Permit, TCEQ findings, the CWA, and the long-term impacts on the waterways observed and documented by Waterkeeper and private citizens.  A review of Formosa's facility operations is appropriate to understand Formosa's challenge.

### C.    *Wastewater Treatment Plant*

Formosa's wastewater treatment plant is a Combined Wastewater Treatment Plant.  It treats industrial process wastewater and contact stormwater from the physical areas of the plant called "inside battery limits."  According to Formosa, wastewater and "contact" stormwater are subject to a three part treatment process, *i.e.*, receiving, pre-treatment, and biological.  Stormwater at the facility includes precipitation that falls on pervious and impervious areas and is not absorbed into the subsurface.  The excess stormwater on the surface flows through a series of internal concrete and earthen drainage structures ditches.  Some are equipped with internal gates, but all eventually discharge through 12 stormwater Outfalls, numbered 002-0013.

12 / 21

ACE00018867
CONFIDENTIAL

Water from the surface of the facility that does not come into contact with any chemical process is called "non-contact stormwater." Non-contact stormwater is captured within 12 drainage areas, with each area draining to an external Outfall.

Formosa's Permit does not specify any controls or treatment for stormwater. Nevertheless, non-contract stormwater falls near manufacturing areas flows through a collection system where Formosa is required to conduct a visual inspection and cleanout any plastic pellets or PVC powder observed prior to releasing the water into the stormwater Outfalls. Non-contact stormwater away from manufacturing areas is not routed through internal gates but, instead, flows straight through to one of the 12 external Outfalls.

Contact stormwater is first pre-treated to remove oil, grease and floating solids, and adjust the pH. It is then sent to the Stormwater Holding Tank for equalization. Following equalization, both contact stormwater and process wastewater go through a solids, oil, grease, emulsion, and foam removal process. The waters then go through a biological treatment that clarifies and separates the wastewater from any solids. However, plastic pellets and PVC powder are not reduced or treated at the biological treatment stage.

The wastewater is then sent to a clarifier for further biological treatment. The presence of plastic pellets and PVC powder cannot be remediated by the biological process at this stage, but may potentially be removed through flocculation. Afterward, treated storm and wastewater are discharged directly into Lavaca Bay through a pipe that extends westward from the plant at Outfall 001.

Failing to control or treat effectively the plastic pellets and PVC powder at the source, (producing/management areas) and permitting stormwater to be discharged through the same Outfalls means that the stormwater generated at the facility will be impacted with plastic pellets

13 / 21

CONFIDENTIAL

Case 2:20-cv-14063-BRM-JSA Document 190 Filed 01/22/24 Page 179 of 186
Case 2:20-cv-14063-BRM-JSA Document 155-5 Filed 05/27/21 Page 179 of 186 PageID: 1141
PageID: 1141

and PVC powder thereby entering Formosa's conveyance system and emptying into the Bays and Creek.

## VIII. FORMOSA'S SOURCE CONTROLS INADEQUATE

In spite of Formosa's source controls, plastic pellets and PVC powder regularly and routinely leave the production areas, and get into the stormwater and wastewater system. Formosa's audits of its facility in 2016 and 2017 document these releases. The source controls implemented by Formosa to date, therefore, fail to sufficiently or effectively prevent the release of plastic pellets and powders to the stormwater system.

Formosa has adopted various techniques and installed devices to remedy its failings. Remediation includes floating booms, gabions, mesh screens, wedge screens, manual removals and external gates all of which have proved inadequate and fail to prevent the discharge of floating solids.

Reliance on manual removal of plastics has also prove to be ineffective and impractical to control the discharge plastic pellets and PVC powder. As described in Formosa, removal relies on visual observation and requires the manual operation of the internal gate system and the gates at the Outfalls.

Formosa's reliance on nets and vacuum trucks, as a removal method, have also proved ineffective, and impractical. Removal of plastic pellets and PVC powder from channels and ditches by fish netting is equally impractical. PVC Powder particles are too small to be captured by the fish netting and often attach to the banks of the channels where it is subject to migration during future runoff.

Formosa's documents demonstrate that its reliance on contractors to clean up plastic pellets and powder is inefficient and ineffective. In its February 2019 "new" pellet recovery

14 / 21

ACE00018869
CONFIDENTIAL

project, Formosa states "[E]ven though PP1 continue efforts of plastic pellet source reduction and plastic pellet recovery, plastic pellets continue to collect in the ditches. In sum, Formosa has installed screens all around the production units to prevent plastic pellets from entering the ditches, has hired two full time professionals to help manually clean up plastic pellets, and has used vacuum trucks to vacuum Formosa's internal and designated permitted Outfalls on a routine basis, yet Formosa continues to violate its Permit.

## IX.    WATERKEEPER'S EXPERT WITNESS DOCUMENTATION

Waterkeeper's samples, photographs, and videos of plastics in both Cox Creek and Lavaca Bay document plastics of more than trace amounts, in similar or more quantities than TCEQ's documentation included in investigation reports. They establish that Formosa's discharges at its outfalls have consistently exceeded trace amounts starting, December 12, 2017, including the most recent visit on February 12, 2019. Waterkeeper's documentation is confirmed by the quantities of plastic pellets and PVC powder collected by Horizon Environmental Services, the cleanup crew hired by Formosa that establishes that more than trace amounts of plastics are being discharged.

Expert opinions offered by Waterkeeper are persuasive and establish that Formosa's design and operation of its stormwater management system allows the discharge of stormwater contaminated with plastic pellets and PVC powder above trace amounts to be released and that these releases are extensive, historical and repetitive. Dr. Jose-Sanchez concluded that powders discharges are likely to continue despite Formosa's controls even though Formosa's proposed controls will likely decrease discharges but not below trace amounts.

Dr. Jose-Sanchez also concludes that Formosa's treated wastewater system is still overwhelmed and that plastic pellets and/or plastic materials are being discharged above trace

15 / 21

ACE00018870
CONFIDENTIAL

amounts through Outfall 001.  The Court's conclusions that Dr. Jose-Sanchez's opinions are based on reliable evidence and credible, and, therefore, adopts them.

## X.  FORMOSA'S RESPONSE TO DR. JOSE-SAHCHEZ

Formosa challenged Dr. Jose-Sanchez's evidence with evidence of its own.  Peter Moleux, Formosa's engineering expert testified.  However, he is not qualified to give opinions about Formosa's stormwater system.  Therefore, his opinion that Formosa is using "being management practices" for stormwater treatment is no opinion.  Nevertheless, he testified that Formosa is in compliance with its Permit requirement as it relates to the discharge of floating solids.  He based his opinion on the operations and the changes made to [Formosa's] operations.  His conclusion is illogical.  Formosa cannot be in compliance simply by saying so.  The Court rejects Moleux's opinion concerning compliance.

Formosa's corporate representative Matt Brogger testified that Formosa's definition of trace amounts uses mercury concentration levels in Formosa's TPDES permit to extrapolate to the definition of trace. Under his theory, each day Formosa could discharge 9,626 plastic pellets from Outfall 006; 7,512 plastic pellets from Outfall 008; 10,922 plastic pellets from Outfall 009. Based on Brogger's calculations, Formosa's, position that no more than trace amounts of plastic pellets have been discharged from its stormwater Outfalls.  He relies in part on the status sheets kept by Formosa employees at the Outfalls where they report that more than trace amounts of plastic pellets were observed at the Outfall gates.

The Court rejects Brogger's calculation method for determining "trace amounts" and also rejects the notion that Formosa's best efforts to contain the plastic pellets and powder means that any discharges of plastic pellets, powder or solids beyond Formosa's best efforts and discharge, constitute trace amounts.  Both Moleux and Bragger's positions have been rejected by Formosa's

ACE00018871
CONFIDENTIAL

retained engineer and the head of its water department and the Court, likewise, rejects their conclusions.

## XI.    CONCLUSIONS

### A.    *Formosa's Challenges of Mootness Fails*

The evidence demonstrates that Formosa has been in violation of its Permit concerning the discharge of floating solids at its various Outfall since January 31, 2016 and that the violations are enormous.  In addition to documents, Waterkeeper has produced a chart compiling its evidence by date [Exhibit 472], which evidence is undisputed. The Court concludes that the evidence shows violations for each of the 736 days of discharges into Lavaca Bay from Outfall 001. *See* [Ex. 63, 254, 263-295 and 472].

In addition, the Court concludes that Formosa is a serial offender, violating its Permit concerning discharge of floating solids, in other than trace amounts, from other Outfalls from January 31, 2016, to at least March 24, 2019.   Some 1,149 days of violations are recorded through Outfalls 003, 004, 005, 006, 007, 008, 009, 012.

Formosa has also failed to report violations of the CWA to State and/or federal authorities at least since January 2016.   The failure to report a noncompliant discharge is a separate violation.  During the permitting process, Formosa acknowledged that it had a duty to report events where plastic pellets and PVC dust becomes entrenched in storm water runoff and is discharged into Lavaca Bay via one of the Outfalls.  Further, Formosa admitted that failing to do so is a Permit violation.  The evidence shows that Formosa has never reported a single discharge of floating solids to TCEQ.

On January 17, 2019, Formosa and TCEQ signed an Agreed Order adjudicating certain violations of Formosa's Permit.  The Order concludes that Formosa "failed to prevent the

17 / 21

ACE00018872
CONFIDENTIAL

discharge of solids in other than trace amounts" at three of its stormwater Outfalls. The Agreed Order also stated that plastic pellets were discharged from outfall 006, 008 and 009 and "were observed floating in Cox Creek and embedded in the Cox Creek sediment." As a result, the TCEQ assessed a penalty of $121,875 against Formosa.

Formosa takes the position that the Agreed Order resolved Waterkeeper's case rendering it moot. Not so. The violations adjudicated in the Agreed Order, represented six violation events between April 4, 2017 to May 17, 2017. These violations are comprised of two events at each of three outfalls – 006, 008, and 009. Based on the overwhelming evidence, the TCEQ's findings and assessment merely shows the difficulty or inability of the TCEQ to bring Formosa into compliance with its Permit restrictions.

### B. Formosa Challenges Waterkeeper's Injury Claim

Formosa challenges Waterkeeper and S. Diane Wilson's standing to bring this suit. An individual has standing to sue when they have (1) "suffered an injury in fact" that is concrete and particularized, and actual or imminent; (2) the injury is fairly traceable to the defendant; and it is likely the injury can be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000), (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992)). In such a case, a plaintiff's injuries are "fairly traceable" to a defendant's discharge where the "defendant has (1) discharged some pollutant in concentrations greater than allowed by its permit (2) into a waterway in which the plaintiffs have an interest that is or may be  adversely affected by the pollutant and that (3) the pollutant causes or contributes to the kinds of injuries alleged by plaintiffs". *Sierra Club, Lone Star Chapter v. Cedar Point Oil*, 73 F.3d 546, 557 (5th Cir. 1996) (*quoting Public Interest Research Group of New Jersey v. Powell Duffryn Terminals, Inc.*, 913 F.2d 64, 72 (3rd Cir. 1990)).

18 / 21

ACE00018873
CONFIDENTIAL

Plaintiffs are not required to "'show to a scientific certainty that defendant's effluent, and defendant's effluent alone, caused the precise harm suffered by the plaintiffs". *Cedar Point Oil*, 73 F.3d at 558 (citations omitted). Plaintiffs must only show that a defendant's discharge "contributes to the pollution that impairs" the plaintiff's use of the water body. *Id. See also Texans United for a Safe Economy Education Fund v. Crown Central Petroleum Corp.*, 207 F.3d 789, 793 (5th Cir. 2000).

The undisputed evidence shows that plastic pellets and PVC powder discharged by Formosa caused or contributed to the damages suffered by the recreational, aesthetic, and economic value of Lava Bay and Cox's Creek. Evidence also establishes that the recreational and aesthetic value of Lavaca Bay, Cox Creek, and their shores have been diminished for members of Waterkeeper, their families and the public in general for use as recreation and aesthetic pleasure. Hence, the presence of PVC powder and plastic pellets distressed the area and lessoned the enjoyment of the local environment.

Wilson, in particular, testified that the recreational and aesthetic value of Lavaca Bay, Cox Creek, and their shores has diminished. She, as well as other individuals, have established that they have also suffered an, injury in fact, because their livelihoods have been damaged due to impacts of discharges on local aquatic life. *San Francisco Herring Association v. Pacific Gas and Electric Co.*, 81 F.Supp.3d 847, 858 (N.D. Ca. 2015). Specifically, the evidence establishes that the shrimp population in the Bay System has been negatively impacted, which condition has negatively impacted Wilson's livelihood.

Waterkeeper and Wilson, among others, have also suffered injury, in fact, because they were unable to obtain information that Formosa was obligated to publicly disclose in a timely fashion in their efforts to combat their injuries. *Center for Biological Diversity, Inc. v. BP*

19 / 21

ACE00018874
CONFIDENTIAL

*America Production Co.*, 704 F.3d 413, 429 (5th Cir. 2015)(*citing FEC v. Atkins*, 524 U.S. 11, 21 (1998); *Sierra Club, Inc. v. Tyson Foods, Inc.*, 299 F.Supp.2d 693, 703-706 (W.D. Ky. 2003)). Both federal and state statutes require reports of permit violations by the permittee to be publicly available. *See* [33 USC. §1318(b); Tex. Water Code §26.0151]. In this regard, Formosa totally failed and refused to comply with a known duty.

### C. *Formosa USA and Formosa Texas Are Persons*

"A corporation is responsible for the wrongs committed by its agents in the course of its business". *United Mine Workers of America v. Coronado Coal Co.*, 259 U.S. 344, 395 (1922). A parent corporations that direct, manage, or control facilities that cause NPDES or SPDES permit non-compliance are not absolved of liability simply because it is the subsidiary that owns the permitted facility.[3] *See U.S. v. Bestfoods*, 524 U.S. 51, 66 (1998)(discussing parent corporation liability under CERCLA). On the contrary, a "person violates" an effluent limitation or condition in an NPDES or SPDES permit when it "directs the workings of, manages, or conducts the affairs of a facility" regarding pollution and the discharge or disposal of waste in such a way as to cause permit non-compliance. *See Bestfoods*, 524 U.S. at 66 (1998)(defining the term "operator" for CERCLA liability).

The evidence shows that Formosa Plastics Corporation, Texas managed, directed, conducted, and took such actions, or failed to take actions that caused non-compliance with Formosa's TPDES Permit. Formosa Plastics Corporation, Texas is, therefore, a "person who violate[d]" the effluent limitations and conditions of Formosa's TPDES Permit, within the meaning of the law. Therefore, Formosa Plastics Corporation USA and Formosa Texas have violated Formosa's TPDES Permit.

---

[3] *See* Footnote No. 2.

20 / 21

ACE00018875
CONFIDENTIAL

Having presented discussion and analysis as to Formosa's discharge conduct, the Court determines that: a declaratory judgment shall issue, pursuant to Waterkeeper claim for relief in the form of monetary and injunction relief against Formosa focusing primarily on future violations of its TPDES Permit and the CWA. An attorney's fee should be awarded; and appropriate sanctions for past violations and to enforce future compliance are appropriate.

It is so Ordered.

SIGNED on this 27th day of June, 2019.

Kenneth M. Hoyt
United States District Judge

21 / 21

ACE00018876
CONFIDENTIAL