**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| FORMOSA PLASTICS CORPORATION, U.S.A., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ACE AMERICAN INSURANCE COMPANY,<br><br>Defendant. | Case No. 2:20-cv-14338 (BRM) (JSA)<br><br>**OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court are two motions. The first is Defendant ACE American Insurance Company's ("ACE") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56. (ECF No. 85.) Plaintiffs Formosa Plastics Corporation, U.S.A. and Formosa Plastics Corporation, Texas (collectively, "Formosa") filed an Opposition (ECF No. 88), and ACE filed a Reply (ECF No. 90). The second is Formosa's Motion for Partial Summary Judgment pursuant to Federal Rule of Civil Procedure. (ECF No. 86.) ACE filed an Opposition (ECF No. 87), and Formosa filed a Reply (ECF No. 89). Having reviewed the parties' submissions[1] filed in

---

[1] ACE framed its briefing and proposed order in support of its Motion for Summary Judgment as seeking dismissal, with prejudice, of Formosa's Complaint. (*See generally* ECF Nos. 85-1, 85-3.) Similarly, Formosa framed its briefing in support of its Motion for Partial Summary Judgment as seeking dismissal, with prejudice, of ACE's counterclaims and affirmative defenses. (*See generally* ECF No. 86-4.) However, where claims are the subject of a motion for summary judgment and the Court finds summary judgment to be appropriate, the Court must enter judgment in favor of the party on the subject claims, rather than dismiss the claims. *See, e.g.*, *Cheminor Drugs, Ltd. v. Ethyl Corp.*, 168 F.3d 119, 121 n.2 (3d Cir. 1999) ("Because the grant of summary judgment and the dismissal of the complaint are inconsistent, we will disregard reference to the 'dismissal' of [plaintiff's] complaint and treat the record as a summary judgment record."); *see also Fanelli v. Centenary Coll.*, 112 F. App'x 210, 212 n.2 (3d Cir. 2004) ("When a district court

connection with the Motions and having declined to hold oral argument pursuant to Federal Rule

of Civil Procedure 78(b), for the reasons set forth below and for good cause having been shown,

ACE's Motion for Summary Judgment is **DENIED** and Formosa's Motion for Partial Summary

Judgment is **DENIED**.

I.    BACKGROUND[2]

A.    **Factual Background[3]**

This matter arises from an insurance coverage dispute in which Formosa seeks to recover

amounts claimed to be covered under a pollution liability insurance policy issued by ACE. (*See*

*generally* Compl. (ECF No. 1).) ACE issued a Global Premises Pollution Liability Insurance

Policy to Formosa for the policy period July 1, 2010, through July 1, 2015, extended to July 1,

---

grants a motion for summary judgment, it should enter judgment for the prevailing party, not dismiss the complaint.") (citing *Cheminor Drugs*, 168 F.3d at 121 n.2); *Sconiers v. United States*, 896 F.3d 595, 596 n.2 (3d Cir. 2018) (affirming grant of summary judgment in favor of defendants and disregarding lower court's order to dismiss plaintiff's claims with prejudice); *Bay Colony Condo. Assoc. v. Scottsdale Ins. Co.*, Civ. A. No. 11-4865, 2012 WL 6725824, *5 n.5 (D.N.J. Dec. 26, 2012) ("A grant of summary judgment on a claim and the dismissal of a claim are procedurally distinct."). Therefore, in addressing the Motions, any requests for dismissal are construed as requesting judgment in favor of the movant.

[2] The factual and procedural background of this matter is well-known to the parties and was previously recounted by the Honorable Jessica S. Allen, U.S.M.J. in the June 8, 2023 Opinion (ECF No. 61), and by the Court in the October 12, 2023 Opinion (ECF No. 75). Therefore, in the interest of judicial economy, the Court includes only the facts and procedural background relevant to the Motions.

[3] The parties submitted eight different statements setting forth and responding to the material facts. The following four are related to ACE's Motion for Summary Judgment: (1) ACE's Statement of Material Facts ("SMF") in Support of Motion for Summary Judgment (ECF No. 85-2); (2) Formosa's Response to ACE's SMF (ECF No. 88); (3) Formosa's Supplemental SMF in Opposition to ACE's Motion for Summary Judgment (ECF No. 88-1); (4) Ace's Response to Formosa's Supplemental SMF (ECF No. 90-1). The following four are related to Formosa's Motion for Summary Judgment: (1) Formosa's SMF in Support of Motion for Partial Summary Judgment (ECF No. 86-1); (2) ACE's Response to Formosa's SMF (ECF No. 87-2); (3) ACE's Counterstatement of Material Facts ("CMF") in Opposition to Formosa's Motion for Partial Summary Judgment (ECF No. 87-1); (4) Formosa's Response to ACE's CMF (ECF No. 89-1).

2019 by an endorsement (the "Policy"). (ECF No. 85-2 ¶ 1; ECF No. 86-1 ¶ 1; ECF No. 88 ¶ 1; ECF No. 87-2 ¶ 1.) Formosa alleges ACE has refused to honor its contractual coverage obligations for amounts Formosa incurred in defense and settlement of a complaint brought by the San Antonio Bay Estuarine Waterkeeper and S. Diane Wilson (collectively, "Waterkeepers") for alleged violations of the Federal Water Pollution Act (the "*Waterkeeper* Litigation" or the "*Waterkeeper* Action"). (ECF No. 1 ¶¶ 1–2.)

### 1.    ACE Agrees to Provide Formosa with Insurance Coverage

On or around July 1, 2010, ACE agreed to provide Formosa with insurance coverage under policy No. GPI G24890491 001. (*See* ECF No. 86-1 ¶ 1; *see also* ECF No. 1, Ex. A at 7.) The pollution liability insurance policy covered Formosa for a policy period of July 1, 2010 through July 1, 2015. (*See* ECF No. 85-2 ¶ 1; ECF No. 86-1 ¶ 1; ECF No. 88 ¶ 1; ECF No. 87-2 ¶ 1.) The coverage was extended by Endorsement Number 026 to July 1, 2019. (*See* ECF No. 88 ¶ 1.) Among the policy's terms, it covered eight facilities in Texas, as well as facilities in several other states and some Canadian provinces. (*See* ECF No. 86-1 ¶¶ 2, 5; *cf.* ECF No. 1 ¶ 13.) The covered locations included Formosa's Point Comfort, Texas facility. (*See* ECF No. 86-1 ¶ 12.) The policy further included myriad terms, provisions, and exclusions (*see id.* ¶¶ 6–11), the relevant set of which are defined and described below.

### 2.    Relevant Definitions, Provisions, and Exclusions of the Policy

"Claim" is defined in the Policy as "the written assertion of a legal right received by the insured from a third-party, including . . . suits or other actions alleging responsibility or liability on the part of the insured for bodily injury, property damage,[4] remediation costs arising out of

---

[4] "Property damage" includes damages to natural resources and biodiversity. (Haas Decl. Ex. 1 § AA; Stockwell Decl. Ex. 5 § AA.)

pollution conditions to which this insurance applies." (ECF No. 85-2 ¶ 8 (internal quotation marks omitted); ECF No. 88 ¶ 8.) "Pollution condition" is defined as the "discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including smoke, soot, vapors, fumes, acids, alkalis, chemicals hazardous substances, hazardous materials, or waste materials, on, in, into, or upon land and structures thereupon, the atmosphere, surface water, or groundwater." (ECF No. 85-2 ¶ 9; ECF No. 88 ¶ 9.) The Policy defines "remediation costs" as "reasonable expenses incurred to investigate, quantify, monitor, mitigate, abate, remove, dispose, treat, neutralize, or immobilize pollution conditions to the extent required by environmental law." (Haas Decl. Ex. 1 § V.BB; Stockwell Decl. Ex. 5 § V.BB.) "Environmental law" is any "national, federal, state, provincial, commonwealth, municipal or other local laws, statutes, directive, ordinances, rules, guidance documents regulations, and all amendments thereto, including voluntary cleanup or risk-based corrective action guidance, governing the liability or responsibilities of the insured . . . with respect to a pollution condition. (Haas Decl. Ex. 1 § V.I; Stockwell Decl. Ex. 5 § V.I.)

There are two different coverages under the Policy, Coverage A (New Pollution Conditions Coverage) and Coverage B (Pre-Existing Pollution Conditions Coverage); each applies to different time periods. (ECF No. 85-2 ¶ 2; ECF No. 88 ¶ 2.) Coverage A applies to "pollution conditions that first commence[d], in their entirety, on or after the inception date [July 1, 2010]." (ECF No. 85-2 ¶¶ 5, 7 (internal quotation marks omitted); ECF No. 88 ¶¶ 5, 7.) Coverage B applies to "pollution conditions that first commenced, in whole or in part, prior to the inception date [July 1, 2010]." ECF No. 85-2 ¶¶ 6–7 (internal quotation marks omitted); ECF No. 88 ¶¶ 6–7.) The Policy provides the following coverage for new and pre-existing "pollution conditions":

> Claims, remediation costs, and associated legal defense expenses, in excess of the self-insured retention, arising out of a pollution

> condition on, at, under, or migrating from a covered location, provided the claim is first made, or the insured first discovers such pollution condition during the policy period.

(ECF No. 85-2 ¶ 4 (internal quotation marks omitted); ECF No. 88 ¶ 4.)

Elsewhere, the Policy's Intentional Non-Compliance Exclusion bars coverage for:

> claims, remediation costs, foreign subsidiary loss or legal defense expenses arising out of or related to the intentional disregard of, or knowing, willful, or deliberate non-compliance with, any law, statute, regulation, administrative complaint, notice of violation, notice letter, instruction of any governmental agency or body, or executive, judicial or administrative order by any responsible person.

(ECF No. 85-2 ¶ 11 (internal quotation marks omitted); ECF No. 88 ¶ 11.) Another relevant exclusion, the Policy's Known Conditions Exclusion, excludes coverage for: "claims, remediation costs, foreign subsidiary loss or associated legal defense expenses, arising out of or related to pollution conditions in existence prior to the policy period and reported to a responsible person but not specifically referenced or identified in documents . . . attached to [the] Policy." (ECF No. 85-2 ¶ 12 (internal quotation marks omitted); ECF No. 88 ¶ 12.)

Section III.A. of the Policy states that ACE "shall have the right and the duty to defend the insured against a claim to which this insurance applies. [ACE] shall have no duty to defend the insured against any claim to which this insurance shall not apply." (ECF No. 85-2 ¶ 14 (internal quotation marks omitted); ECF No. 88 ¶ 14.) Section III.B. provides that ACE "shall have the right to select legal counsel to represent the insured for the investigation, adjustment, and defense of any claims covered under this Policy. . . . Legal defense expenses incurred prior to the selection of legal counsel by [ACE] shall not be covered under [the] Policy." (ECF No. 85-2 ¶ 15 (internal quotation marks omitted); ECF No. 88 ¶ 15.) Section VII.B. of the Policy provides, in relevant part, that Formosa must: "[i]mmediately send [ACE] copies of any demands, notices, summonses

or legal papers received in connection with any claim"; "[c]ooperate with [ACE] in the investigation, settlement, or defense of the claim"; and "[p]rovide [ACE] with such information and cooperation as it may reasonably require." (ECF No. 85-2 ¶ 16 (internal quotation marks omitted); ECF No. 88 ¶ 16.) Section VII.C. of the Policy (the "Consent-to-Settle Clause") provides that Formosa "shall [not] make or authorize an admission of liability or attempt to settle or otherwise dispose of any claim . . . without the written consent of [ACE]." (ECF No. 85-2 ¶ 17.)

### 3.  The Point Comfort Plant

Formosa's Point Comfort Plant encompasses approximately 1,600 acres in Point Comfort, Texas. (*See* ECF No. 88-1 ¶ 1; *see also* ECF No. 86-1 ¶ 4.) The plant had "thirteen different production units" for "manufacturing plastic resins." (ECF No. 88-1 ¶ 1.) Via a permit issued by the Texas Commission for Environmental Quality ("TCEQ"), Formosa was authorized to discharge "stormwater and wastewater from the [p]lant . . . into nearby Cox Creek and Lavaca Bay." (ECF No. 88-1 ¶¶ 2–3.) Because the permit required that "there shall be no discharge of floating solids . . . in other than trace amounts" (*id.* ¶ 3), Formosa "had various systems and procedures in place to recover plastic . . . pellets from its stormwater and wastewater systems and prevent them from escaping the [p]lant." (*Id.* ¶ 6.) "Since at least 1993" (*id.* ¶ 2), the plant was "subject to regular inspections by state and federal officials" to ensure compliance with the permit. (*See id.* ¶ 8.) In June 2010, the Environmental Protection Agency ("EPA") conducted a multi-day inspection of the Point Comfort Plant. (*See id.* ¶ 9.) On October 15, 2010, Formosa was sent a written report by the TCEQ and EPA "that summarized its findings." (*Id.* ¶ 9.) The report did not allege Formosa violated its permit issued by the TCEQ. (*See id* ¶ 10.)

### 3.  The *Waterkeeper* Litigation

On July 31, 2017, the Waterkeepers filed a complaint against Formosa in the United States

District Court for the Southern District of Texas in the case captioned *San Antonio Bay Estuarine Waterkeeper, et al. v. Formosa Plastics Corp., Texas, et al.*, Civ. A. No. 6:17-00047 (the "*Waterkeeper* Litigation," or the "*Waterkeeper* Action"). (ECF No. 86-2 ¶ 12; ECF No. 87-2 ¶ 12.) The *Waterkeeper* Plaintiffs sought the following "relief in the form of a judicial order: (i) for prospective injunctive relief to prevent plastic discharges, (ii) requiring Formosa to take specific action to remediate past environmental harm, (iii) awarding civil penalties pursuant to the [CWA], and (iv) awarding litigation costs and attorneys' fees." (ECF No. 86-1 ¶ 13; ECF No. 87-2 ¶ 13.)

Within seven days of being served with the complaint, on August 11, 2017, Formosa reported the *Waterkeeper* Litigation to ACE, as a claim under the policy, and informed ACE it had retained Kelly Hart & Hallman LLP ("Kelly Hart") to represent them. (*See id.* ¶ 14.) On October 30, 2017, ACE sent a letter to Formosa wherein it agreed to provide Formosa a defense in the *Waterkeeper* Litigation subject to a reservation of rights and consented to Formosa's retention of Kelly Hart. (*See id.*; *cf.* ECF No. 1 ¶¶ 54–55; Countercl. (ECF No. 24 ¶ 29).)

On September 26, 2018, Formosa and Waterkeepers participated in an unsuccessful, full-day mediation that ACE was not made aware of until October 2018. (ECF No. 86-1 ¶ 15; *cf.* ECF No. 1 ¶¶ 57–58; ECF No. 24 ¶¶ 36–38.) The *Waterkeeper* Action proceeded to a one-week liability bench trial that commenced on or about March 25, 2019. (*See* ECF No. 86-1 ¶ 22; ECF No. 24 ¶ 40.) The parties dispute when ACE was made aware of the liability trial. Formosa's submissions to the Court do not make clear when they notified ACE of the liability trial (*see generally*, ECF Nos. 86-1, 88-1, 89-1), but it was apparently, at the latest, by May 29, 2019. (*See* ECF No. 86-1 ¶ 25.) However, ACE asserts it did not know of the liability trial until on or around April 30, 2019. (*See* ECF No. 85-2 ¶ 51.)

On June 27, 2019, the United States District Court for the Southern District of Texas issued

a memorandum and order finding Formosa liable for violations of the Clean Water Act ("CWA"). (ECF No. 86-1 ¶ 26.) In August 2019, Formosa retained Holland & Knight, LLP ("H&K") to serve as settlement counsel while Kelly Hart focused on the upcoming penalty trial. (*Cf. id.* ¶¶ 28–29.) On October 9, 2019, Formosa advised ACE it had retained H&K to pursue possible settlement with Waterkeepers. (*See* ECF No. 85-2 ¶ 61; *cf.* ECF No. 1 ¶ 74; ECF No. 24 ¶¶ 52–53.) On October 15, 2019, Formosa advised ACE of the settlement. (*See* ECF No. 86-1 ¶ 32.) ACE claims Formosa settled the *Waterkeeper* Action without its knowledge or consent. (*Cf. id.* ¶ 39.)

### 4.     The Consent Decree

On December 6, 2019, the Southern District of Texas approved the settlement and entered a final consent decree (the "Consent Decree"). (*Id.*) The Consent Decree included all of the relief requested by the *Waterkeeper* Plaintiffs except for an award of civil penalties under the CWA. (ECF No. 86-1 ¶ 33; ECF No. 87-2 ¶ 33.) Instead, as part of the Consent Decree, Formosa agreed to: contribute $50 million dollars to the Matagorda Bay Mitigation Trust (the "Matagorda Trust"), which would be used to fund environmental mitigation or other projects (the "Mitigation Projects"); and reimburse the *Waterkeeper* Plaintiffs' attorneys' fees. (*Id.*) On December 13, 2019, ACE sent a letter formally denying coverage for: the settlement of the Waterkeeper Action; any costs incurred after October 15, 2019; and any costs incurred by Formosa to retain H&K as settlement counsel. (*See* ECF No. 88-1 ¶ 44.)

### B.     Procedural Background

On October 13, 2020, Formosa filed the Complaint raising a sole cause of action for breach of contract.[5] (ECF No. 1.) On April 30, 2021, ACE filed the Second Amended Answer to the

---

[5] Formosa submits the Court has personal jurisdiction over ACE because it contracted with Formosa Plastics Corporation, U.S.A. in the State of New Jersey. (ECF No 1 ¶ 7.) Formosa further contends the Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332

Complaint following a series of amendments.[6] (Second Am. Answer and Countercls. (ECF No. 24).) ACE raised twenty affirmative defenses and the following counterclaims: Declaratory Judgment—No Coverage Under Coverage A. of the Policy (First Counterclaim); Breach of Contract—Section III.A. of the Policy (Second Counterclaim); Breach of Contract—Section III.B. of the Policy (Third Counterclaim); Breach of Contract—Section VII.B. of the Policy (Fourth Counterclaim); Breach of Contract—Section VII.C. of the Policy (Fifth Counterclaim). (*See generally*, *id.*)

Fact discovery was originally scheduled to close on March 15, 2022. (ECF No. 33.) On March 1, 2022, the parties submitted a joint status letter to Judge Allen outlining the privilege disputes and the parties' respective positions. (*See generally* ECF No. 46.) In the joint letter, Formosa detailed its challenge to ACE's assertion of attorney-client communication over communications with the two law firms Formosa had retained. (*Id*. at 2.) The discovery dispute involved whether five hundred and thirty (530) documents relating to the *Waterkeeper* Litigation containing attorney-client privileged communications and/or work product should be produced. (ECF No. 61 at 19.) Additionally, ACE sought to compel the production of one document withheld based on the mediation privilege. (*Id*. at 19–20.)

On June 8, 2023, Judge Allen issued an Opinion and Order denying ACE's Motion to Compel discovery based on the common interest doctrine, "at issue" doctrine, and fairness grounds. (ECF Nos. 61, 62.) On June 22, 2023, ACE filed an appeal of Judge Allen's June 8, 2023

---

because there is complete diversity of citizenship between the parties and the amount in controversy requirement is satisfied. (*Id.* ¶ 8.) Additionally, Formosa submits venue is proper in this Court under 28 U.S.C. § 1391. (*Id.* ¶ 9.) The Court agrees on all fronts.

[6] Judge Allen denied ACE's Motion for Leave to File a Third Amended Answer and Counterclaims (ECF No. 39) by Order dated May 17, 2022 (ECF No. 50).

Opinion and the accompanying order. (ECF No. 64.) On July 3, 2023, Formosa filed an opposition. (ECF No. 68.) On July 10, 2023, ACE filed a reply in further support of its appeal. (ECF No. 70.) On October 12, 2023, the Court issued an Opinion and Order denying ACE's appeal and affirming Judge Allen's Opinion and Order dated June 8, 2023. (ECF Nos. 75, 76.)

Thereafter, on January 22, 2024, the parties filed the complete briefing for the Motions. (ECF Nos. 85–90.) ACE's Motion for Summary Judgment is docketed as ECF No. 85 with the supporting brief docketed as ECF No. 85-1, Formosa's Opposition is docketed as ECF No. 88 with the opposition brief docketed as 88-8, and ACE's Reply is docketed as ECF No. 90 with the reply brief being docketed as same. Formosa's Motion for Partial Summary Judgment is docketed as ECF No. 86 with the supporting brief docketed as ECF No. 86-4, ACE's Opposition is docketed as ECF No. 87 with the opposition brief being docketed as same, and Formosa's Reply is docketed as ECF No. 89 with the reply brief being docketed as same.

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "On motions for summary judgment, the movant shall furnish a statement which sets forth material facts as to which there does not exist a genuine issue, in separately numbered paragraphs citing to the affidavits and other documents submitted in support of the motion." L. Civ. R. 56.1(a). A party asserting a genuine dispute of material fact must support the assertion by either "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot

produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A factual dispute "is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party," and "is material only if it might affect the outcome of the suit under governing law." *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment." *Read v. Profeta*, 397 F. Supp. 3d 597, 625 (D.N.J. 2019) (citations omitted). Irrelevant or unnecessary factual disputes will also not preclude a grant of summary judgment. *See Anderson*, 477 U.S. at 248. Moreover, "mere speculation does not create genuine issues of material fact." *Dellapenna v. Tredyffrin/Easttown Sch. Dist.*, 449 F. App'x 209, 215–16 (3d Cir. 2011) (citing *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990)).

The party moving for summary judgment has the initial burden of showing the basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once a movant adequately supports its summary judgment motion, the burden shifts to the nonmovant to "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324. "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (quoting *Anderson*, 477 U.S. at 255). In other words, in

deciding a party's summary judgment motion, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 255. "Summary judgment is appropriate only when there are no genuine issues of material fact, drawing all justifiable inferences in favor of the nonmovant." *Adams v. Fayette Home Care & Hospice*, 452 F. App'x 137, 139 (3d Cir. 2011) (citing *Anderson,* 477 U.S. at 248, 255).

If the moving party bears the burden of proof at trial, summary judgment is not appropriate if the evidence is susceptible to different interpretations or inferences by the trier of fact. *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999); *see also id.* at 553 n.9 (noting "summary judgment is rarely granted in a plaintiff's favor in cases where the issue is a defendant's racial motivation, such as disparate treatment suits under Title VII or racial discrimination claims under 42 U.S.C. § 1981"). On the other hand, if the non-moving party bears the burden of proof at trial, "summary judgment is warranted if the nonmovant fails to 'make a showing sufficient to establish the existence of an element essential to [its] case.'" *Nebraska v. Wyoming*, 507 U.S. 584, 590 (1993) (alteration in original) (quoting *Celotex Corp.*, 477 U.S. at 322). A "genuine issue as to any material fact" cannot exist if a party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322–23. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323. A material fact raises a "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 248).

## III.    DECISION

ACE filed a motion seeking summary judgment in its favor. (ECF Nos. 85-1, 85-3 (ACE's Proposed Order).) First, ACE argues New Jersey substantive law applies to this matter. (ECF No. 85-1 at 19–26.) Next, ACE asserts the *Waterkeeper* Litigation is not covered under the Policy due to Formosa's breach of the Policy's Consent-to-Settle Clause. (*Id.* at 26–42.) ACE further contends the *Waterkeeper* Litigation does not fall within the Policy's coverage because Formosa breached several of the Policy's conditions, and there are also two relevant policy exclusions. (*Id.* at 43–48.) ACE concludes by raising the alternative argument that even if ACE has an obligation to reimburse Formosa for its outstanding defense costs, the extent of that obligation is limited. (*Id.* at 49–50.)

Formosa filed a motion seeking summary judgment. (ECF Nos. 86-4, 86-5 (Formosa's Proposed Order).) Specifically, Formosa seeks a ruling that its claimed damages incurred in the settlement of the *Waterkeeper* Litigation—the payments made to the Matagorda Bay Mitigation Trust and reimbursement of its attorneys' fees—are covered under the Policy. (*Id.*) Formosa argues that Texas law applies to ACE's affirmative defenses and counterclaims predicated upon Formosa's alleged failure to cooperate and alleged breach of the Consent-to-Settle Clause. (ECF No. 86-4 at 11–20.) Next, Formosa asserts that ACE's Second, Fourth, and Fifth Counterclaims as well as its Eleventh, Thirteenth, and Fourteenth affirmative defenses—which allege breach of various provisions of the Policy—should be dismissed as a matter of law because ACE cannot demonstrate that it was prejudiced by Formosa's alleged failure to cooperate or seek consent prior to settlement. (*Id.* at 21–27.) Formosa concludes by arguing that amounts it paid to settle the *Waterkeeper* Litigation, including attorneys' fees, are insurable losses under the Policy. (*Id.* at 28–33.)

The Court addresses each argument in turn.

## A.    Choice-of-Law Analysis[7]

ACE asserts New Jersey law applies (ECF No. 85-1 at 19–26; ECF No. 87 at 8–15; ECF No. 90 at 1–3) and argues there is no substantive difference between New Jersey and Texas law as to the relevant disputes that are the subject of its Motion. (ECF No. 85-1 at 19–22; ECF No. 87 at 8; ECF No. 90 at 1–3) Notwithstanding the alleged lack of a substantive difference, ACE contends New Jersey's choice-of-law rules and case law require the application of New Jersey law. (ECF No. 85-1 at 22–26; ECF No. 90 at 2–3.)

In opposition to ACE's Motion, Formosa counters that "ACE incorrectly asserts there is no conflict between New Jersey and Texas law concerning the issues in its motion for summary judgment." (ECF No. 88-8 at 15.) Formosa asserts New Jersey and Texas law differ substantially in their treatment of an alleged breach of a consent-to-settle clause. (*Id.* at 15–16.)

Formosa argues Texas law applies to ACE's counterclaims and affirmative defenses that are premised upon Formosa's alleged failure to cooperate and alleged breach of the Consent-to-Settle Clause. (ECF No. 86-4 at 11–20; ECF No. 88-8 at 16–20; ECF No. 89 at 3–7.) In support of this argument, Formosa asserts the following: Texas is the principal location of the insured risk; and Texas has a dominant significant relationship to the relevant issue because Texas has a greater interest in having its law applied, other factors from Restatement (Second) of Conflict of Laws § 6 weigh in favor of Texas law being applied, and the location of the polluted site carries substantial weight. (ECF No. 86-4 at 11–20; ECF No. 88-8 at 16–20; ECF No. 89 at 3–7.)

In opposition to Formosa's Motion, ACE reiterates that there is no substantive difference between New Jersey and Texas law, and therefore, New Jersey law should apply. (ECF No. 87 at

---

[7] A New York choice-of-law provision in the Policy was deleted by endorsement. (ECF No. 88-1 ¶ 47; ECF No. 90-1 ¶ 47.)

8.) Additionally, ACE counters that, if the Court finds there is a substantive difference between Texas and New Jersey law, New Jersey law should still apply because: the location of the Point Comfort Plant is not determinative of the choice-of-law issue; and New Jersey bears the most significant relationship to Formosa's breach of the Policy's Consent-to-Settle Clause as New Jersey's interests outweigh Texas's interests and the other relevant factors under § 6 weigh in favor of the application of New Jersey law. (*Id.* at 8–15.)

"A federal court sitting in diversity applies the choice-of-law rules of the forum state—here, New Jersey—to determine the controlling law." *Maniscalco v. Brother Int'l (USA) Corp.*, 709 F.3d 202, 206 (3d Cir. 2013) (citations omitted). "New Jersey has adopted the 'most significant relationship' test set forth in the Restatement (Second) of Conflict of Laws[,]" which is a two-part test. *Id.* "Under New Jersey law, where parties lack a contractual choice-of-law clause, as here, [a court] first 'determine[s] whether an actual conflict exists' by assessing the 'substance of the potentially applicable laws.'" *Spalter v. Protective Life Ins.*, No. 22-3344, 2024 WL 658975, at *2 n.3 (3d Cir. Feb. 16, 2024) (quoting *P.V. ex rel. T.V. v. Camp Jaycee*, 962 A.2d 453, 460 (N.J. 2008). The New Jersey Supreme Court specified this step is "done by examining the substance of the potentially applicable laws to determine whether 'there is a distinction' between them." *Camp Jaycee*, 962 A.2d at 460 (citation omitted). If no conflict exists, "there is no choice-of-law issue to be resolved." *Id.* An actual conflict exists when there is a "substantive difference" between the relevant laws of the states. *DeMarco v. Stoddard*, 125 A.3d 367, 383 (N.J. 2015) (citing *Cornett v. Johnson & Johnson*, 48 A.3d 1031, 1047 (N.J. 2012); *Camp Jaycee*, 962 A.2d at 460). Notably, "[a] substantive difference between the law of one state and another exists when the difference is offensive or repugnant to the public policy of this State." *Id.* (citing *Cornett*, 48 A.3d at 1050).

If a conflict exists, the court then proceeds to the second part of the test and "determine[s]

which jurisdiction has the 'most significant relationship' to the claim." *Maniscalco*, 709 F.3d at 207 (quoting *Camp Jaycee*, 962 A.2d at 460). In other words, "the Court determines 'which state has the most meaningful connections with and interests in the transaction and the parties.'" *Spence-Parker v. Del. River & Bay Auth.*, 616 F. Supp. 2d 509, 523 (D.N.J. 2009) (quoting *NL Indus., Inc. v. Comm. Union Ins. Co.*, 65 F.3d 314, 319 (3d Cir. 1995)).

### 1.    Determinations as to Whether Conflicts of Law Exist

#### i.    Consent-to-Settle Clause and the Other Policy Conditions

It is undisputed that under New Jersey law an insurer is not required to demonstrate that it was prejudiced by the insured's breach of a policy's consent-to-settle provision and other policy conditions where the policy is a claims-made policy. *Benecard Servs., Inc. v. Allied World Specialty Ins. Co.*, No. 20-2359, 2021 WL 4077047, at *2 (3d Cir. Sept. 8, 2021) (citing *Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 129 A.3d 1069, 1078, 1080 (N.J. 2016)). However, the parties disagree as to whether Texas law creates an irrebuttable presumption of prejudice to the insurer. (*Compare* ECF No. 85-1 at 20 ("[U]nder Texas law, . . . an insured's settlement without the insurer's consent in breach of the policy creates an irrebuttable presumption of prejudice to the insurer, vitiating coverage under the policy." (citing *Motiva Enters. LLC v. St. Paul Fire and Marine Ins. Co.*, 445 F.3d 381, 385 (5th Cir. 2006)), *with* ECF No. 88-8 at 16 (arguing that Texas law provides that "prejudice cannot be presumed, and instead must be demonstrated." (citing *Coastal Refin. & Mktg., Inc. v. U.S. Fid. & Guar. Co.*, 218 S.W.3d 279, 288 (Tex. App. 2007))).

Based upon its description of the relevant case law in New Jersey and Texas, ACE asserts there is no substantive difference because "[w]hether it is the absence of a prejudice requirement altogether for a claims-made policy under New Jersey law or the irrebuttable presumption of

prejudice as a matter of law under Texas law, the key commonality is that the insurer need not prove it was prejudiced by the insured's breach." (ECF No. 85-1 at 20.) Formosa counters "ACE is wrong in asserting that Texas law creates an irrebuttable presumption of prejudice if an insured settles a case without the insurer's consent. Therefore, there is a stark contrast between New Jersey and Texas law, requiring the Court to engage in a choice of law analysis." (ECF No. 88-8 at 15.) The Court agrees with Formosa.

In *Hernandez v. Gulf Grp. Lloyds*, the Supreme Court of Texas held that "an insurer may escape liability on the basis of a settlement-without-consent exclusion only when the insurer is actually prejudiced by the insured's settlement with the tortfeasor." 875 S.W.2d 691, 692 (Tex. 1994). Thereafter, in *Motiva*, the Fifth Circuit discussed both *Hernandez* and *Ridglea Est. Condo. Ass'n v. Lexington Ins. Co.*, 415 F.3d 474 (5th Cir. 2005),[8] and noted that "it is not entirely clear under Texas law whether an insurer must demonstrate prejudice before it can avoid its obligations under a policy where the insured breaches a prompt-notice provision or a consent-to-settle provision." 445 F.3d at 386 (footnote and citation omitted). Ultimately, the Fifth Circuit held "[w]hen, as in this case, the insurer is not consulted about the settlement, the settlement is not tendered to it and the insurer has no opportunity to participate in or consent to the ultimate settlement decision, we conclude that the insurer is prejudiced as a matter of law." *Id.*

The Court finds ACE's reliance upon *Motiva* is misplaced as that Fifth Circuit decision predates Texas state court decisions which did require a finding of prejudice. *See Lennar Corp. v. Markel Am. Ins. Co.*, 413 S.W.3d 750, 756–57 (Tex. 2013) (providing that an insurer is required

---

[8] In *Ridglea*, the Fifth Circuit provided: "We do not read *Hernandez* as necessarily creating a prejudice requirement for all insurance policies issued in Texas. We have previously held, for example, that an insurer may deny coverage under a 'claims made' liability policy without a showing of prejudice." 415 F.3d at 480 n.4 (citing *Matador Petrol. Corp. v. St. Paul Surplus Lines Ins. Co.*, 174 F.3d 653, 659 (5th Cir. 1999)).

to establish prejudice in order to avoid coverage when an insured has breached a consent-to-settle provision); *Great Am. Ins. Co. of N.Y. v. Compass Well Servs., LLC*, Civ. A. No. 02-19-00373, 2020 WL 7393321, at \*8 (Tex. App. Dec. 17, 2020) ("The case law is clear that, no matter the type of breach alleged, an insurer must establish some form of actual prejudice in order to disclaim coverage on the basis of that prejudice." (collecting cases)); *cf. PAJ, Inc. v. Hanover Ins. Co.*, 243 S.W.3d 630, 636–37 (Tex. 2008) (reversing a decision the Fifth Circuit relied upon in *Motiva* and holding, in the context of an alleged breach of a notice provision, "that an insured's failure to timely notify its insurer of a claim or suit does not defeat coverage if the insurer was not prejudiced by the delay"); *cf. Coastal Refin. & Mktg., Inc.*, 218 S.W.3d at 288–89 (holding, in a context similar to *PAJ*, that, to avoid coverage, an insurer must demonstrate actual prejudice as opposed to "speculative or potential prejudice" (collecting cases)).[9] Indeed, as Formosa correctly notes, the Western District of Texas has expressly recognized that *Motiva* does not accurately represent current Texas state law. *Ryan L. Firm, LLC v. New York Marine & Gen. Ins. Co.*, Civ. A. No. 19-629, 2020 WL 6379231, at \*1 (W.D. Tex. Sept. 9, 2020) ("And while [defendants] continue to rely on *Motiva* . . . for the proposition that a showing of prejudice is not required, after *Motiva*, the Texas Supreme Court and the Fifth Circuit both issued opinions clarifying that Texas law requires an insurer to show that an insured's breach of a consent-to-settlement provision prejudiced the insurer." (internal quotation marks and citations omitted)).[10]

---

[9] District courts in Texas have similarly recognized that the insurer is required to demonstrate prejudice where the insured provided late notice of a claim. *See, e.g.*, *E. Tex. Med. Ctr. Reg'l Healthcare Sys. v. Lexington Ins. Co.*, Civ. A. No. 04-165, 2011 WL 773452, at \*3 (E.D. Tex. Feb. 25, 2011) ("An insured's untimely notice does not excuse the insurer from its payment obligation under the policy absent a showing of prejudice.").

[10] As to *Ryan L. Firm*'s analysis of the current landscape of the Fifth Circuit, the Court agrees to some extent and notes that the Fifth Circuit has issued decisions detailing that Texas state law requires the insurer to establish prejudice in order to avoid coverage following an insured's breach

Based on the foregoing, the Court finds there is a conflict of law because under Texas law an insurer is required to demonstrate it was prejudiced by the insured's breach of a consent-to-settle provision and other policy conditions.[11] Accordingly, the Court must engage in a most significant relationship analysis as to these provisions. *See infra,* Section III(A)(2).

ii.      **The Known Conditions and the Intentional Non-Compliance Exclusions (ECF No. 85-1 at 21)**

Under New Jersey law, "[a]lthough policy exclusions are usually strictly construed, exclusions will be applied as written, so long as the language is clear, unambiguous, and not violative of public policy." *McClellan v. Feit*, 870 A.2d 644, 648–49 (N.J. Super. Ct. App. Div. 2005). Additionally, "[w]hether used in a provision defining coverage or in an exclusion, the phrase ['arising out of'] is defined broadly." *Prudential Prop. & Cas. Ins. Co. v. Brenner*, 795 A.2d 286, 289 (N.J. Super. Ct. App. Div. 2002). New Jersey courts interpret the phrase to mean "originating from, growing out of or having a substantial nexus with the activity for which coverage is provided." *Id.* at 290 (internal quotation marks and citations omitted). The insurer has the burden to prove an exclusion clearly and unambiguously applies to a particular loss. *See Villa*

---

of an insurance policy's provisions. *See Berkley Reg'l Ins. Co. v. Phila. Indem. Ins. Co.*, 690 F.3d 342, 345 (5th Cir. 2012) (discussing there are various contractual obligations under a liability policy, such as a consent-to-settle clause, that are designed to protect the insurer, and holding "it is [] clear that in order for an insured's breach to defeat coverage, the breach must prejudice the insurer in some tangible way" (citing *PAJ*, 243 S.W.3d at 636–37)); *see also Foreman v. Acceptance Indem. Co.*, 730 F. App'x 191, 197 n.15 (5th Cir. 2018) (finding, in the context of a cooperation clause, that "[t]he Texas Supreme Court 'imposed the prejudice requirement as a logical result of the rule that a party's breach of contract excuses the other party's performance only if the initial breach is material'" (quoting *Lennar*, 413 S.W.3d at 763)); *Trumble Steel Erectors, Inc. v. Moss*, 304 F. App'x 236, 239 (5th Cir. 2008) ("Under Texas law, when an insurance policy requires that the policyholder notify its insurer of any claim or suit 'as soon as practicable,' the policyholder's 'failure to timely notify its insurer of a claim or suit does not defeat coverage if the insurer was not prejudiced by the delay.'" (quoting *PAJ*, 243 S.W.3d at 636–37)).

[11] Given the abundance of case law described above, the Court is not persuaded by ACE's attempt to distinguish claims-made policies.

19

*v. Short*, 947 A.2d 1217, 1222 (N.J. 2008).

Similarly, under Texas law, "'[e]xceptions or limitations on liability are strictly construed against the insured in favor of the insured,' and '[a]n intent to exclude coverage must be expressed in clear and unambiguous language.'" *Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660, 668 (Tex. 2008) (quoting *Nat'l Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.*, 811 S.W.2d 552, 555 (Tex. 1991). Additionally, unambiguous policy exclusions are enforced as written. *See Carolina Cas. Ins. Co. v. Sowell*, 603 F. Supp. 2d 914, 925 (N.D. Tex. 2009). Texas courts interpret the phrase "arise out of" broadly to "mean[] that there is simply a 'causal connection or relation,'. . . [*i.e.*,] that there is but for causation, though not necessarily direct or proximate causation." *Landing Council Co-Owners v. Fed. Ins. Co.*, 247 F. Supp. 3d 802, 810 (S.D. Tex. 2017) (quoting *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.*, 141 S.W.3d 198, 203 (Tex. 2004)). Just like New Jersey, the insurer has the duty to prove an exclusion clearly and unambiguously applies to a particular loss. *See Evanston Ins.*, 256 S.W.3d at 668.

Accordingly, the Court finds New Jersey law will govern the application of the Policy's Known Conditions and Intentional Non-Compliance Exclusions because there is no substantive difference between the laws of New Jersey and Texas with respect to the application of policy exclusions.

### 2.    Most Significant Relationship Analysis to Determine Which State's Law Applies to the Consent-to-Settle Clause and the Other Relevant Policy Conditions

Having found there is a conflict of law between New Jersey and Texas law regarding whether an insurer must demonstrate prejudice, the Court proceeds to a discussion and analysis of the most significant relationship test to determine which state's law applies. *Maniscalco*, 709 F.3d at 207. New Jersey has "rejected the mechanical and inflexible *lex loci contractus* rule in resolving

conflict-of-law issues in liability-insurance contracts. Instead, [New Jersey] courts have adopted a more flexible approach that focuses on the state that has the most significant connections with the parties and the transaction." *Gilbert Spruance Co. v. Pa. Mfrs. Ass'n Ins. Co.*, 629 A.2d 885, 888 (N.J. 1993) (citations omitted). To determine which state has the most significant relationship, New Jersey courts consider the factors set forth in *Restatement (Second) Conflict of Laws* §§ 6, 188, and 193.[12] *Id.* (citations omitted); *see also Cont'l Ins. Co. v. Honeywell Int'l, Inc.*, 188 A.3d 297, 317 (N.J. 2018) ("When the risk is 'to some degree transient,' a court must use the *Restatement* § 6 factors in its analysis.") (quoting *Pfizer, Inc. v. Emps. Ins. of Wausau*, 712 A.2d 634, 639 (N.J. 1998)).

Section 193 of the *Restatement* "is the starting point for choice-of-law disputes involving liability-insurance coverage. That section says the law of the state that the parties understood to be the principal location of the insured risk governs unless some other state has a more significant relationship to the case under *Restatement* § 6." *Mega Constr. Corp. v. XL Am. Grp.*, 684 F. App'x 196, 199 (3d Cir. 2017) (internal quotation marks, citations, and footnotes omitted); *see also Robeson Indus. Corp. v. Hartford Accident & Indem. Co.*, 178 F.3d 160, 165 (3d Cir. 1999) ("Thus, under § 193 of the *Restatement*, New Jersey generally interprets casualty-insurance policies in accordance with the law of the state in which the insured risk is principally located, unless some other state has a more significant relationship to the transaction and the parties as illuminated by the consideration of factors listed in § 6." (footnote omitted)); *Pfizer*, 712 A.2d at 638 (noting courts should first look to "*Restatement* section 193, which provides that the place that 'the parties understood . . . to be the principal location of the insured risk governs unless some other state has

---

[12] "*Restatement* section 188 provides the choice-of-law rule in respect of contracts in general, [whereas] *Restatement* section 193 provides guidance in applying section 188's 'relevant contacts' to the special case of casualty-insurance contracts." *Id.*

a more significant relationship under the principles stated in [section] 6 to the transaction and the parties.'" (quoting *Gilbert Spruance*, 629 A.2d at 889)). Importantly, "[a]n insured risk—namely an activity that is the subject matter of the insurance—is principally located in a state if it occurs there during a major portion of the insurance period." *Mega Constr.*, 684 F. App'x at 199 (citing Restatement § 193 cmt. b; *Gilbert Spruance*, 629 A.2d at 899) (internal quotation marks omitted).

Formosa asserts Texas is the principal location of the insured risk, and therefore, the Court should apply Texas law to the interpretation and application of the Policy. (ECF No. 86-4 at 11–13.) However, Formosa also acknowledges that this issue is not dispositive in environmental insurance coverage cases. (*Id.* at 13.) In opposition, ACE does not necessarily dispute that Texas is the principal location; rather, ACE argues this issue alone is not a determinative factor in the Court's analysis as to which state's law to apply. (ECF No. 87 at 9–10.) In reply, Formosa does not directly counter ACE's assertion. (*See* ECF No. 89 at 3–7.) Instead, Formosa more squarely addresses the location of the Point Comfort Plant relative to its corresponding effect upon the analysis of which state has the most significant relationship. (*See id.*)

Here, it is undisputed that the risk at issue is the Point Comfort Plant. Additionally, ACE identified the Point Comfort Plant as Formosa's largest and most significant risk. (ECF No. 86-1 ¶ 4; ECF No. 87-2 ¶ 4.) The Policy provides coverage for thirty-one locations. (ECF No. 86-1 ¶ 5; ECF No. 87-2 ¶ 5.) Of these locations, eight are located in Texas which is more than any other state. (*Id.*) Applying § 193, the Court finds Texas is the principal location of the insured risk. *See Viacom Int'l, Inc. v. Admiral Ins. Co.*, 2006 WL 1060504, at *13 (N.J. Super. Ct. App. Div. Apr. 21, 2006) ("Because the insurance carriers in this case were well aware of the operations in Pennsylvania and Illinois, the principal location of the environmental risk insured is the site of those operations. The situs states are therefore presumed to have the most significant relationships

to the matter and their laws should govern unless New Jersey or New York have a more dominant relationship."); *see also Johnson Matthey Inc. v. Pa. Mfrs.' Ass'n Ins. Co.*, 593 A.2d 367, 372 (N.J. Super. Ct. App. Div. 1991) ("*Restatement* [§] 193 says that rights under a casualty policy should ordinarily be decided under the substantive law of the state which the parties understood was to be the principal location of the insured risk. Here, that is clearly New Jersey, where [plaintiff's] plant was located, and where [plaintiff's] waste predictably found its way into landfills.").

Despite the Court's finding that Texas is the principal location of the insured risk, this issue is not dispositive as the Policy provided coverage across multiple states. *See Mega Constr.*, 684 F. App'x at 199; *see also Pfizer*, 712 A.2d at 638 ("When such an insured operation or activity is predictably multistate, the significance of the principal location of the insured risk diminishes; in such a case, section 193 directs that 'the governing law is that of the state with the dominant significant relationship according to the principles set forth in *Restatement* section 6' as applied to 'the particular issue involved.'" (quoting *Gilbert Spruance*, 629 A.2d at 893)); *Arcelormittal Plate, LLC v. Joule Tech. Servs., Inc.*, 558 F. App'x 205, 211–12 (3d Cir. 2014) ("The *Restatement (Second) of Conflict of Laws*, in an official comment, explains that in an insurance dispute, a court should generally give the location of the insured risk 'greater weight than any other single contact.' *Restatement (Second) of Conflict of Laws* § 193 cmt. b. Nonetheless, if the policy covers 'a group of risks that are scattered throughout two or more states,' the location of the risk has 'less significance' to the choice-of-law determination." *Id.* (footnote omitted)); *cf. Robeson Indus.*, 178 F.3d at 166 (finding the "insured['s] activities were not 'predictably multistate,' and they thus fit within the general site-specific rule of § 193" because "[t]he policies involved covered only [the insured]'s New York property, and only New York was implicated by [the insured]'s contamination" (citations omitted).)

23

Therefore, the Court will undertake an analysis of which state has a more significant relationship under *Restatement* § 6. The § 6 factors are as follows:

> (a) the interstate system's needs; (b) the forum's relevant polices; (c) other interested states' relevant policies and interests in the issue at hand; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability, and uniformity of result; and (g) ease in determining and applying the law in issue.

*Mega Constr.*, 684 F. App'x at 199–200.[13]

ACE argues "New Jersey's choice-of-law principles dictate the application of New Jersey substantive law." (ECF No. 85-1 at 23.) ACE submits the first two *Pfizer* factors favor New Jersey law because: (1) "New Jersey has a strong interest in applying its own law where, as here, the matter involves a New Jersey claims-made policy issued to a New Jersey insured"; and (2) "[t]o apply a different rule would clearly frustrate New Jersey's foregoing public policy interest." (*Id.*) Next, in reliance upon § 188 and *Honeywell*, 188 A.3d at 318–20, ACE argues the third and fourth factors favor the application of New Jersey law. (*Id.* at 24.) Finally, ACE argues the fifth factor weighs in favor of New Jersey because "the law of the forum state is the more efficient law and is better suited for the instant dispute than Texas law." (*Id.* at 25 (citing *Honeywell*, 188 A.3d at 320).)

In opposition, Formosa counters that, "to the extent ACE's argument is that New Jersey

---

[13] The parties' briefing addressed the factors that the Supreme Court of New Jersey provided in *Pfizer*. (ECF No. 85-1 at 23–25; ECF No. 88-8 at 18–20; ECF No. 86-4 at 13–17; ECF No. 87 at 10–13.) These factors are as follows: "(1) the competing interests of the relevant states, (2) the national interests of commerce among the several states, (3) the interests of the parties, (4) the interests underlying the contract law, and (5) the interests of judicial administration." *Pfizer*, 712 A.2d 634 at 639 (citing *Gen. Ceramics Inc. v. Firemen's Fund Ins. Cos.*, 66 F.3d 647, 656 (3d Cir. 1995)). In its analysis, the Supreme Court of New Jersey combined "factors (3) and (4) . . . into one factor," as "contract law is largely private law." *Id.* The Court notes that *Pfizer* relies upon a Third Circuit decision from nearly thirty years ago. *See id.* Although this is not the most recent description of the factors by the Third Circuit, *see Mega Constr.*, 684 F. App'x at 199–200, the Court will frame its analysis in accordance with the factors articulated in *Pfizer* because they are the factors that the parties briefed, and they generally align with the factors more recently articulated by the Third Circuit.

has an interest in protecting an insurer's right to control the case," this argument is misguided because ACE "*disclaimed* any responsibility to control the case in its initial letter." (ECF No. 88-8 at 17–18.) Formosa further argues ACE largely ignores and fails to properly address the *Pfizer* factors. (*Id.* at 18–20.)

In reply, ACE argues Formosa's position is misguided as "the coverage here is not dependent on the environmental contamination in Texas, but Formosa's breach of the consent-to-settle clause by its insurance department in Formosa's Livingston, New Jersey headquarters." (ECF No. 90 at 2.) ACE submits "[n]one of the cases cited by Formosa to advance Texas law involved a claims-made policy, and all involved coverage issues *directly* concerning the environmental pollution at issue, such as the pollution exclusion or trigger and allocation of coverage." (*Id.*)

Formosa argues the Court should apply Texas law because Texas has a more significant relationship to the issues before the Court, and Texas has a greater interest in having its laws applied. (ECF No. 86-4 at 13–20.) Formosa specifically asserts Texas has a greater interest in having its laws applied because "Texas law requires that an insurer demonstrate . . . that it suffered material prejudice before it may escape its coverage obligations through assertion of violation of an insurance policy's [] duty to cooperate and consent to settlement provisions." (*Id.* at 14.) Formosa further submits "[t]he alleged contamination for which coverage was sought took place in Texas, and New Jersey's domestic concerns are not advanced in any way that would support applying New Jersey's laws to a dispute involving contamination that took place only in Texas." (*Id.* at 15.) Formosa contends the remaining factors favor the application of Texas law. (*Id.* at 16–17.) Formosa concludes by arguing the Court should apply Texas law given the significance of the location of the Point Comfort Plant. (*Id.* at 18–20.)

25

In opposition, ACE argues New Jersey bears the most significant relationship to Formosa's breach of the Policy's Consent-to-Settle Clause. (ECF No. 87 at 10–15.) ACE submits New Jersey has a strong interest in applying its own law because, amongst other reasons, (1) New Jersey recognizes the differences between occurrence-based and claims-made policies; and (2) New Jersey has a compelling interest in requiring sophisticated insureds, like Formosa, to comply with unambiguous insurance policy terms that were agreed upon. (*Id.* at 10–11.) Next, ACE contends the interests of the parties and contract law also favor New Jersey. (*Id.* at 12–13.) ACE also argues the interests of judicial administration favor the application of New Jersey law because "the law of the forum state . . . is the more efficient law and is better suited for the instant dispute than Texas law." (*Id.* at 13.) As to Formosa's argument that the location of the Point Comfort Plant holds significant weight, ACE counters by arguing the following: (1) the relevant issue "is not whether the environmental contamination falls within the Policy's coverage, but rather Formosa's separate breach of the consent-to-settle clause while defending the *Waterkeeper* Litigation"; (2) "New Jersey law should apply because the conduct causing the breach was engaged by Formosa's insurance department in Livingston, New Jersey"; (3) "[t]he cases cited by Formosa do not warrant the application of Texas law, as those cases involved materially different coverage issues directly implicated by the subject environmental pollution." (*Id.* at 14.)

In reply, Formosa counters the conduct causing the breach occurred in Texas. (ECF No. 89 at 4.) Formosa submits its "Risk Manager testified that he 'left it to J. Steven Ravel of [Kelly Hart] to provide ACE with "whatever updates [that were] being requested" from Formosa.'" (*Id*. (citing ECF No. 85-2 ¶ 71).) Further, Formosa asserts "Texas was the location of: (i) the site; (ii) Mr. Ravel (and H&K); (iii) relevant facts and materials regarding the case; (iv) the litigation proceedings and trial[;] and (v) settlement negotiations." (*Id.*) Additionally, Formosa submits that

it "notified ACE of the *Waterkeeper* Litigation from Texas and ACE sent its coverage position letter to Formosa in Texas." (*Id.*) Formosa argues ACE cannot cite to sufficient case law which overlooked the location of the polluted site. (*Id.*) Formosa reiterates that New Jersey courts have consistently held the location of a contaminated site has a greater interest in having its laws applied to the dispute. (*Id.* at 6.)

i.    The Competing Interests of New Jersey and Texas[14]

The first factor, competing interests of the states, "require[s] courts to consider whether application of a competing state's law under the circumstances of the case 'will advance the policies that the law was intended to promote.'" *Pfizer*, 712 A.2d at 639 (quoting *Gen. Ceramics*, 66 F.3d at 656). Further, "[t]he focus of this inquiry should be on 'what [policies] the legislature or court intended to protect by having that law apply to wholly domestic concerns, and then, whether those concerns will be furthered by applying that law to the multi-state situation." *Id.* at 639–40 (alteration in original) (quoting *Gen. Ceramics*, 66 F.3d at 656).

Here, ACE is correct in noting that New Jersey law recognizes "differences between occurrence-based and claims-made policies." (ECF No. 87 at 11.) Indeed, policyholders of an occurrence-based policy are generally "unsophisticated consumer[s] unaware of all of the policy's requirements," whereas claims-made policies are issued to "knowledgeable" institutional insureds that use "sophisticated brokers" to purchase their policies, making those insureds "better able to deal with the insurers on an equal footing." *Templo Fuente*, 129 A.3d at 1080–81 (citations

---

[14] Under the second factor, the interests of commerce among the states, a court "consider[s] whether application of a competing state's law would frustrate the policies of other states" and must determine whether the "law of one state [can] be disregarded without offense to its purposes[.]" *Pfizer*, 712 A.2d at 640. For the most part, the parties simultaneously addressed the first two factors. Therefore, the Court will do the same.

omitted). Further the New Jersey Supreme Court has held that "the rules tending to favor an insured that has entered into a contract of adhesion are inapplicable where, as here, both parties are sophisticated commercial entities with equal bargaining power." *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 948 A.2d 1285, 1294 (N.J. 2008) (citing *Pacifico v. Pacifico*, 920 A.2d 73, 78–79 (N.J. 2007)). However, the Court is not persuaded by ACE's reliance on these distinctions and its assertion that the location of the polluted site is outweighed by the "compelling interest in holding 'sophisticated' insureds to the unambiguous policy terms they agreed to . . . and protecting 'the insurer's paramount right to control the case.'" (ECF No. 87 at 11 (citing quoting *Fuente*, 129 A.3d at 1081; *Griggs v. Bertram*, 443 A.2d 163, 169 (N.J. 1982)).)

Instead, the Court finds the first factor weighs in favor of the application of Texas law in accordance with the abundance of New Jersey case law which provides that the interests of the situs state control. *See Pfizer*, 712 A.2d at 641 (holding, in the analysis of which state's law applies to a pollution-exclusion clause, that "the states in which the waste has come to rest would have their laws rather than New Jersey's more fully advanced if applied to the matter in issue"); *see also Viacom*, 2006 WL 1060504, at *15 ("New Jersey's interests as the forum state are outweighed by the situs states' interests . . . . The [insurers'] arguments that New Jersey's equitable policies outweigh those of [the situs states] are not persuasive." (citation omitted)); *Lonza, Inc. v. Everest Reinsurance Co.*, No. A-0170-03T1, 2005 WL 4005969, at *2 (N.J. Super. Ct. App. Div. May 16, 2006) ("States in which polluted sites exist . . . have an interest in having their laws 'more fully advanced' than any other state's law . . . because those states' environments have been damaged, their regulatory schemes implicated, and the health and welfare of their citizens placed at risk." (citations omitted)); *Borden-Perlman Ins. Agency, Inc. v. Utica Mut. Ins. Co.*, 2016 WL 1368589, at *6–7 (N.J. Super. Ct. App. Div. Apr. 7, 2016), *cert. denied*, 227 N.J. 26 (affirming trial court's

decision to apply situs state's law instead of New Jersey law where there was a multi-state policy that did not contain a choice of law provision and the underlying liability arose outside of New Jersey); *Leksi, Inc. v. Fed. Ins. Co.*, 736 F. Supp. 1331, 1334 (D.N.J. 1990) ("Common sense indicates that a state will be less willing to allow toxic wastes to be placed on its land unless it can be assured that its law will be applied in determining the respective liabilities of the parties for cleanup costs. The insurance coverage issues necessarily correspond to the liability issues.").

Given Texas's interest as the location of the polluted site, the Court finds that the remaining § 6 factors do not significantly impact the Court's analysis. *See NL Indus.*, 65 F.3d at 321 ("[I]n environmental cases, the location of the site carries very substantial weight in the 'significant relationship' analysis, typically adequate to overcome the contacts of the place of contracting." (citation omitted)). Therefore, the Court finds the interests of Texas as the situs state of the underlying pollution substantially weigh in favor of the application of Texas law. *See also Permacel v. Am. Ins. Co.*, 691 A.2d 383, 388 (N.J. Super. Ct. App. Div. 1997) ("[T]he location of the waste carries a very substantial weight in the significant relationship analysis under Restatement § 6." (internal quotation marks and citations omitted)).[15] Notwithstanding, the Court will continue its analysis to demonstrate how the factors do not substantially weigh in favor of the

---

[15] As detailed above, ACE presents the nuanced argument that the relevant issue "is not whether the environmental contamination falls within the Policy's coverage, but rather Formosa's separate breach of the consent-to-settle clause while defending the *Waterkeeper* Litigation," and therefore, "New Jersey law should apply because the conduct causing the breach was engaged by Formosa's insurance department in Livingston, New Jersey." (ECF No. 87 at 14.) However, the Court is not persuaded by this framing and finds Formosa's response instructive on this issue. (*See* ECF No. 89 at 4–5 ("ACE cites no authority where a court looked to where the conduct causing the breach occurred and found that location trumped the environmental site's location, whether the issue was a policy exclusion, condition, or otherwise. New Jersey courts prioritize the law of the state most affected by available insurance coverage for pollution, not where an insurance policy condition was allegedly breached. In fact, as ACE notes (in a footnote), the *Pfizer* Court itself held that the law of the site governed the insurer's late-notice defense.").)

application of New Jersey law such that Texas law should not be applied.

Regarding the second factor, the Court finds this factor weighs in favor of the application of Texas law. As the *Viacom* court noted, it is possible the "application of New Jersey law might offend the policies of the situs states." 2006 WL 1060504, at *15; *see Lonza*, 2005 WL 4005969, at *12 ("[A]pplication of New Jersey's law frustrates [the situs state]'s policies concerning the provision of sufficient funds to remediate environmentally-polluted sites within its borers."); *see also Pfizer*, 712 A.2d at 644 (holding "the substantial weight given to the law of the waste site is not overcome," and finding "[t]o apply New Jersey law would unduly conflict with the interests of commerce among the states").

ii.     The Interests of the Parties and the Interests Underlying Contract Law

In analyzing the interests of the parties under contract law, "courts . . . focus on [the parties'] justified expectations and their needs for predictability of result. These are basic purposes of contract law, especially insurance law." *Pfizer*, 712 A.2d at 640 (citations omitted). "Restatement section 188 'contacts' with the states the domicile or residence of the parties, and places of incorporation, business, contracting, and performance, come into play here in assessing what parties might reasonably have expected to be predictable." *Id.*

Here, it is undisputed New Jersey is the place of contracting, negotiation, and performance of the Policy. The Policy was issued and brokered in New Jersey. Further, Formosa is headquartered in New Jersey and its insurance and risk management departments are located there as well. However, in a scenario, like here, where there is a lack of a choice-of-law provision, the parties' reasonable expectations are inherently impacted. *See id.* at 642 ("[I]n the absence of a choice-of-law provision, a policyholder would expect that it would be indemnified under the law in effect at the place where liability is imposed."); *see also Viacom*, 2006 WL 1060504, at *16

("The insurance contracts here did not contain choice of law provisions. Without such provisions, the parties cannot argue that they expected New York or New Jersey law to apply to insurance coverage for sites located elsewhere. No party can contend that it was relying on predictions of how New Jersey law would affect its liabilities."). Therefore, the Court finds that the third and fourth factors do not significantly weigh in favor of the application of New Jersey or Texas law.

### iii.    The Interests of Judicial Administration

The final factor "consider[s] whether the fair, just and timely disposition of controversies within the available resources of courts will be fostered by the competing law chosen." *Pfizer*, 712 A.2d at 640. As the Supreme Court of New Jersey noted, "Environmental insurance coverage cases tend to be extraordinarily complex, with multiple parties and multiple issues. Efficient administration of such cases is an important factor to consider." *Id.* The Court finds this factor does not significantly impact the principle described above that the situs state's law should be applied. *See Unisys Corp. v. Ins. Co. of N. Am.*, 712 A.2d 649, 652 (N.J. 1998) (discussing the interests of judicial administration and finding "the law of the waste sites should govern if it differs from New Jersey's").[16]

### iv.    Texas Has the Most Significant Relationship

As discussed above, the Court has found that the first and second factors weigh in favor of the application of Texas law. To the extent the remaining factors, especially the third and fourth factors may weigh in favor of the application of New Jersey law, the Court finds that they do not

---

[16] The Court is not persuaded by ACE's reliance upon *Honeywell*. (ECF No. 87 at 13.) In *Honeywell*, the Supreme Court of New Jersey found that New Jersey's "special judicial framework" was best suited to adjudicate over an asbestos insurance coverage matter that required an allocation of liability among insurers for nationwide products-liability claims. 188 A.3d at 320 The *Honeywell* court's finding that New Jersey law should apply is not particularly relevant here as the Court is faced with different facts and legal principles.

significantly impact its analysis because the location of the polluted site was in Texas. *See NL Indus.*, 65 F.3d at 321; *see also Permacel*, 691 A.2d at 388. Accordingly, the Court finds that the application of Texas law to the issues of the alleged breach of the Consent-to-Settle and the Policy's other relevant conditions is warranted because Texas has the most significant relationship.

**B.    Issues of Material Facts Exist as to Whether ACE Was Prejudiced By Formosa's Alleged Breach of the Consent-to-Settle Clause**

Having found Texas law applies to the issue of whether Formosa's alleged breach of the Consent-to-Settle Clause vitiates ACE's coverage, the Court proceeds to an analysis of whether ACE was prejudiced by Formosa's alleged breach.

In support of its Motion, ACE argues there is no coverage for the *Waterkeeper* Litigation due to Formosa's breach of the Consent-to-Settle Clause. (ECF No. 85-1 at 34.) ACE asserts: "Formosa is not, as a matter of law, entitled to coverage because it excluded ACE from participating in the defense and settlement of the *Waterkeeper* Litigation, and prejudice to ACE is presumed as a matter of law." (*Id.*) ACE contends Formosa's breach of the Consent-to-Settle Clause is distinguishable from cases where the insured timely notified and afforded the insurer the opportunity to participate in the settlement of the underlying claim. (*Id.* at 38.) ACE further asserts it is undisputed that Formosa settled the *Waterkeeper* Litigation without ACE's knowledge or written consent which constitutes prejudice as a matter of law. (*Id.* at 39–42.) Alternatively, ACE submits that Formosa's breach of the Consent-to-Settle Clause and the execution of the Consent Decree prejudiced ACE as a matter of fact. (*Id.* at 42.)

In opposition to ACE's Motion, Formosa argues ACE cannot avoid coverage of the *Waterkeeper* Litigation on the basis of the alleged breach of the Consent-to-Settle Clause. (ECF No. 88-8 at 20–31.) Formosa asserts ACE's framing of this issue—as Formosa excluded ACE from participating in the defense and settlement of the *Waterkeeper* Litigation—is erroneous. (*Id.*

at 21.) Instead, Formosa contends the evidence establishes ACE:

> chose not to be involved, (ii) declined to be an active participant in Formosa's defense, (iii) failed to ask questions or seek information on any regular basis, (iv) did not regularly communicate with defense counsel, (v) specifically stated that it would not take control of Formosa's defense as it had no duties under the Policy, and (vi) never substantively responded to defense counsel's updates or settlement offers or otherwise objected to settlement.

(*Id.* (citing ECF No. 86-1 ¶¶ 17–19, 35–38; ECF No. 88-1 ¶¶ 42–46); *see also id.* at 21–23.)

Formosa further submits:

> There can be no prejudice where a carrier makes no effort to be involved in the defense of a case, makes no complaint that it needs more information or wants to be more involved, determines that it need not regularly communicate with the defense counsel it approved despite having full access to that defense counsel, and otherwise shows no interest in the course of or outcome of the case.

(*Id.* at 23.)

Regardless, Formosa argues ACE is wrong on the law because Texas law requires a showing of prejudice in all cases that allege a breach of a Consent-to-Settle Clause. (*Id.* at 21; *see also id.* at 24–29.) Formosa submits ACE's assertion—that Formosa excluded ACE from all settlement discussions and mediation—is erroneous. (*Id.* at 27.) Formosa notes ACE was placed on notice of the *Waterkeeper* Litigation more than two years before the case settled in principle. (*Id.* at 28.) Formosa asserts it is entitled to summary judgment in its favor because ACE has not identified evidence that it was prejudiced as a result of Formosa's settlement of the *Waterkeeper* Litigation. (*Id.* at 29.) Formosa alternatively argues there are disputed facts as to the issue of prejudice which preclude a finding of summary judgment in favor of ACE when viewed in the light most favorable to Formosa as the non-movant. (*Id.* at 30–31.)

In reply, ACE counters that Formosa's framing of this matter is erroneous because: (1) "Formosa did not notify ACE of the mediation until *after* it had occurred"; and (2) "[w]hile

Formosa's contention that certain settlement discussions were allegedly reported to ACE is unclear, it is undisputed that Formosa contends post-trial settlement discussions were disclosed to ACE, Formosa did not notify ACE of a July 3, 2019 settlement offer until October 9, 2019—*more than three months later*"; "the notion that ACE would not have done anything differently had it been properly informed of the mediation, trial or settlement of the *Waterkeeper* Litigation lacks any support. Indeed, ACE could have done several things that could have potentially altered the outcome." (ECF No. 90 at 7.) ACE further submits it did not abandon any of its rights under the Policy. (*Id.* at 8–9.)

In support of its Motion, Formosa argues that ACE cannot establish it was prejudiced by ACE's alleged failure to cooperate or seek ACE's consent prior to the settlement of the *Waterkeeper* Litigation. (ECF No. 86-4 at 21–27.) Formosa asserts it is entitled to summary judgment on ACE's Second, Fourth, and Fifth Counterclaim as well as its Eleventh, Thirteenth, and Fourteenth Affirmative Defenses[17] because: (1) ACE did not intend to provide coverage for Formosa's settlement of the *Waterkeeper* Litigation as evidenced by Mr. Klink's testimony; and (2) the testamentary evidence from Mr. Stella, Mr. Ravel, and Mr. Klink establishes that ACE would not have acted differently in the defense and settlement of the *Waterkeeper* Litigation. (*Id.* at 21, 23–27.) Formosa argues the testamentary evidence establishes that ACE was not prejudiced by any alleged lack of cooperation or consent. (*Id.* at 22–23.)

In opposition, ACE argues Formosa's breach of the Consent-to-Settle Clause prejudiced ACE under Texas law. (ECF No. 87 at 15–31.) ACE asserts it does not need to demonstrate prejudice because breach of a consent-to-settle clause constitutes prejudice as a matter of law. (*Id.*

---

[17] ACE's Eleventh, Thirteenth, and Fourteenth Affirmative Defenses asserts Formosa's claims are barred because Formosa breached the provisions of the Policy that are the basis of ACE's Second, Fourth, and Fifth Counterclaims. (*See* ECF No. 24.)

at 17–22.) ACE alternatively contends the undisputed facts demonstrate Formosa's breach of the Consent-to-Settle Clause and execution of the Consent Decree prejudiced ACE as a matter of fact. (*Id.* at 22–31.) In support of this assertion, ACE submits Formosa prejudiced ACE by: (1) failing to inform ACE of major developments from the *Waterkeeper* Litigation; (2) executing the Consent Decree to avoid uncovered fines, penalties, and injunctive relief under the CWA; and (3) excluding ACE from important discussions during the *Waterkeeper* Litigation. (*Id.*)

In reply, Formosa reiterates ACE fails to raise an issue of fact demonstrating that ACE was prejudiced. (ECF No. 89 at 7–9.) Formosa submits: "[t]he only 'prejudice' ACE claims is that Formosa attempted through the Consent Decree to convert an uncovered judgment into a settlement that included potentially covered remediation costs. But this is not prejudice, and ACE presents absolutely no evidence that Formosa engaged in any such fraudulent 'conversion.'" (*Id.* at 8.)

"[A]n insurer may escape liability on the basis of a settlement-without-consent exclusion only when the insurer is actually prejudiced by the insured's settlement with the tortfeasor." *Hernandez*, 875 S.W.2d at 692; *see also Progressive Cnty.*, 202 S.W.3d at 816 ("[E]ven though there was no evidence that the condition precedent of cooperation was satisfied, [the insurer] will not escape liability unless it was prejudiced by the lack of cooperation." (citations omitted)). The Supreme Court of Texas has held "[u]nder *Hernandez*, an insurer establishes prejudice from a settlement to which it did not agree by showing that the insured's unilateral settlement was a material breach of the policy—that is, that it significantly impaired the insurer's position." *Lennar*, 413 S.W.3d at 756; *see also Sentry Select Ins. Co. v. Lopez*, Civ. A. No. 14-284, 2016 WL 4257751, at *7 (W.D. Tex. Mar. 18, 2016) (holding an insurer is not prejudiced when it is in the same position it would have been in if the insured complied with the insurance policy's provisions).

Indeed, "an immaterial breach does not deprive the insurer of the benefit of the bargain and thus cannot relieve the insurer of the contractual coverage obligation." *PAJ*, 243 S.W.3d at 631 (citing *Hernandez*, 875 S.W.2d at 692).

Notably, insurers must demonstrate prejudice that was actually sustained and cannot rely upon theoretical or speculative prejudice. *See Coastal Refin. & Mktg., Inc.*, 218 S.W.3d at 288 ("[T]he insured's breach of a notice provision is material when the insurer has sustained 'actual' prejudice. The requirement of 'actual prejudice' means that the insurer may not disclaim coverage on the basis of prejudice that is only theoretical or presumed merely from the length of delay."); *Sentry Select*, 2016 WL 4257751, at *7 ("Moreover, the insurer must demonstrate actual prejudice, and may not rely merely upon 'hypothetical scenarios or prejudice in the abstract.'" (quoting *E. Tex. Med. Ctr.*, 2011 WL 773452, at *4)). "[W]hile the existence of prejudice is 'generally a question of fact,' the court may decide the issue on summary judgment 'if the undisputed facts establish prejudice sufficient to relieve an insurer of its obligations.'" *Charter Sch. Sols. v. GuideOne Mut. Ins. Co.*, 407 F. Supp. 3d 641, 651 (W.D. Tex. 2019) (quoting *Galvan v. Great Lakes Reinsurance PLC*, Civ. A. No. 14-645, 2015 WL 12552009, at *3 (S.D. Tex. Apr. 15, 2015)). When the insurer is the movant for summary judgment and seeks to establish the existence of prejudice, the insurer bears "the burden to establish that it had sustained prejudice—monetary or otherwise—from the settlement." *Coastal Refin. & Mktg., Inc.*, 218 S.W.3d at 296.

ACE argues Formosa's actions in allegedly breaching the Consent-to-Settle Clause by settling the *Waterkeeper* Litigation without ACE's knowledge or written consent constitutes prejudice as a matter of law. (ECF No. 85-1 at 39–42; ECF No 87 at 17–22.) ACE asserts Formosa excluded it from participating in the defense and settlement of the *Waterkeeper* Litigation. Here, Formosa unilaterally discussed settlement with the *Waterkeeper* Plaintiffs at multiple junctures

including: initial settlement discussions in April 2017 after the *Waterkeeper* Plaintiffs issued their April 6, 2017 60-day notice of intent to sue (Haas Decl. Ex. 3); and continued settlement discussions from May to June 2017 (*id.* Exs. 4–6), late 2018 into the first quarter of 2019, including mediation (*id.* Exs. 14, 16–19), and the summer of 2019, months after the bench trial in the *Waterkeeper* Litigation had concluded (*id.* Exs. 27–32). Further, despite the Reservation of Rights and ACE's consent to Formosa's retention of Kelly Hart, Formosa undertook the following consequential actions without ACE's knowledge or consent: Formosa engaged in mediation of the *Waterkeeper* Litigation which ACE was not notified of until after the mediation concluded (Haas Decl Exs. 12–14); Formosa hired H&K to pursue the "settlement track" of the *Waterkeeper* Litigation, and ACE did not have an opportunity to object or consent to H&K's retention until six days before the *Waterkeeper* Litigation settled (*see id.*; Pastuck Dep. 215:3–14; Haas Decl. Ex. 24); Formosa made a $10 million settlement offer to the *Waterkeeper* Plaintiffs on July 3, 2019 and a subsequent settlement offer of $35 million, both of which ACE was not notified of until October 9, 2019 (Haas Opp. Decl. Ex. F); Formosa settled the *Waterkeeper* Litigation by executing the Consent Decree (Haas Decl. Exs. 34–36).

Formosa acknowledges the following: ACE did not receive updates from Formosa or Kelly Hart between October 25, 2018 and May 23, 2019 (Haas Decl. Exs. 21–23; ECF No. 86-4 at 6); and it should have kept ACE informed of the developments in the *Waterkeeper* Litigation (Torres Dep. Tr. 98:18–24, 111:3–22; Ho Dep. Tr. 87:22–88:7). Indeed, in an e-mail dated October 3, 2018, one week after the mediation, Mr. Torres stated "I don't believe the Pollution Carrier [ACE] participated in the discussions but since the mediation did not result in any settlement, we need to keep them in the loop as you begin to prepare further on this case." (Haas Decl. Ex. 14.)

ACE primarily relies on four cases to support its assertion that Formosa's actions constitute

prejudice as a matter of law—*Motiva*; *Md. Cas. Co. v. Am. Home Assurance Co*., 277 S.W.3d 107 (Tex. App. 2009); *Allen Butler Constr., Inc. v. Am. Econ. Ins. Co*., Civ. A. No. 10–0490, 2011 WL 6183575 (Tex. App. Dec. 13, 2011); and *Bobwhite Rentals, LLC v. Nat'l Liab. & Fire Ins. Co*., Civ. A. No. 18-1330, 2019 WL 1557178 (S.D. Tex. Feb. 12, 2019). The Court is not persuaded by ACE's reliance on these cases. *Motiva* involved a scenario where the insurer actively sought to defend the insured and participate in settlement negotiations but was excluded from the mediation and denied access to all documents related to the subject claim. 445 F.3d at 383–84. In *Md. Cas. Co.*, the insured failed to forward the suit papers to the insurer, and the insured did not notify the insurer that it expected a defense and coverage for the claims. 277 S.W.3d at 116. The Texas Court of Appeals noted the insured did not notify the insurer of the claim until after the case had settled, which "was so late that it wholly deprived [the insurer] of its ability to defend the lawsuit." *Id.* at 117. Similarly, in *Allen Butler Constr.*, the dispute was settled before it was reported to the insurer. 2011 WL 6183575, at *4. The court in *Allen Butler Constr.* noted the insured did not consult the insurer and the insurer "was not given any opportunity to participate in, or consent to, any ultimate settlement decision." *Id.* In *Bobwhite Rentals, LLC*, the Southern District of Texas found prejudice as a matter of law where an insured settled a claim more than a year before even reporting it to the insurer. 2019 WL 1557178, at *4.

Here, unlike some of the cases described above, it is undisputed that Formosa put ACE on notice immediately after the *Waterkeeper* Litigation was filed, and the settlement was not accomplished until more than two years later. Further, the following testamentary evidence demonstrates, to some extent, that ACE did not have an interest in taking an active role in the *Waterkeeper* Litigation: after learning of the mediation, Mr. Klink did not inform Formosa or its counsel that they should not have participated in the mediation without his involvement (Klink

Dep. Tr. 59:10–15); after receiving the *Waterkeeper* Plaintiff's settlement demand, Mr. Klink did not recall discussing it with Formosa or anyone at ACE (*id.* 46:10–17); Mr. Ravel tried to get ACE involved in the defense when the trial was a few months away (Ravel Dep. Tr. 42:4–43:21); Mr. Ravel attempted to discuss strategy with Mr. Klink but he declined to do so (*id.* 44:8–45:19); Mr. Ravel reached out to Mr. Klink a number of times but did not get a response (*id.* 51:16–25). Although not directly on point, the Court finds that these facts are somewhat analogous to *Coastal Refin. & Mktg., Inc.*, where the Texas Court of Appeals found no prejudice for a breach of a consent-to-settle provision in the context of an insurer who was aware of a lawsuit and settlement negotiations between the insured and a third-party but did not participate. 218 S.W.3d at 295. Based on the foregoing, the Court finds there is an issue of material fact as to whether Formosa's actions in settling the *Waterkeeper* Litigation without ACE's knowledge or written consent constitutes prejudice as a matter of law. *See Great Am. Ins.*, 2020 WL 7393321 ("In short, the fact of a breach by the insured does not establish prejudice to the insurer as a matter of law." (footnote omitted).) Accordingly, the Court will proceed to an analysis of whether Formosa's actions constitute prejudice as a matter of fact such that an entry of judgment in favor of ACE is warranted.

As to the issue of whether Formosa's actions prejudiced ACE as a matter of fact, the Court similarly finds there are genuine issues of material fact. Formosa claims ACE would not have acted differently in the defense and settlement of the *Waterkeeper* Litigation had Formosa timely informed ACE of all material developments. Here, there is also testamentary evidence in the record which establishes a dispute of material fact as to whether ACE's position was significantly impaired.

Relevant to this inquiry, Mr. Klink testified the following: the settlement amount "was, as far as coverage goes, irrelevant" but what was relevant was "what the settlement was actually for,

what they had agreed to do with that money or what that money was for" (Klink Dep. Tr. 69:14–70:3); he likely determined there would be no indemnity as early as October 24, 2018 when ACE received Formosa's mediation statement (*id.* 46:18–47:10); if ACE was made aware of the July 3, 2019 settlement offer, Mr. Klink would have attended the mediation and ACE "could have sweetened the pot with costs of defense money" and told Formosa "at that time what could potentially be covered and what was not, which could have potentially swayed [Formosa] one way or the other" (*id.* 89:20–90:9); "[ACE] would have attended the liability trial. We attend all our trials" (*id.* 90:19–20); ACE's assistance to the insured during a liability trial is determined "on a case-by-case basis," but they could have offered Formosa its resources including a panel of "seasoned litigators" as well as experts (*id.* 90:21–91:12); although ACE would not have experienced a different outcome because it determined that it would not provide coverage as Formosa knowingly violated its permit, ACE would have participated in this matter and could have potentially impacted the outcome for Formosa (*id.* 114:15–115:25). Mr. Stella testified that ACE would have reviewed and considered a settlement offer. (Stella Dep. Tr. 38:1–39:16, 51:8–21.)

Mr. Pastuck testified the following: Formosa was shocked and surprised by Judge Hoyt's adverse ruling which put Formosa in a "fairly awkward position" (Pastuck Dep. Tr. 199:2–12, 207:15–17); Formosa's "backs [were] to the wall" and Formosa's management "had given [] a pretty clear mandate" to settle (*id.* 207:15–208:1; *see also id.* 199:14–16); Formosa believed the *Waterkeeper* Plaintiffs had Formosa "over a barrel," with respect to any settlement (*id.* 222:24–223:9); Formosa believed it "would have to be malleable to some extent on the numbers if this was ever going to get over the finish line from a practical standpoint" (*id.* 207:22–24).

Based upon the Court's review of the relevant testimony and the facts detailed at length above, the Court finds there is a dispute of material fact as to whether ACE's position was

significantly impaired by Formosa's breach of the Consent-to-Settle Clause. Although it appears ACE was deprived of a meaningful opportunity to contribute to the mediation, and potentially assist in obtaining a more favorable settlement, ACE primarily relies upon "hypothetical scenarios or prejudice in the abstract [which are] insufficient" to establish actual prejudice. *E. Tex. Med. Ctr.*, 2011 WL 773452, at \*4. Further, ACE's arguments that it was prejudiced by Formosa's unilateral settlement are contradicted by Mr. Klink's testimony that ACE would not have experienced a different outcome because it determined it would not provide coverage as Formosa knowingly violated its permit. Therefore, ACE has failed to establish "[t]he loss of a right with [] demonstrated value." *Id.*

Accordingly, the Court finds that summary judgment in favor of ACE—on the basis that Formosa's actions in allegedly breaching the Consent-to-Settle Clause prejudiced ACE as a matter of fact—is not warranted.[18]

### C.    Formosa's Alleged Breach of the Policy's Other Relevant Conditions

ACE argues there is no coverage for the *Waterkeeper* Litigation because Formosa breached the Policy's defense, settlement, reporting, and cooperation conditions contained in Sections III.A., III.B., and VII.B. (ECF No. 85-1 at 43–44.) ACE asserts Formosa is not entitled to coverage because Formosa's breach of these conditions vitiates coverage as a matter of law under both New Jersey and Texas law. (*Id.* at 43.) As to New Jersey law, ACE argues Formosa's breach of these conditions *per se* voids coverage because the Policy is a claims-made policy.[19] (*Id.* at 43–44.)

---

[18] For similar reasoning, summary judgment is not warranted in favor of Formosa on ACE's Fifth Counterclaim and Fourteenth Affirmative Defense. In the following section, the Court will further address Formosa's Motion seeking summary judgment on ACE's Second and Fourth Counterclaims and Eleventh and Thirteenth Affirmative Defense.

[19] The Court will not address ACE's arguments to the extent they are related to New Jersey law as the Court has already held Texas law applies to its analysis of the Policy's conditions; therefore,

Regardless of which state's law is applied, ACE argues Formosa's conduct in breach of the conditions prejudiced ACE as a matter of fact. (*Id.* at 44.)

In opposition, Formosa counters this portion of ACE's Motion should be denied because ACE is not entitled to summary judgment for Formosa's alleged breach of the Policy's other relevant conditions. (ECF No. 88-8 at 31–39.) First, Formosa argues ACE cannot establish it was prejudiced by Formosa's alleged breaches. (*Id.* at 32–33.) Next, Formosa contends ACE has not satisfied its burden of establishing breach of these conditions, and ACE's decision not to be involved in the *Waterkeeper* Litigation constitutes waiver. (*Id.* at 34–36.) Formosa asserts: (1) ACE disclaimed the duty to defend pursuant to the Reservation of Rights; (2) "ACE determined it had no duties under the Policy, subsequently expressed no interest in the case and also determined it would deny coverage (and actually did deny coverage), ACE can hardly argue that it had a right to control the defense"; (3) ACE inconsistently acted with its purposed right to control the defense because it informed Formosa it did not have a duty under the Policy; (4) ACE did not request to control the defense and did not complain about the manner in which Formosa was conducting the defense; (5) ACE consented to Formosa's selection of Kelly Hart as defense counsel at approved rates; (6) ACE has not established what records it did not receive; (7) "ACE cannot establish that Formosa failed to authorize ACE to obtain records or otherwise failed to provide it with information it required"; and (8) "Formosa did indeed cooperate with ACE in the investigation, settlement, and defense of the *Waterkeeper* Litigation, in the rare instance that ACE expressed some interest." (*Id.*) Finally, Formosa argues ACE breached its duty to act diligently and in good faith, and therefore summary judgment in favor of ACE—on the basis of an alleged breach of the

---

ACE must establish that it was prejudiced by Formosa's alleged breach of the Policy's other relevant conditions. *See supra* Section III.A.2.

other relevant conditions—is not warranted. (*Id.* at 36–39.)[20]

"Texas law provides that insurance policies are construed according to common principles governing the construction of contracts." *Am. Home Assurance Co. v. Cat Tech LLC*, 660 F.3d 216, 220 (5th Cir. 2011) (quoting *Am. Int'l Specialty Lines Ins. Co. v. Rentech Steel L.L.C.*, 620 F.3d 558, 562 (5th Cir. 2010)). "Insurance policy interpretation principles emphasize a policy's plain language in determining its intended coverage." *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 131 (Tex. 2010) (citations omitted). Further, "where the language is plain and unambiguous, courts must enforce the contract as made by the parties, and cannot make a new contract for them, nor change that which they have made under the guise of construction." *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 753 (Tex. 2006) (citing *E. Tex. Fire Ins. Co. v. Kempner*, 27 S.W. 122, 122 (Tex. 1894)).

Under Texas law, "[t]he insured has the initial burden to establish coverage under the policy." *Ewing Constr. Co. v. Amerisure Ins. Co.*, 420 S.W.3d 30, 33 (Tex. 2014). When a cooperation clause is a condition precedent to coverage under an insurance policy, the insured also has the burden of establishing satisfaction of that condition. *Progressive Cnty. Mut. Ins. Co. v. Trevino*, 202 S.W.3d 811, 816 (Tex. App. 2006) (citations omitted); *see also Martinez v. ACCC Ins. Co.*, 343 S.W.3d 924, 929 (Tex. App. 2011) ("An insurer's obligation depends upon proof that all conditions precedent have been performed." (citations omitted)). However, "[a]n insured's failure to cooperate will not operate to discharge the insurer's obligations under the policy unless the insurer is actually prejudiced or deprived of a valid defense by the actions of the insured." *Id.* at 930 (citations omitted).

---

[20] ACE does not raise substantial, responsive arguments in its reply brief. (*See* ECF No. 90.)

Here, Section III.A. grants ACE the "right and duty to defend [Formosa] against a claim to which [the Policy] applies." (ECF No. 85-2 ¶ 14 (internal quotation marks omitted); ECF No. 88 ¶ 14.) Section III.B. provides that ACE "shall have the right to select legal counsel to represent the insured for the investigation, adjustment, and defense of any claims covered under this Policy. . . . Legal defense expenses incurred prior to the selection of legal counsel by [ACE] shall not be covered under [the] Policy." (ECF No. 85-2 ¶ 15 (internal quotation marks omitted); ECF No. 88 ¶ 15.) Section VII.B. of the Policy provides, in relevant part, that Formosa must: "[i]mmediately send [ACE] copies of any demands, notices, summonses or legal papers received in connection with any claim"; "[c]ooperate with [ACE] in the investigation, settlement, or defense of the claim"; and "[p]rovide [ACE] with such information and cooperation as it may reasonably require." (ECF No. 85-2 ¶ 16 (internal quotation marks omitted); ECF No. 88 ¶ 16.)

ACE's arguments in support of this portion of its Motion are apparently predicated upon the arguments raised in relation to the alleged breach of the Consent-to-Settle Clause, *i.e.*, Formosa's unilateral engagement in settlement discussions and alleged failure to apprise ACE of significant events in the *Waterkeeper* Litigation prejudiced ACE as a matter of law and a matter of fact.[21] As held above, the Court finds there is a dispute of material fact as to whether Formosa's actions prejudiced ACE by significantly impairing its position. Accordingly, ACE's Motion seeking summary judgment on the basis of Formosa's alleged breach of the Policy's other relevant

---

[21] ACE does not specify as to Formosa's actions which breached the Policy's other conditions. (*See* ECF No. 85-1 at 43–44; *see also* ECF No. 88-8 at 32 ("[ACE] does not even attempt to identify facts that would allow the Court to find that ACE was prejudiced.").) The Court will succinctly address this portion of ACE's Motion because it is not the Court's responsibility to sift through the record to find evidence and make arguments supporting ACE's position. *See DeShields v. Int'l Resort Props. Ltd.*, 463 F. App'x 117, 120 (3d Cir. 2012) (noting that "judges are not like pigs, hunting for truffles buried in briefs" (internal citation and quotation marks omitted)).

conditions fails on these grounds as well.[22] The Court will not address Formosa's remaining arguments, as to why this portion of ACE's Motion should be denied, because they are moot.

### D.    Summary Judgment is Not Warranted with Respect to the Consent Decree[23]

Formosa argues that amounts paid to settle the *Waterkeeper* Litigation, including attorneys' fees, are insurable losses under the Policy. (ECF No. 86-4 at 28–33.) Formosa asserts the settlement amounts were covered under the Policy because: (1) the Policy provided coverage for claims of liability for property damage and remediation costs arising out of a pollution condition; (2) the alleged discharge of plastics is a pollution condition and the Point Comfort Plant is a covered location; (3) the Policy does not restrict the types of settlements that may be reached in response to a covered claim; and (4) "[t]he mere fact that Formosa made its settlement payment in the form of a contribution to a Trust—pursuant to a settlement demand from the plaintiffs—does not negate that the payment resulted in the resolution of the covered claim by settlement." (*Id.* at 29–33.)

In opposition, ACE argues the amounts that Formosa paid to settle the *Waterkeeper* Litigation pursuant to the Consent Decree are not covered under the Policy because these payments did not include "remediation costs" required by "environmental law." (ECF No. 87 at 31–41.)

---

[22] The Court is not persuaded by ACE's reliance on *Foreman v. Acceptance Indem. Co.*, 730 F. App'x 191, 197 (5th Cir. 2018) and *Martinez*, 343 S.W.3d at 929. Both of these decisions involved vastly different factual scenarios.

[23] To the extent that Formosa relies upon this portion of its motion as a basis for the Court's granting of summary judgment in its favor on its breach of contract claim and the entry of an order which directs ACE to provide coverage and payment for the Consent Decree, the Court finds that an entry of a corresponding order is precluded by the Court's prior finding that issues of material fact exist as to whether ACE was prejudiced by Formosa's breach of the Consent-to-Settle Clause or the Policy's defense, settlement, reporting, and cooperation conditions. *See supra* Sections III.B, C. Notwithstanding, the Court will proceed with an analysis of whether the Consent Decree is an insurable loss under the Policy.

ACE asserts none of the Mitigation Projects were required under the CWA. (*Id.* at 32–34.) ACE submits the Mitigation Projects are supplemental environmental projects that do not constitute remediation costs and are not covered under the Policy. (*Id.* at 34–35.) ACE alternatively contends the Mitigation Projects are not remediation costs because they bear an insufficient nexus to Formosa's plastic discharges. (*Id.* at 35–41.)

In reply, Formosa argues that ACE fails to establish that the amounts Formosa paid to settle the *Waterkeeper* Litigation are not covered under the Policy. (ECF No. 89 at 10–15.) Formosa submits "[a]ll that matters is that Formosa paid money to settle a covered 'claim' asserting responsibility or liability for 'property damage' and 'remediation costs.'" (*Id.* at 10 (citation omitted).) Additionally, Formosa asserts the following: (1) ACE fails to explain why amounts paid under the Consent Decree do not fall within the Policy's agreement to pay for claims, property damage, or remediation costs; (2) the Mitigation Projects redressed the *Waterkeeper* plaintiffs' injuries; (3) ACE's assertions that the Mitigation Projects do not meet the definition of "remediation costs" and were not required by environmental laws are flawed; and (4) ACE has failed to establish that the Mitigation Projects lack a sufficient nexus to the harm caused by the plastic discharges. (*Id.* at 11–15.)

In essence, the parties dispute whether the terms of the Consent Decree constitute property damages or remediation costs that are covered under the Policy. In construing the Policy, the Court must "examine the entire agreement and seek to harmonize and give effect to all provisions so that none will be meaningless." *Gilbert Tex.*, 327 S.W.3d at 126 (citation omitted). "An intent to exclude coverage must be expressed in clear and unambiguous language." *Evanston Ins.*, 256 S.W.3d at 668 (citing *Hudson Energy Co.*, 811 S.W.2d at 555). Courts in Texas utilize a burden-shifting analysis:

> The insured has the initial burden to establish coverage under the policy. *Gilbert*, 327 S.W.3d at 124. If it does so, then to avoid liability the insurer must prove one of the policy's exclusions applies. *Id.* If the insurer proves that an exclusion applies, the burden shifts back to the insured to establish that an exception to the exclusion restores coverage. *Id.*

*Ewing Constr.*, 420 S.W.3d at 33 (citing *Gilbert Tex.*, 327 S.W.3d at 124). "The court must adopt the construction of an exclusionary clause urged by the insured as long as that construction is not unreasonable, even if the construction urged by the insurer appears to be more reasonable or a more accurate reflection of the parties' intent." *Admiral Ins. Co. v. Ford,* 607 F.3d 420, 423 (5th Cir. 2010) (citing *Utica Nat'l Ins. Co. of Tex. v. Am. Indem. Co.,* 141 S.W.3d 198, 202 (Tex. 2004)). If, however, the language is susceptible to only one reasonable interpretation and can be given definite meaning within the policy as a whole, such exclusion is unambiguous as a matter of law. *Valmont Energy Steel, Inc. v. Commercial Union Ins. Co.,* 359 F.3d 770, 776 (5th Cir. 2004); *see also Travelers Lloyds Ins. Co. v. Pacific Employers Ins. Co.,* 602 F.3d 677, 681 (5th Cir. 2010) ("Under Texas law, insurance policies and indemnity agreements are contracts, and the general rules of contract interpretation apply. An insurance policy's terms are unambiguous if they have definite and certain legal meaning. If the terms are unambiguous, the court must enforce the policy according to its plain meaning. The parties' disagreement regarding the extent of coverage does not create an ambiguity.").

"Claim" is defined in the Policy as "the written assertion of a legal right received by the insured from a third-party, including . . . suits or other actions alleging responsibility or liability on the part of the insured for bodily injury, property damage, remediation costs arising out of pollution conditions to which this insurance applies." (ECF No. 85-2 ¶ 8 (internal quotation marks omitted); ECF No. 88 ¶ 8.) "Property damage" includes damages to natural resources and biodiversity. (Haas Decl. Ex. 1 § AA; Stockwell Decl. Ex. 5 § AA.) "Remediation costs" are

defined as "reasonable expenses incurred to investigate, quantify, monitor, mitigate, abate, remove, dispose, treat, neutralize, or immobilize pollution conditions to the extent required by environmental law." (Haas Decl. Ex. 1 § V.BB; Stockwell Decl. Ex. 5 § V.BB.) "Environmental law" is any "national, federal, state, provincial, commonwealth, municipal or other local laws, statutes, directive, ordinances, rules, guidance documents regulations, and all amendments thereto, including voluntary cleanup or risk-based corrective action guidance, governing the liability or responsibilities of the insured . . . with respect to a pollution condition." (Haas Decl. Ex. 1 § V.I; Stockwell Decl. Ex. 5 § V.BB.)

As part of the Consent Decree, Formosa agreed to: contribute $50 million dollars to the Matagorda Trust which would be used to fund environmental mitigation or other projects; and reimburse the *Waterkeeper* Plaintiffs' attorneys' fees. (ECF No. 86-1 ¶ 33; ECF No. 87-2 ¶ 33.) The Consent Decree identified environmental mitigation projects that would be funded from the Matagorda Trust and Formosa's contributions thereto, including but not limited to: $20 million to the Federation of Southern Cooperatives to form a Matagorda Bay Fishing Cooperative under a project called the Matagorda Bay Community Development Project. (ECF No. 86-3, Ex. B ¶ 56); $10 million for the development, protection, operation and maintenance of Green Lake Park (*id.* ¶ 57); $750,000 to the Port Lavaca YMCA to fund ecosystem educational camps for children and teenagers (*id.* ¶ 58); $2 million to Calhoun County for erosion control and beach restoration at Magnolia Beach (*id.* ¶ 59); $1 million to the University of Texas Marine Science Institute Nurdle Patrol, which documents the discharge of plastics on the gulf shore (*id.* ¶ 60); $5 million for an Environmental Research Mitigation Project providing funds for environmental research regarding the Bay Systems (*id.* ¶ 61); and $11,250,000 to the Matagorda Bay Mitigation Trust fund (*id.* ¶ 62). Each project listed in the Consent Decree identified the purpose or goal as it related to damages

from the *Waterkeeper* litigation, including restoration of, protection of, revitalization of, and education about marine ecosystems. (*See generally, id.* ¶¶ 57–62.)

The Court has "examine[d] the entire agreement and seek[s] to harmonize and give effect to all provisions so that none will be meaningless." *See Gilbert Tex.*, 327 S.W.3d at 126 With respect to "property damage," the Court finds Formosa met its burden in showing the claims for property damage were covered as in insurable loss under the Policy. The language is not ambiguous, and Formosa's proposed construction is not unreasonable. Therefore, it must be adopted by the Court. *See Admiral Ins. Co. v. Ford,* 607 F.3d 420, 423 (5th Cir. 2010). The *Waterkeeper* Litigation alleged, and ultimately settled, Formosa's liability for, *inter alia*, "property damage" to natural resources and biodiversity. (*See* Haas Decl. Ex. 1 § AA; Stockwell Decl. Ex. 5 § AA (noting that "property damage" under the Policy includes damage to natural resources and biodiversity).) Unlike the definition of "remediation costs," there is no limiting language regarding expenses recurred as required by environmental law.

The burden then shifts to ACE to prove one of the Policy's exclusions applies. As stated in Sections III. B & C, *supra*, there are questions of material fact regarding application of several exclusions and conditions. Accordingly, summary judgment is not warranted at this stage.

As for "remediation costs," the Court must determine whether the terms of the Consent Decree were "required by environmental law" as required by the Policy. Pursuant to Section 505 of the CWA, "any citizen may commence a civil action on his own behalf," known as a citizen's suit, "against any person . . . who is alleged to be in violation of . . . an effluent standard or limitation." 33 U.S.C. § 1365(a)(1). "Under the CWA citizen-suit provision, federal courts are authorized to enter injunctions and assess civil penalties, payable to the United States Treasury, against any person found to be in violation of 'an effluent standard or limitation' under the Act."

*Env't Conservation Org. v. City of Dallas*, 529 F.3d 519, 526 (5th Cir. 2008) (citing § 1365(a);

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 175, 120 S. Ct. 693,

145 L.Ed.2d 610 (2000)); *Sierra Club, Inc. v. Elec. Controls Design, Inc*., 909 F.2d 1350, 1354

(9th Cir. 1990) ("[I]f the payments required under the proposed consent decree are civil penalties

within the meaning of the Clean Water Act, they may be paid only to the U.S. Treasury.") As for

injunctive relief "in a Clean Water Act case, a court may fashion injunctive relief requiring a

defendant to pay monies into a remedial fund, if there is a nexus between the harm and the remedy."

*Pub. Int. Rsch. Grp. of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 82 (3d Cir.

1990). However, where a court labels the monetary relief as a civil penalty rather than injunctive

relief, that money must paid into the Treasury. *Id.*

      In the Consent Decree, the court expressly stated: "Jurisdiction over this action is conferred

by 28 U.S.C. § 1331 (federal question) and 33 U.S.C. § 1365(a) (Clean Water Act jurisdiction). . . .

The requested relief is proper under 28 U.S.C. §§ 2201, 2202, and 33 U.S.C. §§ 1319(d), 1365(a),

(d)." (ECF No. 86-3, Ex. B ¶ 7.) The "Mitigation Projects" are listed as a subheading under the

"Remedial Measures" and are defined as "environmental remediation projects that provide benefits

that would not otherwise be available but for this Consent Decree." (*Id.* ¶ 11(i).) The Mitigation

Projects are not classified as "civil penalties." (*Id.*) Indeed, the term "civil penalties" is not stated

anywhere in the Consent Decree.

      Reading the Consent Decree in its entirety, the Court finds that no civil penalties were

ordered by the district court. The Court expressly stated that the relief was proper under, *inter alia*,

33 U.S.C. §§ 1319(d) and 1365(a) & (d) governing CWA citizen suits, and the court elected not to

classify the payments owed for the Mitigation Projects as civil penalties. Had they been classified

as such, the monies would be owed to the Treasury rather than the Matagorda Trust. *See Pub. Int.*

50

*Rsch. Grp. of New Jersey, Inc.*, 913 F.2d at 82. The court operated within its equitable power to "fashion injunctive relief requiring a defendant to pay monies into a remedial fund." *Id.*[24]

Nevertheless, ACE argues the CWA does not allow for injunctions to remedy effects of past compliance. (ECF No. 87 at 33 (citing *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 64 (1987).) ACE's reliance is misplaced. While the Court in *Gwaltney* stated that the CWA "does not permit citizen suits for *wholly* past violations," *id.* (emphasis added), it also stated:

> The most natural reading of "to be in violation" [from 33 U.S.C. § 1365(a)] is a requirement that citizen-plaintiffs allege a state of either continuous or intermittent violation—that is, a reasonable likelihood that a past polluter will continue to pollute in the future. Congress could have phrased its requirement in language that looked to the past ("to have violated"), but it did not choose this readily available option.

*Id.* at 57. Therefore, continuous or intermittent violations are sufficient to permit injunctive relief under the CWA. The *Waterkeeper* Plaintiffs contended the plastic discharges were ongoing, and the district court, in ruling on liability, found that appropriate sanctions for past violations and to enforce future compliance were appropriate. (ECF No. 86-3, Ex. B ¶ 3.)

Again, the burden shifts to ACE to prove one of the Policy's exclusions applies. As stated in Sections III. B & C, *supra*, there are issues of material fact regarding the application of several exclusions and conditions. Additionally, there are issues of material fact regarding the reasonableness of the settlement, whether the Mitigation Projects are supplemental projects, whether a sufficient nexus exists between the harm and the remedy, and whether the Mitigation

---

[24] To the extent ACE argues there is an insufficient nexus between the harm and the remedy, the reasonableness of the Consent Decree, the Mitigation Projects are supplemental, personalized projects, or that they go beyond what is required by environmental law, the Court finds issues of material fact exist and reserves this issue for the fact finder.

Projects go beyond what is required by environmental law. *See supra* n.24. Accordingly, summary judgment is not warranted at this stage.

As for attorneys' fees, the CWA states that "[t]he court, in issuing any final order in any action brought pursuant to this section, may award costs of litigation (including reasonable attorney and expert witness fees) to any prevailing or substantially prevailing party, whenever the court determines such award is appropriate." 33 U.S.C.A. § 1365. The Consent Decree was a final order of the court, and the court expressly stated that "settlement of the alleged claims without further litigation or trial of any additional issues is fair, reasonable and in the public interest." (ECF No. 86-3, Ex. B at 2.) Therefore, the attorneys' fees are permitted under CWA and are unambiguously covered by the Policy as costs related to the covered claim. However, as with the other portions of the Consent Decree, summary judgment is not warranted because there are issues of material fact regarding the application of the exclusions and conditions.

E.  **ACE Has Not Established That It Is Entitled to Summary Judgment on the Basis of the Alleged Collusive Nature of the Consent Decree**

ACE argues there is no coverage for the Consent Decree because it was executed to avoid uncovered fines, penalties, and injunctive relief under the CWA. (ECF No. 85-1 at 29–33.) ACE asserts that incidental to Formosa's alleged breach of the Consent-to-Settle Clause "was Formosa's attempt to transform its non-covered liability for CWA penalties, which Formosa believed would be substantial, into potentially covered 'remediation costs' under the Policy." (*Id.* at 29 (footnote omitted).) ACE submits costs for remediation or mitigation for past discharges are not recoverable in a CWA citizen suit. (*Id.* at 31.) ACE contends: (1) "the penalties and injunctive relief that would have been awarded against Formosa, had the *Waterkeeper* Litigation gone to judgment in the damages phase, would not have been covered under the Policy"; (2) "coverage for any CWA penalties would have been barred by the Policy's Fines and Penalties Exclusion and/or New Jersey

public policy"; (3) "coupled with the Policy's Fines and Penalties Exclusion, Formosa's entry of the Consent Decree allowed Formosa to avoid damages uncovered by the Policy"; and (4) Formosa is not entitled to "coverage for the Consent Decree, pursuant to which it agreed to relief that Plaintiffs were not entitled to under the CWA, and as to which ACE, by virtue of having been kept completely in the dark, had no opportunity to object or even lend its input." (*Id.* at 31–33.)

In opposition, Formosa asserts the Consent Decree was not collusive and was entered to resolve Formosa's purportedly covered liabilities. (ECF No. 88-8 at 45–50.) Formosa argues the following: (1) the Policy covers remediation costs and civil penalties that could have been imposed against Formosa in the *Waterkeeper* Litigation; (2) civil penalties under the CWA are insurable under both Texas and New Jersey law; and (3) ACE's argument that Formosa colluded or fraudulently acted, was not asserted prior to the briefing of the Motions and cannot be considered; "even if it could be asserted . . . it rests on facts that Formosa disputes and cannot be resolved in ACE's favor as a matter of summary judgment." (*Id.*)

In reply, ACE reiterates Formosa is not entitled to recover for the Consent Decree because the majority of the relief was not available under the citizen suit provisions of the CWA and the various projects of the Consent Decree are not covered as "remediation costs" under the Policy. (ECF No. 90 at 10–11.)

The Court has already found that the terms of the Consent Decree do not include civil penalties and, to the extent they require injunctive relief, those terms are covered as flowing from "property damage" or "remediation costs," subject to issues of material fact left for the fact finder.[25] As to allegations of collusion or fraud, albeit mostly speculative, they likewise present

---

[25] Reasonableness and scope of the injunction, the nexus between the harm and remedy, the application of exclusions, etc. *See supra* Sections III. B, C, & D.

issues of material fact for the fact finder. Summary judgment is not warranted at this time.

### F. Summary Judgment is Not Warranted on the Basis That the Known Conditions and the Intentional Non-Compliance Exclusions Bar Coverage

ACE contends the *Waterkeeper* Litigation does not trigger Coverage A of the Policy leaving Coverage B as the only potentially applicable coverage. (ECF No. 85-1 at 44.) Regardless, ACE submits coverage under both is precluded by the Known Conditions and the Intentional Non-Compliance Exclusions. (*Id.* at 44–48.) First, ACE argues Formosa's discharge of plastic pellets prior to the Policy's inception date renders Coverage A inapplicable. (*Id.* at 45.) Next, ACE asserts Formosa's prior knowledge of plastic pellet discharges from the Point Comfort Plant triggers the Known Conditions Exclusion. (*Id.* at 45–47.) Finally, ACE contends Formosa's continuous and repeated violations of its Texas Pollutant Discharge Elimination System ("TPDES") Permit in violation of the CWA triggers the Intentional Non-Compliance Exclusion. (*Id.* at 47–48.)

In opposition, Formosa argues summary judgment is not warranted on this portion of ACE's Motion because there are disputed issues of fact as to whether the Known Conditions Exclusion applies. (ECF No. 88-8 at 39–42.) Formosa submits: "While ACE asserts that Formosa knew of plastic pellets being discharged, ACE wholly ignores the fact that such discharges were believed to be permissible at the time and that Formosa disclosed the presence of plastics and its wastewater and stormwater management practices to ACE." (*Id.* at 39–40.) Formosa analogizes this matter to *Pittston Co. v. Allianz Ins. Co.*, 905 F. Supp. 1279, 1314 (D.N.J. 1995), *rev'd in part sub nom.*, *Pittston Co. Ultramar Am. v. Allianz Ins. Co.,* 124 F.3d 508 (3d Cir. 1997), and contends Formosa reasonably believed it was permitted to discharge trace amounts of plastics at the time that the Policy was issued. (*Id.* at 40–41.) Formosa asserts: (1) ACE relies upon disputed testamentary evidence and does not demonstrate that Formosa knew of discharges exceeding permitted limits; and (2) "Formosa's current employees with environmental compliance

responsibilities when the Policy was issued on July 1, 2010—Matt Brogger, John Hyak, and David Hill—each have submitted sworn declarations that they were not aware of any discharges of pellets or powders before July 1, 2010 that violated the Plant's permit." (*Id.* at 41–42 (citing ECF No. 88-1 ¶¶ 36–40).) Further, Formosa argues summary judgment is not warranted as a reasonable jury could find that the Known Conditions Exclusion does not apply because Formosa disclosed: (1) "the presence of plastics on the site was considered to be a *de minimus* pollution condition, but that Formosa was presently in compliance with its permit"; and (2) "Formosa disclosed to ACE that with respect to non-hazardous wastes such as plastics, only spills in excess of 100 pounds had to be reported." (*Id.* at 42.)

Next, Formosa submits ACE has not met its burden of establishing that the Intentional Non-Compliance Exclusion bars coverage as a matter of law. (*Id.* at 43–45.) Formosa asserts: (1) the *Waterkeeper* court did not make findings as to Formosa's intent; (2) "ACE has not presented any evidence to support a finding that 'all' of the alleged pollution at the [Point Comfort Plant] was the result of 'intentional non-compliance'"; and (3) Formosa undertook good faith efforts to comply with its Permit. (*Id.*)

In reply, ACE counters Formosa's arguments are contradicted by the findings of fact provided by Judge Hoyt following the bench trial of the *Waterkeeper* Litigation. (ECF No. 90 at 9–10.) As to the Known Conditions Exclusion, ACE submits Judge Hoyt found that Formosa knowingly discharged more than trace amounts of plastic pellets. (*Id.* at 9.) Further, ACE argues the Known Conditions Exclusion bars coverage because "notwithstanding any alleged belief by Formosa to the contrary, the undisputed facts indicate Formosa knew of discharges of plastic pellets in greater than trace amounts before the Policy incepted on July 1, 2010." (*Id.* at 10.) As to the Intentional Non-Compliance Exclusion, ACE reiterates its position that Formosa's conduct

was knowing, intentional, willful, or deliberate as evidenced by Judge Hoyt's findings that Formosa was a "serial offender." (*Id.*) ACE contends "Formosa offers no support for its conclusion that Judge Hoyt's factual determinations should be ignored." (*Id.*)

### 1.    Coverage A is Inapplicable[26]

Coverage A is limited to pollution conditions that first commenced, in their entirety, on or after July 1, 2010. (ECF No. 85-2 ¶ 5; ECF No. 88 ¶ 8.) ACE correctly submits that "[t]he *Waterkeeper* Litigation does not satisfy Coverage A because Formosa began discharging plastic pellets into Cox Creek and Lavaca Bay from the Point Comfort Plaint well before July 1, 2010." (ECF No. 85-1 at 45.) The following facts support this finding: several Formosa employees— including Jurasek, Brogger, Hyak, and Joe Whitehead—testified that Formosa had been discharging plastic pellets prior to July 1, 2010 and that several managers at the Point Comfort Plant were aware of the plastic pellet discharges (ECF No. 85-2 ¶¶ 75, 78, 80, 82–83; ECF No. 88 ¶¶ 75, 78, 80, 82–83); Formosa's wastewater manager testified that Formosa had been discharging pellets into Cox Creek for approximately 25 years (ECF No. 85-2 ¶ 78; ECF No. 88 ¶ 78); a FBI report reflects that on July 31, 1998, an anonymous persons claimed during an interview that "pellets are found regularly up river [sic] from the [Point Comfort Plant] and near the wastewater outfall of one of [Formosa's] sisters plants located near by [sic]" (ECF No. 85-2 ¶ 79 (citing Haas Decl. Ex. 49); ECF No. 88 ¶ 79); Mr. Hyak testified that he was aware of Formosa's discharging of plastic pellets into Cox Creek since at least October 2002 (ECF No. 85-2 ¶ 82; ECF No. 88 ¶ 82); a Formosa employee testified that it "became common practice for [Formosa's] supervisors to provide false information regarding chemical constituents in Lavaca Bay," and that he was instructed to manipulate and dump water samples (ECF No. 85-2 ¶ 77; ECF No. 88 ¶ 77); the EPA

---

[26] Formosa does not raise arguments disputing that Coverage A is inapplicable.

conducted an inspection of the Point Comfort Plant from June 15 to June 17, 2010 during which Mr. Hill accompanied the EPA (ECF No. 85-2 ¶¶ 84–85; ECF No. 88 ¶¶ 84–85); the EPA ultimately provided a report which documented plastic discharges at and from the Point Comfort Plant (ECF No. 85-2 ¶ 86; ECF No. 88 ¶ 86).

Based on the foregoing, the Court's analysis is limited to Coverage B which applies to pollution conditions that first commenced, in whole or in part, prior to July 1, 2010.

## 2. Known Conditions Exclusion

As provided above, the Policy's Known Conditions Exclusion, excludes coverage for: "claims, remediation costs, foreign subsidiary loss or associated legal defense expenses, arising out of or related to pollution conditions in existence prior to the policy period and reported to a responsible person but not specifically referenced or identified in documents . . . attached to [the] Policy." (ECF No. 85-2 ¶ 12 (internal quotation marks omitted); ECF No. 88 ¶ 12.) Additionally, "pollution condition" is defined as the "discharge, dispersal, release, escape, migration, or seepage of any solid, liquid, gaseous or thermal irritant, contaminant, or pollutant, including smoke, soot, vapors, fumes, acids, alkalis, chemicals hazardous substances, hazardous materials, or waste materials, on, in, into, or upon land and structures thereupon, the atmosphere, surface water, or groundwater." (ECF No. 85-2 ¶ 9; ECF No. 88 ¶ 9.)

Under New Jersey law,[27] "[a]lthough policy exclusions are usually strictly construed, exclusions will be applied as written, so long as the language is clear, unambiguous, and not violative of public policy." *McClellan v. Feit*, 870 A.2d 644, 648–49 (N.J. Super. Ct. App. Div. 2005). Additionally, "[w]hether used in a provision defining coverage or in an exclusion, the phrase ['arising out of'] is defined broadly." *Prudential Prop. & Cas. Ins. Co. v. Brenner*, 795

---

[27] *See supra* Section III.A.1.ii.

A.2d 286, 289 (N.J. Super. Ct. App. Div. 2002). New Jersey courts interpret the phase to mean "originating from, growing out of or having a substantial nexus with the activity for which coverage is provided." *Id.* at 290 (internal quotation marks and citations omitted). The insurer has the burden to prove an exclusion clearly and unambiguously applies to a particular loss. *See Villa*, 947 A.2d at 1222.

Here, the Court finds that ACE has not satisfied its burden of proving the Known Conditions Exclusion applies. Although Formosa's employees knew of plastic pellets being discharged, ACE does not address the fact that Formosa believed these discharges were permissible. Indeed, Formosa has held a TPDES Permit since at least 1993 which allowed stormwater and wastewater from the Point Comfort Plant to be discharged in the Cox Creek and Lavaca Bay. (ECF No. 88-1 ¶ 2; ECF No. 90-1 ¶ 2.) The TPDES Permit did not contain a specific limit on the discharge of plastic participles, and instead provided that "there shall be no discharge of floating solids or visible foam in other than trace amounts." (ECF No. 88-1 ¶ 3; ECF No. 90-1 ¶ 3.) Formosa provided sworn declarations completed by current employees—Brogger, Hyak, and Hill—with environmental compliance responsibilities when the Policy was issued on July 1, 2010, stating that these employees were not aware of any discharges of plastics before July 1, 2010, in violation of the TPDES Permit. (ECF No. 88-1 ¶ 40; ECF No. 90-1 ¶ 40.)

In support of its Motion, ACE points to Judge Hoyt's findings from the *Waterkeeper* bench trial. Namely, ACE relies on Judge Hoyt's finding that Formosa knew it had been discharging more than "trace amounts" of plastic pellets and that he found Jurasek's testimony—regarding his informing Formosa of the subject plastic pellet discharges in 2000—to be "credible and reliable." (ECF No. 90 at 9 (citing Haas Decl. Ex. 25 at 5–6, 8).) ACE noticeably does not cite to any findings by Judge Hoyt which provide a timeline as to when Formosa first allegedly knew it was

discharging plastics in more than "trace amounts." (*See generally* ECF No. 90.) While this raises the question of whether Formosa may have known that plastic pellets and powder were being discharged, there remains an issue of material fact as to whether and when a "responsible person" received a report of a "pollution condition" or would have thought that a "pollution condition" existed that was not in compliance with the TPDES Permit. The Court further notes Jurasek conceded he had no knowledge of the terms of Formosa's TPDES Permit or of Plant operations after 2001, and although Whitehead claimed "management" knew about plastic discharges into Cox Creek, he did not identify who he was referring to and admitted "he couldn't say he knew for a fact." (ECF No. 88-1 ¶ 37–38; ECF No. 90-1 ¶ 37–38.)

An exclusion for known or expected discharge of pollutants is not triggered when the release of pollutants is "an inevitable incident to the business the insurer has chosen to underwrite." *See Pittston Co. v. Allianz Ins. Co.*, 905 F. Supp. 1279, 1314 (D.N.J. 1995), *rev'd in part sub nom.*, *Pittston Co. Ultramar Am. v. Allianz Ins. Co.*, 124 F.3d 508 (3d Cir. 1997). In *Pittson*, the district court considered liability policies sold to the insured operator of an oil terminal which included an exclusion for "property damage arising out of any emission, discharge, seepage, release or escape of any . . . pollutant . . . if such emission . . . is either expected or intended from the standpoint of any insured." *Id.* at 1312. The insurer argued the insured knew oil had been discharged into the ground, while the insured "contended that it was a well-run operation in relation to the prevailing standards." *Id.* at 1313. The district court held that "[o]nly an expected or intended discharge that is in excess of what is normally incidental to the operation will trigger [the subject] pollution exclusion clause." *Id.* at 1314. Further, the district court denied the insurer's motion for summary judgment seeking a denial of coverage based on the application of the pollution exclusion clause because "[t]he evidence [was] insufficient as to whether [the insured] expected or intended to

discharged pollutants." *Id.* at 1316.

Here, the Court notes that, as part of ACE's application process for the Policy, Formosa provided ACE with over 3,000 pages of environmental reports and other documents that disclosed environmental conditions and risks associated with Formosa's sites. (ECF No. 88-1 ¶¶ 11–12; ECF No. 90-1 ¶¶ 11–12.) Additionally, Formosa provided ACE with: a listing of chemicals that had been spilled at or released from Formosa's facilities and reported to the appropriate environmental regulators over the previous five years; a copy of its Spill Prevention Control and Countermeasure Plan; disclosures that it only reported spills or discharges into surface waters that were 100 pounds or greater; an environmental site assessment that identified the presence of synthetic plastic powder; and a description of how wastewater and stormwater were managed at the Point Comfort Plant subject to the TPDES Permit. (ECF No. 88-1 ¶¶ 13–17; ECF No. 90-1 ¶¶ 13–17.) Therefore, just like the insurer in *Pittston*, ACE knew that Formosa was discharging plastic pollutants pursuant to the TPDES Permit.

Accordingly, the Court finds there is an issue of material fact as to whether and when a "responsible person" received a report of a "pollution condition" or would have thought that a "pollution condition" existed prior to July 1, 2010 which was not in compliance with the TPDES Permit.

### 3.    Intentional Non-Compliance Exclusion

The Policy's Intentional Non-Compliance Exclusion bars coverage for "claims, remediation costs . . . or legal defense expenses" which are: "arising out of or related to the intentional disregard of, or knowing, willful, or deliberate non-compliance with, any law, statute, regulation, administrative complaint, notice of violation, notice letter, instruction of any governmental agency or body, or executive, judicial or administrative order by any responsible

person." (ECF No. 85-2 ¶ 11 (internal quotation marks omitted); ECF No. 88 ¶ 11.)

ACE argues that Formosa's conduct was "knowing, intentional, willful or deliberate" for purposes of the intentional non-compliance exclusion as demonstrated by Judge Hoyt's finding that Formosa was a "serial offender" that violated its TPDES Permit for a period of 1,149 days between January 31, 2016 and, at least, March 24, 2019. (ECF No. 85-1 at 48 (quoting Haas Decl. Ex. 25 at 17; ECF No. 90 at 10 (quoting Haas Decl. Ex. 25 at 17).) However, as Formosa correctly asserts, Judge Hoyt did not make any findings as to Formosa's intent and ACE has not provided sufficient evidence that Formosa intentionally acted such that there are no issues of material fact as to whether the Intentional Non-Compliance Exclusion should apply. (ECF No. 88-8 at 43–45.) Based on the facts described at length above, the Court agrees with Formosa and finds there is an issue of material fact as to whether and when[28] Formosa allegedly acted with "intentional disregard of, or knowing, willful, or deliberate non-compliance."

### G.    Summary Judgment Limiting ACE's Obligation to Reimburse Formosa is Not Warranted[29]

ACE raises the alternative argument that its obligation to reimburse Formosa for outstanding defense costs is limited. (ECF No. 85-1 at 49–50.) ACE submits its obligation to reimburse Formosa is limited by the clear, unambiguous terms of the Policy. (*Id.* at 49.)

In opposition, Formosa counters ACE's arguments on this issue are misguided because "the law and policy provision ACE relies upon for this limitation apply only when the insurance

---

[28] "ACE has cited no evidence that would support a finding of intentional non-compliance with permits before the time period discussed by the Judge, and this defense would not apply to pollution caused during that earlier time period." (ECF No. 88-8 at 44.)

[29] The Court's discussion of these arguments may be putting the cart before the horse because the Court has found that summary judgment in favor of either of the parties is not warranted. However, the Court will address these arguments because the parties devoted some briefing to this issue.

company actually exercises its duty to defend or right to select legal counsel" which is not what occurred here. (ECF No. 88-8 at 50 (internal quotation marks omitted).) Further, Formosa submits: (1) the Policy does not state that costs incurred by counsel selected by Formosa reduces the self-insured retention; (2) Formosa's execution of the Consent Decree does not bar Formosa from seeking legal defense expenses incurred in the defense of a covered claim; and (3) "whether and when ACE's panel counsel rates should be applied is disputed, given that ACE failed to communicate to Formosa what those rates were for over two years." (*Id.*)

Here, the Court finds that Formosa is not entitled to reimbursement for any defense costs incurred before August 11, 2017, the date the *Waterkeeper* Litigation was tendered to ACE. Both New Jersey and Texas law do not support recovery of pre-tender defense costs. *See SL Indus., Inc. v. Am. Motorists Ins. Co.*, 607 A.2d 1266, 1273 (N.J. 1992) ("[T]he insurance company is liable only for that portion of the defense costs arising after it was informed of the facts triggering the duty to defend."); *Lafarge Corp. v. Hartford Cas. Ins. Co.*, 61 F.3d 389, 400 (5th Cir. 1995) ("[U]nder Texas law, the duty to defend does not arise until a petition alleging a potentially covered claim is tendered to the insurer." (citation omitted)). Further, ACE's obligation to reimburse Formosa is limited by the clear, unambiguous terms of the Policy which in Section III.B. explicitly states: "Legal defense expenses incurred prior to the selection of legal counsel by [ACE] shall not be covered under [the] Policy." (ECF No. 85-2 ¶ 15 (internal quotation marks omitted); ECF No. 88 ¶ 15.)[30]

ACE asserts that it is not obligated to provide coverage for: (1) "'any costs incurred by Formosa for [H&K]'s role as settlement,' . . . because Formosa retained [H&K] without ACE's

---

[30] *See President v. Jenkins*, 853 A.2d 247, 254 (N.J. 2004); *Fiess*, 202 S.W.3d at 753.

consent, and only noticed ACE of [H&K]'s retention approximately one week before Formosa entered into the Consent Decree on October 15, 2019" (ECF No. 85-1 at 50 (quoting ECF No. 1 ¶ 95)); and (2) "Formosa's defense costs incurred after October 15, 2019, the date Formosa executed the Consent Decree without ACE's knowledge or consent" (*id.*). The Court finds that summary judgment on these two coverage issues is not warranted as ACE has failed to sufficiently establish that it suffered prejudice, which is now an issue reserved for the fact finder. *See supra* Sections III.B, III.C.[31]

## IV.    CONCLUSION

For the reasons set forth above, ACE's Motion for Summary Judgment is **DENIED** and Formosa's Motion for Partial Summary Judgment is **DENIED**. An appropriate order follows.


Dated: November 25, 2024                 */s/ Brian R. Martinotti*
                                         **HON. BRIAN R. MARTINOTTI**
                                         **UNITED STATES DISTRICT JUDGE**

---

[31] ACE raises the argument that "any reimbursement of Formosa's independent counsel fees to Kelly Hart is limited to those incurred after Formosa's tender of the *Waterkeeper* Litigation to ACE and before the October 15, 2019 entry of the Consent Decree, and subject to ACE's standard panel counsel hourly rates." (ECF No. 85-1 at 50.) ACE raised this argument in one sentence, and similarly Formosa briefly responds to this argument with one sentence. (*See* ECF No. 88-8 at 50.) The Court will not address this issue. *See United States v. Hoffecker*, 530 F.3d 137, 163 (3d Cir. 2008) ("A skeletal 'argument,' really nothing more than an assertion, does not preserve a claim. Especially not when the brief presents a passel of other arguments, as [defendant]'s did." (alteration in original) (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991))). Indeed, ACE did not provide "citations to authority or the parts of the record on which he relies." *Id.*; *see also DeShields*, 463 F. App'x at 120.